# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JOSEPH KOHUT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KBR, INC., WILLIAM P. UTT, BRIAN FERRAIOLI, and SUSAN K. CARTER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Kohut ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by KBR, INC. ("KBR" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by KBR; and (c) review of other publicly available information concerning KBR.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a class action on behalf of purchasers of KBR securities between April 25, 2013 and May 5, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       KBR is a global engineering, construction and services company supporting the energy, hydrocarbons, power, minerals, civil infrastructure, government services, industrial and commercial market segments.  KBR offers services through its Gas Monetization, Hydrocarbons, Infrastructure, Government and Power ("IGP"), Services and Other business segments.

3.       On May 5, 2014, the Company issued a press release and filed a Current Report with the SEC on Form 8-K announcing that the Audit Committee of the Company's Board of Directors had determined that the Company's financial statements filed with the SEC on Form 10-K for the fiscal year ended December 31, 2013 should no longer be relied upon.  According to the Company, the material financial statement errors were primarily attributable to how the Company estimated costs to complete seven of its contracts, which resulted in pre-tax charges in excess of $150 million and the reversal of over $20 million in previously recognized profits.  In addition, the Company identified an overstatement error in its revenue recognition on a long-

term construction project of approximately $9.0 million pre-tax, and an understatement of its income tax provision of approximately $6.5 million that were not properly reported.  The Company further announced that it intends to restate its consolidated financial statement for fiscal 2013, and will postpone filing its Form 10-Q for the period ending March 31, 2014 until after the amended Form 10-K is complete.

4.      On this news, shares of KBR declined $1.61 per share, nearly 7%, to close on May 5, 2014, at $24.23 per share, on unusually heavy volume.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had improperly estimated costs to complete certain contracts; (2) that the Company had accounting errors resulting from timing of the recognition of revenues and from understating its income tax provision; (3) that, as a result, the Company's revenue and financial results were overstated; (4) that, as such, the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, KBR's principal executive offices are located within this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Joseph Kohut, as set forth in the accompanying certification, incorporated by reference herein, purchased KBR common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant KBR is a Delaware corporation with its principal executive offices located at 601 Jefferson Street, Suite 3400, Houston, Texas 77002.

13.     Defendant William P. Utt ("Utt") was, at all relevant times, Chief Executive Officer ("CEO") and a director of KBR until his retirement on April 9, 2014.

14.     Defendant Brian Ferraioli ("Ferraioli") was, at all relevant times, Chief Financial Officer ("CFO") of KBR since October 28, 2013, and is serving as the interim Principal Executive Officer from April 9, 2014 through June 2, 2014.

15.     Defendant Susan K. Carter ("Carter") was, at all relevant times, CFO of KBR until her resignation on September 26, 2013.

16.     Defendants Utt, Ferraioli, and Carter are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of KBR's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     KBR is a global engineering, construction and services company supporting the energy, hydrocarbons, power, minerals, civil infrastructure, government services, industrial and

commercial market segments.  KBR offers services through its Gas Monetization, Hydrocarbons, IGP, Services and Other business segments.

**Materially False and Misleading
Statements Issued During the Class Period**

18.     The Class Period begins on April 25, 2013.  On this day, the Company issued a press release entitled, "KBR Announces First Quarter 2013 Results."  Therein, the Company, in relevant part, stated:

- **Earnings per diluted share of $0.59**

- **Operating income up 19% year-over-year**

- **Operating income margin up 156 basis points year-over-year**

- **Cash and equivalents of $904 million at March 31, 2013**

- **2013 earnings per diluted share guidance remains $2.45 to $2.90**

KBR (NYSE:KBR) announced today that first quarter 2013 net income attributable to KBR was $88 million, or $0.59 per diluted share, compared to net income attributable to KBR of $91 million, or $0.61 per diluted share, in the first quarter of 2012.

Consolidated revenue in the first quarter 2013 was $1.9 billion compared to $2.0 billion in the first quarter of 2012. Operating income in the first quarter 2013 was $133 million compared to operating income of $112 million in the prior year first quarter.

"KBR's first quarter performance was consistent with our expectations. We delivered $0.59 of EPS on strong project execution across all of KBR's businesses, including on the five problem projects we discussed in the fourth quarter where no incremental provisions were taken in the first quarter," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "We continue to see strong prospects for growth across our businesses and remain confident in our ability to successfully win and execute new work going forward."

**Business Discussion** (All comparisons are first quarter 2013 versus first quarter 2012, unless otherwise noted).

**Hydrocarbons Results**

Hydrocarbons revenue was $947 million, down $169 million, or 15%. Hydrocarbons job income was $180 million, up $44 million, or 32%.

- Gas Monetization job income was $104 million, up $25 million, or 32%, primarily related to continued strong execution, increased volumes at several LNG projects, and the close out of projects nearing completion.

- Oil and Gas job income was $25 million, up $2 million, or 9%, primarily related to higher work volumes on the Shah Deniz project, FEED work for an FPSO in Angola and engineering and design work for a semi-submersible unit and a drilling platform. Partially offsetting the increase was the completion or near completion of several projects.

- Downstream job income was $26 million, up $12 million, or 86%, primarily related to increased profits from an ethylene project in Uzbekistan, a gasifier FEED in Saudi Arabia, and the KBR-AMCDE entity in Saudi Arabia. Partially offsetting the increase was the completion of engineering on a refinery project in Africa.

- Technology job income was $25 million, up $5 million, or 25%, primarily related to several new ammonia projects in the United States, Bolivia, Nigeria, Indonesia, India and Hungary as well as an ethylene project in Uzbekistan and a VCC project in Russia. Partially offsetting the increase was the completion of ammonia projects in Brazil and Egypt and an aniline project in China.

**Infrastructure, Government and Power (IGP) Results**

IGP revenue was $407 million, down $111 million, or 21%. IGP job income was $63 million, down $12 million, or 16%.

- North American Government and Logistics (NAGL) job income was $20 million, up $5 million, or 33%, primarily related to award fee and base fee close-out items on the completed LogCAP III program in Iraq.

- International Government, Defence and Support Services (IGDSS) job income was $22 million, down $14 million, or 39%, primarily related to lower work volumes on the Allenby & Connaught and Afghanistan ISP projects.

- Infrastructure job income was $10 million, down $5 million, or 33%, primarily related to lower work volumes on water, transportation and facilities projects. The decrease was partially offset by higher activity on the Doha Expressway project in Qatar.

- Power and Industrial (P&I) job income was $8 million, down $2 million, or 20%. Higher activity on a waste-to-energy expansion project and work performed on an emissions control EPC project was more than offset by the substantial completion of engineering activity on a coal gasification project and the completion of an industrial project in Louisiana.

- Minerals job income was $3 million, up $4 million, or 400%, primarily related to charges taken on a legacy EPC project in the first quarter of 2012 that did not recur in the first quarter of 2013.

**Services Results**

Services revenue was $485 million, up $137 million, or 39%. Services job income was $31 million, up $3 million, or 11%, primarily related to several new module fabrication and turnaround projects ramping in Canada.

**Ventures Results**

Ventures job income was $8 million, flat with the prior year.

**Corporate**

First quarter of 2013 corporate general and administrative expense was $52 million.

First quarter of 2013 labor cost absorption expense was $15 million due to expected under-absorption of KBR's centralized engineering resources.

Total cash used in operating activities in the first quarter of 2013 was $93 million.

The effective tax rate for the first quarter of 2013 was approximately 23% compared to 9% for the first quarter of 2012.

During the first quarter of 2013, KBR had share repurchases of $6 million, capital expenditures of $20 million and pension contributions of $7 million for total cash deployment of $33 million.

19.     On April 25, 2013, KBR filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Carter, and reaffirmed the Company's financial results previously announced that day.  The Company's Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendants Utt and Carter, who certified:

1.     I have reviewed this quarterly report on Form 10-Q of KBR, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

20.    On July 25, 2013, the Company issued a press release entitled, "KBR Announces Earnings Per Diluted Share Of $0.61 For Second Quarter 2013."  Therein, the Company, in relevant part, stated:

- **2013 EPS earnings guidance range revised to $2.55 to $2.90**

- **Backlog book-to-bill of 1.1, excluding FX impact of $611 million**

- **Job income up 8% and job income margins up 153 basis points, year-over-year**

- **Continued solid balance sheet with $800 million in cash and equivalents**

KBR (NYSE:KBR) announced today that second quarter 2013 net income attributable to KBR was $90 million, or $0.61 per diluted share, compared to net income attributable to KBR of $104 million, or $0.70 per diluted share, in the second quarter of 2012.

Consolidated revenue in the second quarter of 2013 was $2.0 billion compared to $2.1 billion in the second quarter of 2012. Operating income in the second quarter of 2013 was $123 million compared to $129 million in the prior year second quarter.

"KBR delivered solid project execution in the second quarter, driving job income and job income margins up 8% and 153 basis points year-over-year, respectively," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "We also made strong progress on bookings in North America, with key strategic wins in Downstream with nearly $1 billion in EPC awards in ammonia

and ethylene, with the technology licenses awarded related to these downstream wins, and with a North American FEED award for the Pacific Northwest LNG project in Canada in our Gas Monetization business.  These wins help to affirm KBR's position as a premiere North American contractor."

**Business Discussion** (All comparisons are second quarter 2013 versus second quarter 2012, unless otherwise noted).

**Hydrocarbons Results**

Hydrocarbons revenue was $955 million, down $167 million, or 15%. Hydrocarbons job income was $177 million, up $13 million, or 8%.

Gas Monetization job income was $101 million, up $7 million, or 7%, primarily related to continued strong execution and increased volumes at two LNG projects. Partially offsetting the increase was the substantial completion of another LNG project.

Oil and Gas job income was $26 million, down $12 million, or 32%. Increased work volumes on the Shah Deniz and GDF Suez Bonaparte projects was more than offset by GVA license fees of $8 million booked in the second quarter of 2012 for several semi-submersible hulls which did not recur in the second quarter of 2013, as well as lower work volumes from the completion or near completion of several offshore projects.

Downstream job income was $22 million, up $9 million, or 69%, primarily related to increased profits from an ethylene project in Uzbekistan, a gasifier FEED in Saudi Arabia, increased work volumes at the KBR-AMCDE entity in Saudi Arabia as well as the start of the new Dyno Nobel ammonia project and a new ethylene project in the United States. Partially offsetting the increase was lower work volumes from the completion or near completion of several projects in the United States.

Technology job income was $28 million, up $9 million, or 47%, primarily related to several new ammonia projects in the United States, Bolivia, Nigeria, Indonesia, India and Hungary, as well as an ethylene project in the United States and a propylene project in China. Partially offsetting the increase was lower work volumes from the completion of ammonia projects in Brazil and China and a VCC project in Russia.

**Infrastructure, Government and Power (IGP) Results**

IGP revenue was $392 million, down $99 million, or 20%. IGP job income was $62 million, down $1 million, or 2%.

North American Government and Logistics (NAGL) job income was $14 million, up $9 million, or 180%. The second quarter 2012 included a net negative $18 million impact due to the adverse Tamimi Global Company, Ltd. judgment and a gain for higher cost recoveries, both related to the LogCAP III contract. Partially offsetting the increase was reduced LogCAP III project close-out recoveries and lower work volumes on the LogCAP IV contract.

International Government, Defence and Support Services (IGDSS) job income was $31 million, up $5 million, or 19%, primarily related to increased income on the Afghanistan ISP project and the new Joint Operational Fuel System contract. Partially offsetting the increase was the completion of the Temporary Deployable Accommodations project in Afghanistan.

Infrastructure job income was $8 million, down $8 million, or 50%. Higher activity on the Doha Expressway project in Qatar was more than offset by lower work volumes on water, transportation and facilities projects, primarily in Australia.

Power and Industrial (P&I) job income was $6 million, down $4 million, or 40%. Higher activity on a waste-to-energy expansion project and work performed on an emissions control EPC project was more than offset by lower work volumes from the substantial completion of engineering activities on a coal gasification project and the completion of an industrial project in Louisiana.

Minerals job income was $3 million, down $3 million, or 50%, primarily related to the completion of several minerals projects in the United States and Australia as well as decreased activity on the Hope Downs 4 iron ore project in Australia.

**Services Results**

Services revenue was $622 million, up $197 million, or 46%. Services job income was $38 million, up $9 million, or 31%, primarily related to increased activity on several module fabrication and turnaround projects in Canada as well as increased work activity in Industrial Services and Building Group.

**Ventures Results**

Ventures job income was $12 million, up $2 million, or 20%, primarily related to lower maintenance costs at a project in the United Kingdom.

**Corporate**

Corporate general and administrative expense, including $11 million related to the company's ERP implementation, was $63 million, up $11 million, or 21%.

Second quarter of 2013 labor cost absorption expense was $17 million, which included approximately $5 million in expenses related to the closure of an office. An additional $2 million in expenses associated with the office closure was allocated to other overheads.

The effective tax rate for the second quarter 2013 was approximately 12% primarily due to favorable tax rate differentials on foreign earnings and tax reserve releases related to final negotiations of transfer pricing agreements.

Total cash used in operating activities in the second quarter of 2013 was $4 million, which included approximately $108 million paid by KBR for Pemex's draw on performance bonds related to the EPC 1 dispute, which KBR disclosed in a Form 8-K filing in June, 2013.

During the second quarter of 2013, KBR had capital expenditures of $20 million, pension contributions of $5 million, and quarterly dividend payments of $12 million for total cash deployment of $37 million.

21.     On July 25, 2013, KBR filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Carter, and reaffirmed the Company's financial results previously announced that day.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Utt and Carter, substantially similar to the certifications contained in ¶19, *supra*.

22.     On October 24, 2013, the Company issued a press release entitled, "KBR Announces Earnings Per Diluted Share Of $0.16 For Third Quarter 2013."  Therein, the Company, in relevant part, stated:

- **Backlog at $14.2 billion with book-to-bill of 1.2x**

- **Total cash provided by operations of $178 million in the third quarter of 2013**

- **Operating income of $166 million, up 35% from the second quarter of 2013**

KBR (NYSE:KBR) announced today that third quarter 2013 net income attributable to KBR was $24 million, or $0.16 per diluted share, compared to a net loss attributable to KBR of $81 million, or $0.55 per diluted share, in the third quarter of 2012.

Consolidated revenue in the third quarter of 2013 was $1.8 billion compared to $2.0 billion in the third quarter of 2012. Operating income in the third quarter of 2013 was $166 million compared to an operating loss of $11 million in the prior year third quarter. The third quarter of 2012 included a non-cash goodwill impairment charge of $178 million related to a market assessment of the minerals business.

"The third quarter was highlighted by a strong, 1.2x book-to-bill ratio and cash flow from operations of $178 million. The quarter was unfavorably impacted by the adverse tax ruling related to the separation from our prior parent, several non-operational discrete tax items and the delay of key project close-out items originally forecast in the quarter," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "Looking forward, we continue to see a strong opportunity set of major projects across all of our businesses; however, we expect the near term competitive environment for new awards to continue."

**Business Discussion** (All comparisons are third quarter 2013 versus third quarter 2012, unless otherwise noted).

### Gas Monetization Results

Gas Monetization revenue was $552 million, down $256 million, or 32% primarily related to completed construction on the Skikda LNG and Escravos GTL projects. Gas Monetization job income was $157 million, up $10 million, or 7%, primarily related to the recognition of a change order executed on the Gorgon LNG project as well as increased activity on the Ichthys LNG EPC and other active FEED projects. Partially offsetting the increase was lower income related to the Skikda LNG project in Algeria.

A supplemental table outlining Gas Monetization's historical job income and business group overhead for the new reporting structure is attached.

### Hydrocarbons Results

Hydrocarbons revenue was $364 million, up $53 million, or 17%. Hydrocarbons job income was $69 million, down $3 million, or 4%. An $8 million gain in the third quarter of 2012 from the completion of an ammonia project in Venezuela, which did not recur in the third quarter of 2013, was partially offset by a $5 million gain in the third quarter of 2013 due to a favorable arbitration award on a previously completed Egyptian project. Income from new ammonia and ethylene EPC projects and related technology awards in North America were offset by the completion or near completion of several offshore engineering projects.

### Infrastructure, Government and Power (IGP) Results

IGP revenue was $383 million, down $50 million, or 12%. IGP job income was $56 million, down $6 million, or 10%, primarily related to lower work volumes for infrastructure-related projects, reduced activity on the LogCAP IV contract, and lower construction volumes on the Allenby & Connaught project. Partially offsetting the decrease was $6 million in cost reductions on a project in Indonesia as well as a third quarter 2012 charge of $8 million on a project in Indonesia that did not recur in the third quarter of 2013.

**Services Results**

Services revenue was $494 million, up $75 million, or 18%. Services job income was $31 million, up $16 million, or 107%, primarily related to $21 million in charges in the third quarter of 2012 due to increased cost estimates to complete two construction projects in the United States that did not recur in the third quarter of 2013, as well as increased activity on several module fabrication projects in Canada. Partially offsetting the increase was lower income related to a contract expiration and dry-docking of a vessel in the MMM joint venture.

**Other Results**

Other revenue was $18 million, down $3 million, or 14%. Other job income was $9 million, down $6 million, or 40%, primarily related to lower gas supply availabilities as well as lower ammonia prices at the EBIC ammonia plant in Egypt and increased maintenance costs at a project in the United Kingdom.

**Corporate**

Corporate general and administrative expense, including $14 million related to the company's ERP implementation, was $66 million, up $10 million, or 18%.

Third quarter of 2013 labor cost absorption expense was $10 million, a $7 million improvement from the second quarter of 2013.

The effective tax rate for the third quarter 2013 was approximately 46% primarily due to a $38 million, or $0.26 per diluted share, tax expense related to an unfavorable accounting referee report for a tax dispute with KBR's former parent as outlined in a KBR Form 8-K filed on October 11, 2013.

Noncontrolling interest was $63 million in the third quarter of 2013, which includes approximately $50 million related to a change order executed on the Gorgon LNG project.

Total cash provided by operating activities in the third quarter of 2013 was $178 million.

During the third quarter of 2013, KBR had capital expenditures of $17 million and quarterly dividend payments of $12 million for total cash deployment of $29 million.

KBR expects 2013 EPS to be at the low end of the previous guidance range of between $2.55 and $2.90, excluding charges related to the tax dispute with KBR's former parent.

23.     On October 24, 2013, KBR filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Utt and reaffirmed the Company's financial results previously announced that day.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendant Utt, substantially similar to the certifications contained in ¶19, *supra*.

24.     On February 27, 2014, the Company issued a press release entitled, "KBR Announces Fourth Quarter And Annual 2013 Financial Results."  Therein, the Company, in relevant part, stated:

- **Backlog at $14.4 billion with book-to-bill of 1.1x for fourth quarter of 2013**

- **Total cash provided by operations of $209 million in the fourth quarter of 2013**

- **Cash and cash equivalents of $1.1 billion at December 31, 2013**

- **Board of Directors authorizes new $350 million share buyback program**

KBR (NYSE:KBR) announced today its fourth quarter and annual 2013 financial results.

**Fourth Quarter Results**

Net income attributable to KBR was $27 million, or $0.18 per diluted share, compared to net income attributable to KBR of $30 million, or $0.20 per diluted share, in the fourth quarter of 2012.

Consolidated revenue in the fourth quarter of 2013 was $1.7 billion compared with $1.8 billion in the fourth quarter of 2012. Gross profit in the fourth quarter of

2013 was $84 million compared to gross profit of $60 million in the prior year fourth quarter.

"The fourth quarter was highlighted by a strong 1.1x book-to-bill ratio and cash flow from operations of $209 million. We're also pleased our Board of Directors has authorized a new $350 million share repurchase program," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "However, earnings for the quarter were significantly less than anticipated. Looking forward, opportunities across all of our business segments remain strong and we believe that we are well positioned to win and execute a significant portion of this work. We continue to pursue several mega LNG prospects but do not expect final investment decisions from our customers until 2015."

The following pre-tax items are included in the 2013 fourth quarter financial results:

- A $17 million, non-cash charge associated with the accounting for foreign currencies occurring over the life of a project and a $20 million charge for increased costs from delays in project commissioning, project taxes, and other costs for a project which achieved provisional acceptance in January 2014

- Severance and associated workforce adjustment-related costs of approximately $13 million

- Legal settlements of approximately $13 million, inclusive of a $6.6 million expected settlement with the African Development Bank

- Approximately $16 million non-cash impact related to a change in the percentage of completion on a LNG project. This current period impact is expected to be recognized in future earnings as the project progresses

- A higher tax rate than forecast

Additionally, during the quarter, the anticipated closeout on two LNG projects did not occur which could have resulted in an approximate $0.36 per share improvement in the quarterly earnings. We have subsequently received provisional acceptance on one of the LNG projects and are working on the close out of this project. We remain optimistic we will achieve a favorable settlement, but have reduced our estimate of the potential EPS benefit to a range of between zero and $0.27 per share.

**Business Discussion** (All comparisons are fourth quarter 2013 versus fourth quarter 2012, unless otherwise noted.)

**Gas Monetization Results**

Gas Monetization revenue was $432 million, down $176 million, primarily due to reduced activity on two projects nearing completion in Africa. Gross profit was $21 million, down $85 million, primarily due to the $17 million charge relating to accounting for foreign currencies and the $20 million charge for increased costs as noted above, in addition to favorable changes in project estimates recognized in Q4 2012 on an LNG project in Australia that did not reoccur in Q4 2013.

Gas Monetization equity in earnings of unconsolidated affiliates, net of tax, was $9 million, flat with the prior year.

**Hydrocarbons Results**

Hydrocarbons revenue was $432 million, up $107 million. Hydrocarbons gross profit was $44 million, down $13 million. Fourth quarter 2012 included a $14 million gain related to a project settlement that did not reoccur in 2013. Revenue growth is the result of increased downstream activity on ammonia, urea and ethylene projects in North America, an ethylene project in Uzbekistan, and an oil and gas project in Azerbaijan.

**Infrastructure, Government and Power (IGP) Results**

IGP revenue was $387 million, down $60 million. Gross profit was $20 million, up $53 million. The increase in gross profit was driven by $58 million in project charges associated with two minerals projects in the fourth quarter of 2012 which did not reoccur in 2013. While activity in the infrastructure and minerals markets remains challenging, opportunities for international government, power generation and air quality control projects in the U.S. remain encouraging.

IGP equity in earnings of unconsolidated affiliates, net of tax, was $13 million, down $2 million. The decline was primarily related to reduced activity on a project for the U.K. Ministry of Defence that is nearing completion.

**Services Results**

Services revenue was $460 million, up $27 million. Gross profit was $10 million, up $62 million, primarily due to $62 million in Q4 2012 charges related to cost increases to complete three construction projects in the United States in addition to increased activity on several module fabrication contracts in Canada.

Services equity in earnings of unconsolidated affiliates, net of tax, was $3 million, down $5 million, primarily due to lower vessel utilization at our Mexican joint venture.

**Corporate**

Corporate general and administrative expense was $68 million, up $9 million, primarily due to higher ERP implementation expenses, severance costs and costs related to additional reserves established by our captive insurance company.

**Labor Cost Absorption**

Fourth quarter of 2013 labor cost absorption (LCA) expense was $15 million, a $7 million improvement from the prior year's fourth quarter. The main drivers for the under absorption of costs continue to be reduced work volumes at our London and Australian offices plus associated severance costs.

**Tax**

The effective tax rate for the fourth quarter 2013 was approximately 33 percent, primarily driven by a valuation allowance taken against certain U.S. state tax loss carry-forwards during the quarter.

**Full Year 2013 Results**

Net income attributable to KBR was $229 million, or $1.54 per diluted share, in fiscal year 2013, compared with net income attributable to KBR of $144 million, or $0.97 per diluted share, in fiscal year 2012.

25. On February 27, 2014, KBR filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year.  The Company's Form 10-K was signed by Defendants Utt and Ferraioli, and reaffirmed the Company's financial results previously announced that day.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Utt and Ferraioli, substantially similar to the certifications contained in ¶19, *supra*.

26. The statements contained in ¶¶18-25 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had improperly estimated costs to complete certain contracts; (2) that the Company had accounting errors resulting from timing of the recognition of revenues and from understating its income tax provision; (3) that, as a result, the Company's revenue and financial results were overstated; (4) that, as such, the Company's financial statements were not prepared in accordance with GAAP; (5) that the Company lacked adequate internal and financial controls;

and (6) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### Disclosures at the End of the Class Period

27.     On May 5, 2014, KBR issued a press release entitled, "KBR, Inc. Announces Intention to Restate Consolidated Financial Statements for the Year 2013."   Therein, the Company, in relevant part, stated:

> KBR Inc. (NYSE: KBR) announced today that the Audit Committee of the company's Board of Directors has concluded that the company's previously issued condensed consolidated financial statements for the year ended December 31, 2013 should no longer be relied upon and should be restated.
>
> In connection with the preparation of KBR's Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million, consisting of the reversal of $23 million in previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion. The negative cash impact associated with the work released to date under the seven contracts has largely been incurred and the forecast net negative cash flow to complete this work is expected to be less than $45 million. Our review of this matter is ongoing and therefore the amounts previously noted are subject to change. We believe that the majority of these losses should have been recognized in our consolidated financial statements for the year ended December 31, 2013.
>
> The seven contracts in question are with third-party clients and do not impact other KBR projects. Six of the contracts will be completed during 2014 or in early 2015. The seventh contract is a master services-type agreement that provides our client with the right, but not the obligation, to place new pipe fabrication and module assembly orders until 2017. The pre-tax losses noted above include estimated losses only for work released to us through March 31, 2014. Future work orders, if any, will be accounted for at the time of each release. We have begun discussions with our client under the master services agreement regarding a market-based cost adjustment. At this time, we can provide no assurance that such discussions will be successfully concluded. The estimated losses noted above do not assume recovery from clients for quantity and/or cost increases caused by client-directed actions. We believe we are entitled to certain recoveries from our clients but since collection remains uncertain, we will record any such recoveries if, and when, mutually agreed.

KBR's self-perform pipe fabrication and module assembly activities are limited to our Edmonton, Alberta operations. The contracts referenced herein were part of a rapid expansion of work at these operations and resulted in increased internal and external costs and adversely impacted our historical module assembly productivity rates.

Separately, during the preparation of our Form 10-Q for the three months ending March 31, 2014, we identified an overstatement error in our revenue recognition on a long-term construction project approximating $9.0 million pre-tax ($6.3 million after tax) and an error which resulted in an understatement of our income tax provision of approximately $6.5 million that had not been properly included in the Consolidated Statement of Income for the year ended December 31, 2013.

Mr. Loren K. Carroll, Chairman of the Company's Board of Directors, issued the following statement:

> "The KBR Board of Directors and management team take the accuracy and integrity of KBR financial statements very seriously. We are committed to conducting a thorough investigation and implementing corrective measures. KBR's management team remains focused on enhancing value for all of our stakeholders, including returning capital to shareholders. Between February 27, 2014 and April 30, 2014, KBR repurchased approximately 3.4 million shares of its common stock at an average price of $27.29 for a total of $94 million. We will continue to leverage the Company's position as a global leader in engineering, procurement and construction in order to further strengthen our customer relationships, convert our significant backlog, support existing contracts and win and execute new work."

As soon as practicable, we expect to amend KBR's Form 10-K for the year ended December 31, 2013 to restate the financial statements and to revise related information. As a result, we will not file KBR's 10-Q for the three months ending March 31, 2014 until after filing of the amended Form 10-K. Given the ongoing nature of our review, the forecast filing date for each of the amended 2013 Form 10-K and Form 10-Q for the three months ending March 31, 2014 is uncertain.

The KBR Audit Committee, comprised of members of its Board of Directors, has retained independent legal and accounting advisors to review these matters and to advise the Committee, which is in addition to the review being conducted by KBR's management. The Audit Committee has discussed the matters described in this Current Report with KPMG LLP, KBR's independent registered public accounting firm.

Additional information relating to the restatement will be disclosed in a Form 8-K, which will be filed shortly with the SEC.

28.     Also on May 5, 2014, KBR filed a current report with the SEC on Form 8-K.

Therein, the Company, in relevant part, stated:

**ITEM 4.02     Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

In connection with the preparation of KBR, Inc.'s Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million, consisting of the reversal of $23 million in previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion. Our review of this matter is ongoing and therefore the amounts previously noted are subject to change. We believe, subject to further review, that the majority of these losses should have been recognized in our consolidated financial statements as of and for the year ended December 31, 2013.

The seven contracts in question are with third-party clients and do not impact other KBR projects. Six of the contracts will be completed during 2014 or in early 2015. The seventh contract is a master services type agreement that provides our client with the right, but not the obligation, to place new pipe fabrication and module assembly orders until 2017. The pre-tax losses noted above include estimated losses only for work released to us through March 31, 2014. Future work orders, if any, will be accounted for at the time of each release. We have begun discussions with our client under the master services agreement regarding a market-based cost adjustment. At this time, we can provide no assurance that such discussions will be successfully concluded. The negative cash impact associated with the work released to date under the seven contracts has largely been incurred and the forecast net negative cash flow to complete this work is expected to be less than $45 million. The estimated losses noted above do not assume recovery from clients for quantity and/or cost increases caused by client-directed actions. We believe we are entitled to certain recoveries from our clients but since collection remains uncertain, we will record any such recoveries if, and when, mutually agreed.

KBR's self-perform pipe fabrication and module assembly activities are limited to our Edmonton, Alberta operations. The contracts referenced herein were part of a rapid expansion of work at these operations and resulted in increased internal and external costs and adversely impacted our historical module assembly productivity rates.

Separately, during the preparation of our Form 10-Q for the three months ending March 31, 2014, we identified an overstatement error in our revenue recognition on a long-term construction project approximating $9.0 million pre-tax ($6.3

million after tax) and an error which resulted in an understatement of our income tax provision of approximately $6.5 million that had not been properly included in the Consolidated Statement of Income for the year ended December 31, 2013.

As a result of the errors described above, on May 1, 2014, the Audit Committee of the Board of Directors of KBR, in consultation with and based on the recommendation of management, concluded that KBR's consolidated financial statements as of and for the year ended December 31, 2013 should be restated to correct for the aforementioned errors and that, accordingly, KBR's previously issued consolidated financial statements for 2013 should no longer be relied upon. Additionally, KBR's earnings and press releases and similar communications should no longer be relied upon to the extent that they relate to these consolidated financial statements. As soon as practicable, we expect to amend KBR's Form 10-K for the year ended December 31, 2013 to restate the financial statements and correct the errors identified herein, and to revise related information, including our discussion of KBR's internal controls and procedures. As a result, we will not file KBR's 10-Q for the three months ending March 31, 2014 until after filing of the amended Form 10-K. Given the ongoing nature of our review, the forecast filing date for the amended 2013 Form 10-K and Form 10-Q for the three months ending March 31, 2014 is uncertain. KBR's management is continuing to review these matters to ensure it has determined the causes for these errors and will continue to consider the effect of these errors on our prior conclusions regarding our internal control over financial reporting and disclosure controls and procedures as of the end of the applicable period. We will amend, as necessary, any disclosures pertaining to our evaluation of such controls and procedures in connection with our amended Annual Report on Form 10-K for the year ended December 31, 2013, and in our Form 10-Q for the three months ending March 31, 2014.

As described in Item 2.04 above, we are working closely with our bank syndicate to timely address any and all compliance matters related to our credit agreement and other financial arrangements.

The KBR Audit Committee, comprised of members of its Board of Directors, has retained independent legal and accounting advisors to review these matters and to advise the Committee, which is in addition to the review being conducted by KBR's management. The Audit Committee has discussed the matters described in this Current Report with KPMG LLP, KBR's independent registered public accounting firm.

As a result of the above items, KBR is also withdrawing its previously issued guidance for 2014. We expect to provide updated guidance later this year. In keeping with our previously announced intent to return capital to shareholders, between February 27, 2014 and April 30, 2014, KBR repurchased approximately 3.4 million shares of its common stock at an average price of $27.29 for a total of $94 million.

29.    On this news, shares of KBR declined $1.61 per share, nearly 7%, to close on May 5, 2014, at $24.23 per share, on unusually heavy volume.

## KBR'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## <u>FILED WITH THE SEC</u>

30.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper recording of revenue, in violation of GAAP rules.

31.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

32.    The fact that KBR announced that its financial statements will need to be restated, and informed investors that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, 7-13; SFAS No. 154, 25).

33.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, 10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that "financial reporting should provide information about the economic resources of KBR, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that "financial reporting should provide information about KBR's financial performance during a period" was violated (FASB Statement of Concepts No. 1, 42);

(e)     The principle that "financial reporting should provide information about how management of KBR has discharged its stewardship responsibility to owners (stockholders) for the use of KBR resources entrusted to it" was violated (FASB Statement of Concepts No. 1, 50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, 95).

34.     The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased KBR's securities between April 25, 2013 and May 5, 2014, inclusive (the "Class Period") and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, KBR's securities were actively traded on the New York Stock Exchange (the "NYSE").   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Millions of KBR shares were traded publicly during the Class Period on the NYSE.   As of January 31, 2014, KBR had 148,152,414 shares of common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by KBR or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of KBR; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

41.     The market for KBR's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, KBR's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired KBR's securities relying upon the integrity of the market price of the Company's securities and market information relating to KBR, and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of KBR's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about KBR's business, operations, and prospects as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about KBR's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period

resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

44.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.     During the Class Period, Plaintiff and the Class purchased KBR's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

46.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding KBR, his/her control over, and/or receipt and/or modification of KBR's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning KBR, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

47.     The market for KBR's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, KBR's securities traded at artificially inflated prices during the Class Period.   On October 22, 2013, the Company's stock closed at a Class Period high of $36.10 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of KBR's securities and market information relating to KBR, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of KBR's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about KBR's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of KBR and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49.     At all relevant times, the market for KBR's securities was an efficient market for the following reasons, among others:

(a)     KBR stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      As a regulated issuer, KBR filed periodic public reports with the SEC and/or the NYSE;

(c)      KBR regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      KBR was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

50.      As a result of the foregoing, the market for KBR's securities promptly digested current information regarding KBR from all publicly available sources and reflected such information in KBR's stock price. Under these circumstances, all purchasers of KBR's securities during the Class Period suffered similar injury through their purchase of KBR's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of KBR who knew that the statement was false when made.

### FIRST CLAIM
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase KBR's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

54.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for KBR's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about KBR's financial well-being and prospects, as specified herein.

56.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of KBR's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about KBR and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing KBR's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of KBR's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class

acquired KBR's securities during the Class Period at artificially high prices and were damaged thereby.

60.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that KBR was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their KBR securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>SECOND CLAIM</u>
**Violation of Section 20(a) of**
<u>**The Exchange Act Against the Individual Defendants**</u>

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of KBR within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, KBR and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 9, 2014

**ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**

By: /s/Sammy Ford IV
Sammy Ford IV
Federal Bar Number: 950682
Texas Bar Number: 24061331
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Facsimile: (713) 225-0827

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff*