**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE KBR, INC. SECURITIES LITIGATION | Case No. 4:14-CV-01287 |
| | Judge Lee H. Rosenthal |
| | **<u>JURY TRIAL DEMANDED</u>** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................. 2

II.     JURISDICTION AND VENUE ........................................ 8

III.    THE PARTIES.................................................................. 8

        A.      Lead Plaintiffs ..................................................... 8

        B.      Defendants ............................................................ 8

                1.      Corporate Defendant ................................ 9

                2.      Individual Defendants ............................ 10

IV.     FACTUAL ALLEGATIONS ......................................... 14

        A.      KBR Repeatedly Touts Its Canadian Services Business as an
                Engine of Growth and Significant Profit Source .................................. 14

                1.      Leading up to the Class Period, Defendants Highlight the
                        Strong Performance of KBR's Services Business ................................... 14

                2.      KBR Falsely Reported Strong Profits From Its Services
                        Business During the Second Half of 2013 ................................ 16

        B.      KBR's Financial Results for the Second Half of 2013 Were
                Artificially Inflated, and Its "Robust Performance" in Canada Was
                a Fiction .................................................................. 18

                1.      Relevant Accounting Principles................................ 19

                2.      KBR Senior Management's  Involvement in the Cost
                        Estimation Process .................................................. 23

                3.      The Severe Impact of KBR's Accounting Violations............................. 26

        C.      KBR Is Forced to Disclose a "Material Weakness" in Its Reporting
                of Cost Estimates, but Falsely Assures  Investors That Its 2013
                Financial Statements Are Accurate.................................. 29

        D.      KBR's Chief Accounting Officer Abruptly Resigns and Its Chief
                Executive Officer Sells a Massive Amount of Stock............................. 32

        E.      KBR's Restatement Wipes Out Its Profits for the Third and Fourth
                Quarters of 2013 and Decimates Its Year-End Results ........................ 34

        F.      KBR Stuns Investors with an Additional $82 Million in Losses on
                Its Canadian Contracts, and Finally Admits That It Lacked the
                Information Required to Accurately Estimate Contract Costs ............................ 39

i

V.      ADDITIONAL ALLEGATIONS OF SCIENTER..........................................................43

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS .....................................................................48

        A.      Materially False and Misleading Statements and Omissions
                Concerning the Third Quarter 2013 ......................................................49

        B.      Materially False and Misleading Statements and Omissions
                Concerning the Fourth Quarter and Full Year 2013 .............................55

        C.      Materially False and Misleading Statements and Omissions
                Concerning the First and Second Quarters of 2014 ..............................59

VII.    LOSS CAUSATION.............................................................................................62

VIII.   PRESUMPTION OF RELIANCE.........................................................................66

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
        BESPEAKS CAUTION DOCTRINE ...................................................................67

X.      CLASS ACTION ALLEGATIONS .......................................................................68

XI.     CLAIMS FOR RELIEF ........................................................................................70

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
        AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against
        Defendants KBR, Utt, Carter, Ferraioli and Baldwin).......................................70

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
        (Against Defendants Utt, Carter, Ferraioli and Baldwin) ..................................74

XII.    PRAYER FOR RELIEF ........................................................................................76

XIII.   JURY DEMAND ..................................................................................................76

Lead Plaintiffs Arkansas Public Employees Retirement System and the IBEW Local No. 58 / SMC NECA Funds, as defined herein, by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of KBR, Inc. ("KBR" or the "Company") from September 11, 2013 through July 30, 2014, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP and Labaton Sucharow LLP. This investigation included, among other things, a review and analysis of: (i) public filings by KBR with the Securities and Exchange Commission (the "SEC"), including the Company's May 30, 2014 restatement of its financial results for the third and fourth quarters of 2013, and the full year 2013; (ii) KPMG LLP's audit reports concerning KBR's internal controls dated February 27, 2014 and May 30, 2014, which found material weaknesses in KBR's internal financial reporting controls; (iii) public reports and news articles concerning, among other things, the SEC's ongoing investigation of KBR relating to the alleged wrongful conduct discussed herein; (iv) research reports by securities and financial analysts; (v) economic analyses of securities movement and pricing data; (vi) transcripts of investor calls with KBR senior management; (vii) consultations with relevant experts; and (viii) other publicly available material and data identified herein. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Lead

Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   <u>INTRODUCTION</u>

1.      This case is about a company that artificially inflated its income by violating well-established accounting rules that were central to its business.  KBR is one of the country's largest industrial, engineering and construction companies.  Throughout 2013, KBR reported a steady stream of profits flowing from its construction contracts for oil and gas facilities in Canada, which were accounted for as part of the Company's Services business segment.  The supposed profits that KBR reported from these contracts were important to its financial performance in 2013, and thus, were the focus of repeated public statements by the Company's most senior officers.   In numerous investor conferences, SEC filings, press releases, and other communications, KBR and its senior officers, including its former Chief Executive Officer Defendant William P. Utt, repeatedly touted KBR's Canadian construction operations.

2.      At each quarter, KBR and Defendant Utt portrayed these contracts as an engine of growth for the Company and a key driver of its profits, lauding them for their supposedly "very successful" and "robust performance."  The Company's press releases singled out the results of its Services business as particularly "strong," and underscored that "several module fabrication projects in Canada" were the "primary" force that drove KBR's Services profit up by as much as 100% each quarter.  In conference calls, Defendant Utt stated that these contracts were "doing very well," performance was "very good," and any issues were "minimal."  As the Company's former Chief Financial Officer, Defendant Susan Carter, aptly summarized, "On the Services side, we've talked a lot about Canada in [] 2013."

3.      Investors relied on the Company's statements.  These statements were particularly material to investors because, during this time period, certain of the Company's other business

segments were struggling, thus making the purported success of the Services unit even more important to KBR's financial health.   In numerous published reports during 2013, analysts expressed the view that KBR's Canadian Services business was making critical contributions to KBR's bottom line.   For example, analysts at Deutsche Bank highlighted the "strong growth from the Canadian operations," analysts at William Blair & Co. regarded Canada as "one of KBR's strongest growing divisions in 2013," and Sterne Agee & Leach reported that the "Canadian … projects showed no sign of a slowdown."

4.      Unfortunately for investors, the supposedly stellar performance of KBR's Canadian Services business during the Class Period was an accounting fiction.  As KBR has now admitted, in reality, the Canadian contracts were financial failures that caused the Company to suffer highly material, undisclosed losses in 2013.  As detailed further below, on May 30, 2014, KBR and its Audit Committee issued a restatement of the Company's financial statements for the third quarter of 2013, the fourth quarter of 2013 and the full year (the "Restatement").   In the Restatement, the Company admitted to violating Generally Accepted Accounting Principles ("GAAP") governing the manner in which KBR was supposed to calculate the costs, profits, and losses on its key Canadian contracts under the "percentage-of-completion" accounting method. Notably, these rules have been in place for more than 30 years, and KBR has described them as "fundamental" to its business for the better part of a decade.   Under these rules, KBR was required to calculate the cost of completing its contracts, update its cost calculations at each reporting period as the project progressed, and recognize all losses as soon as they become apparent, i.e., when the costs exceeded the revenues under the contract.

5.      In a clear violation of these rules, KBR failed to recognize $156 million in known pre-tax losses tied to its Canadian construction contracts during the third and fourth quarters of

2013.  The amount of unreported losses was massive—the $156 million in pre-tax losses exceeded KBR's net income for all of 2012.  KBR's failure to report these losses enabled the Company to issue financial results that were divorced from reality, and to transform quarterly losses into illusory profits.  KBR artificially inflated its operating income in its Services business—which it had emphasized to investors for its supposedly stellar performance—by as much as 524% during the Class Period.  Further, KBR overstated its Company-wide net income by a staggering 329% during the third quarter of 2013, 242% during the fourth quarter of 2013, and 63% for the full year.

6.     The first sign to investors that something was potentially amiss with KBR's financial reporting surfaced on February 27, 2014.  On that day, KBR was forced to disclose in its 2013 Form 10-K that its outside auditor had identified a "material weakness" in KBR's internal controls over the calculation of cost estimates for its long-term contracts, which required KBR to take a $17 million charge to earnings.  However, KBR and its senior management, including Defendants Utt, new Chief Financial Officer Brian K. Ferraioli, and Chief Accounting Officer Dennis S. Baldwin, falsely assured investors that this "material weakness" was isolated to "one major project" that was "near completion" and was unrelated to KBR's prized Canadian Services business.

7.     Notably, KBR and Defendants Utt, Ferraioli, and Baldwin told investors that, in light of the "material weakness" finding, they had conducted extensive "additional" year-end testing on the Company's 2013 financial statements, and "ensure[d]" that KBR's reported financial results were accurate and in compliance with GAAP.  They continued to tout the purported success of KBR's Canadian construction operations, stating in the 2013 Form 10-K

that the "Services business segment had a strong year in 2013," with its results "primarily driven by construction activities on oil sands-related projects in western Canada."

8.     On March 4, 2014, five days after KBR falsely stated that it had "ensure[d]" that its 2013 results were accurate, Defendant Baldwin informed KBR's management that he was resigning.   On March 6, 2014—before news of Baldwin's resignation was made public— Defendant Utt sold over 70% of his personally-held KBR stock in a single day, reaping more than $4.5 million in proceeds.  The value of Utt's stock sale on that day exceeded the value of all of his sales from the prior two years combined.

9.     On May 5, 2014, KBR surprised the market by announcing that the Company needed to restate its 2013 financial results to account for approximately $158 million in previously-unreported losses stemming from its Canadian construction contracts (the "May 5 Disclosure").  News of the restatement blindsided investors, and analysts swiftly downgraded KBR.  The Company's stock price immediately fell by more than 6%, declining from $25.84 to $24.23, on extremely high trading volume of more than 4 million shares.  On May 30, 2014, as noted above, KBR issued the full Restatement, in which it admitted that $156 million in losses should have been, but were not, reported in its financial statements for the third and fourth quarters of 2013.

10.     Although investors had learned of the impact of the Canadian construction contracts on KBR's 2013 financial results through the May 5 Disclosure and the Restatement, KBR continued to mislead investors about material losses it was continuing to suffer on these same contracts in the first half of 2014.  KBR's disclosure on May 5 purported to identify all of the losses on its Canadian construction contracts on work released "through March 31, 2014"— i.e., the end of the first quarter of 2014.  In reality, however, during the first quarter of 2014,

KBR had incurred $41 million in additional Canadian contract losses that were nowhere mentioned in the May 5 disclosure.  Moreover, KBR failed to disclose a critical fact that went to the heart of its ability to determine its losses on certain of these contracts: it was impossible for KBR to reliably determine the losses it was continuing to incur, and make accurate disclosures to investors, because the Company lacked design drawings that it needed to estimate its costs on certain of the contracts.

11.     On June 19, 2014, KBR reported financial results for the first quarter of 2014 that fell far short of consensus expectations.  In explaining the driving factor behind these results, KBR disclosed that, contrary to the Company's May 5 statement that it had accounted for all contract losses through the first quarter of 2014, the Company had suffered "$41 million of additional losses in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada."

12.     Analysts immediately expressed disappointment that KBR "widely miss[ed] estimates primarily due to continued losses on fabrication contracts in its Services segment," noting their surprise at the fact that "the impact of problem projects in Canada … continued into 1Q14."  As a result of this disclosure, on June 19, 2014, KBR's stock price declined by more than 7%, again on extremely high trading volume.

13.     Investors did not learn the full truth about the losses on KBR's Canadian construction contracts until July 31, 2014.  That day, the Company reported dismal second-quarter 2014 earnings, and explained that the poor earnings were driven by yet an additional $41 million in quarterly losses on the same contracts, which had by this point decimated the Company's income statement for four consecutive quarters.  When analysts insisted upon an

answer from management for these continued losses, KBR's current CFO, Defendant Ferraioli, made a startling admission.

14.     Defendant Ferraioli admitted that, until then, it had been "impossible" for KBR to accurately calculate the losses on its Canadian fabrication contracts because the Company lacked an essential piece of information for determining its costs—namely, the design drawings for certain of the projects—and was therefore unable to ascertain the amount of work, time, and materials that were necessary to complete the job.[1]   In other words, until July 31, 2014, the Company's cost estimates on these contracts had lacked any reasonable basis.

15.     The market reacted with astonishment.  Analysts reported that "the cost overruns in Canada" were "surprising" and "disappointing," and expressed dismay that the Company's quarterly "loss was driven primarily by a US$41m increase in construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects—the same projects that caused issues for the company last quarter."  KBR's stock price immediately fell another 7%, falling from $22.16 to $20.66 on extremely high trading volume.

16.     KBR's misconduct described herein has continued to have a severe negative impact on the Company's shareholders.  The core misstatements at issue in this case have triggered a wide-ranging SEC investigation into the circumstances surrounding KBR's Restatement.  The SEC investigation, which was announced in May 2014, is ongoing.  The Company's stock price has not recovered, and presently trades at $18.10 per share.

---

[1] All emphasis is added unless otherwise noted.

## II.   JURISDICTION AND VENUE

17.   The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

18.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

20.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.   Lead Plaintiffs

21.   Lead Plaintiff Arkansas Public Employees Retirement System ("APERS") is a public pension fund that provides retirement benefits for qualified public employees of the State of Arkansas.  APERS was established in 1957 and, as of June 30, 2013, manages assets totaling over $6.4 billion for approximately 90,000 members.  As set forth in the certification previously filed with the Court and attached hereto, APERS purchased 79,700 shares of common stock of KBR during the Class Period, and suffered damages as a result.  On September 8, 2014, this Court appointed APERS as Lead Plaintiff for this litigation.

22.   Lead Plaintiff the IBEW Local No. 58 / SMC NECA Funds are pension or welfare benefit funds that provide retirement, health and welfare benefits for approximately 15,000

workers in the electrical industry and their beneficiaries in Southeastern Michigan.  As of December 2012, the IBEW Local No. 58 / SMC NECA Funds had more than $1 billion in assets under management.  The IBEW Local No. 58 / SMC NECA Funds are composed of the I.B.E.W. Local No. 58 Annuity Fund ("Annuity Fund"), the Electrical Workers' Pension Trust Fund of Local Union #58, I.B.E.W. ("Electrical Workers' Pension"), the Electrical Workers' Insurance Fund ("Electrical Workers' Insurance"), and the International Brotherhood of Electrical Workers Local Union No. 58 Sound and Communications Division Pension Fund ("International Brotherhood").  As set forth in the certification attached hereto, during the Class Period, each of the IBEW Local No. 58 / SMC NECA Funds purchased shares of KBR common stock:  the Annuity Fund purchased 69,652 shares, the Electrical Workers' Pension purchased 45,391 shares, the Electrical Workers' Insurance purchased 4,851 shares, and the International Brotherhood purchased 3,643 shares.  In total, the IBEW Local No. 58 / SMC NECA Funds purchased 123,537 shares of KBR common stock and suffered damages as a result.  On September 8, 2014, this Court appointed the IBEW Local No. 58 / SMC NECA Funds as Lead Plaintiff for this litigation.

### B. **Defendants**

#### 1. **Corporate Defendant**

23.    Defendant KBR, Inc. is an engineering, construction and services company incorporated in Delaware with its principal executive offices located at 601 Jefferson Street, Suite 3400, Houston, Texas 77002.  KBR was formerly owned by Halliburton Company, from which it separated on April 5, 2007.  KBR trades on the New York Stock Exchange under the ticker symbol "KBR."

24.    As described in KBR's 2013 Form 10-K, the Company's business is divided into five reportable "segments": (i) Services; (ii) Gas Monetization; (iii) Hydrocarbons;

(iv) Infrastructure, Government and Power; and (v) Other.   KBR's Services business, which is discussed herein, provides construction and maintenance services to commercial industries and the government.   The Services business was, according to KBR's 2013 Form 10-K, the Company's second largest revenue source during 2013, behind only the Gas Monetization business by a small amount.  The Services business's revenues purportedly increased year-over-year each quarter during 2013, and accounted for nearly 30% of KBR's revenues during the third and fourth quarters.

25.    KBR maintained an Executive Leadership Team (the "ELT") as part of its business operations.  The ELT, which is further discussed below, was headed by the Company's Chief Executive Officer ("CEO"), Defendant Utt, and its members included the Company's Chief Financial Officers ("CFOs"), first Defendant Carter and then Defendant Ferraioli, and its Chief Accounting Officer ("CAO"), Defendant Baldwin.   The ELT met monthly in Houston, Texas, and was directly involved in the cost estimation process for the Canadian Services projects central to this case.  In advance of each ELT meeting, as discussed below in ¶¶62-65, members of the ELT received a report from the Canadian Services business, which would include information about the cost estimates for Canadian projects and key information about those projects, including whether KBR had received the necessary design drawings for the projects.

### 2.    <u>Individual Defendants</u>

26.    Defendant William P. Utt was the CEO and President of KBR from April 3, 2006 until his resignation on April 9, 2014.  Between September 26, 2013 and October 28, 2013, Utt also served as the Company's interim CFO, and signed SEC filings in that capacity.  During his time with the Company, Utt also acted as Chairman of KBR's Board of Directors and the head of the ELT.  On April 9, 2014, during the Class Period, Defendant Utt resigned, and a "principal

executive officer" was temporarily put in place until June 2, 2014.  Before joining KBR, Utt had more than 20 years of financial and accounting experience in the engineering and construction industries, including prior positions as President and CEO of SUEZ Energy North America and President and CEO of Tractebel's North American energy businesses.  Utt holds an M.B.A.  As noted above and detailed below at ¶¶83-86, Utt sold 162,471 shares of his KBR stock for proceeds of more than $4.5 million on March 6, 2014.

27.     During the Class Period, Utt reviewed, approved, and signed KBR's false and misleading SEC filings, including the Third Quarter 2013 Form 10-Q and the 2013 Form 10-K and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certification").  Utt also reviewed and approved of false and misleading press releases and Form 8-Ks issued by KBR during the Class Period, including the Third Quarter 2013 Press Release, the Third Quarter 2013 Form 8-K, the Fourth Quarter and Full Year Press Release, and the Fourth Quarter 2013 Form 8-K.  Utt also participated in conference calls with securities analysts, during which KBR's false and misleading filings with the SEC and press releases were presented and discussed.

28.     Defendant Susan K. Carter was CFO and Executive Vice President of KBR from October 29, 2009 until her resignation on September 26, 2013.  Defendant Carter, in her role as CFO, was a member of the ELT.  Before joining KBR, Carter had more than 28 years of financial and accounting experience, including as Chief Accounting Officer of Cummins Inc. and Chief Financial Officer of Lennox International Inc. and Honeywell Inc.  Carter is a Certified Public Accountant and holds an M.B.A. and a B.S. in Accounting.  Carter made false and misleading statements and omitted material facts in a September 11, 2013 presentation to securities analysts and other market participants.

11

29.     Defendant Dennis S. Baldwin was CAO and Senior Vice President from August 16, 2010 until his resignation on March 18, 2014, which occurred shortly after he signed the Company's materially false 2013 Form 10-K and shortly before KBR and its Audit Committee announced their intention to restate KBR's 2013 results.  Defendant Baldwin, in his role as CAO, was a member of the ELT.  Before joining KBR, Baldwin had 26 years of accounting and business experience in the engineering and construction industries, including as the Chief Accounting Officer for McDermott International and Integrated Electrical Services, Inc. Baldwin is a Certified Public Accountant and holds an M.B.A and a B.B.A. in Accounting.

30.     During the Class Period, Baldwin reviewed, approved, and signed KBR's false and misleading SEC filings, including KBR's Third Quarter 2013 Form 10-Q and KBR's 2013 Form 10-K.  Baldwin also reviewed and approved of false and misleading press releases and Form 8-Ks issued by KBR during the Class Period, including the Third Quarter 2013 Press Release, the Third Quarter 2013 Form 8-K, the Fourth Quarter 2013 and Full Year Press Release, and the Fourth Quarter 2013 Form 8-K.  In addition, during the Class Period, Baldwin participated in conference calls with securities analysts, during which KBR's false and misleading filings with the SEC and press releases were presented and discussed.  Baldwin also signed KBR's Comment Letters to the SEC Staff throughout 2013.

31.     Defendant Brian K. Ferraioli has been KBR's CFO and Executive Vice President since October 28, 2013, and acted as its interim principal executive officer from April 9, 2014 through June 2, 2014. Defendant Ferraioli, in his role as CFO and principal executive officer, was a member of the ELT.  Before joining KBR, Ferraioli had more than 34 years of financial and accounting experience in the engineering and construction industries, including as Chief

Financial Officer of The Shaw Group, Foster Wheeler USA, and Foster Wheeler Power Systems, Inc. Ferraioli holds a B.S. in Accounting and an M.B.A.

32.     During the Class Period, Ferraioli reviewed, approved, and signed KBR's false and misleading SEC filings, including KBR's 2013 Form 10-K, the First Quarter 2014 Form 10-Q, and the SOX Certifications therein. Ferraioli also reviewed and approved of false and misleading press releases and Form 8-Ks issued by KBR during the Class Period, including the Fourth Quarter 2013 and Full Year Press Release, the Fourth Quarter 2013 Form 8-K, the May 5, 2014 Press Release Announcing the Intention to Restate, the May 5, 2014 Form 8-K, the First Quarter 2014 Form 8-K, and the First Quarter 2014 Press Release. Ferraioli also participated in conference calls with securities analysts, during which KBR's false and misleading filings with the SEC and press releases were presented and discussed.

33.     Defendants Utt, Carter, Baldwin, and Ferraioli are collectively referred to as the "Individual Defendants" and, together with KBR, as the "Defendants." The Individual Defendants directly participated in the management of KBR's operations, including its accounting and reporting functions, had the ability to and did control KBR's financial reporting, and were privy to confidential information concerning KBR and its business, operations and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

## IV.   FACTUAL ALLEGATIONS

### A.   KBR Repeatedly Touts Its Canadian Services Business as an Engine of Growth and Significant Profit Source

34.   Throughout 2013, KBR stressed to investors that its Canadian Services business—and in particular, several Canadian "pipe fabrication and modular assembly projects"—was an important driver of profit for the Company.   The contracts for these projects, which were entered into during 2012 and 2013, required KBR to fabricate pipes and modular components and to provide turnaround services for oil and gas facilities in the Canadian oil sands—in other words, to refurbish, build and (in some cases) assemble the pieces used to construct the oil and gas facilities.

35.   KBR emphasized at numerous investor conferences during 2013 that the Company's Services business, propelled by these construction projects, had performed very well during each quarter and at year-end, and was quite lucrative to KBR's bottom line.   KBR filed financial statements with the SEC reflecting the purportedly strong performance of the Canadian projects in its Services business, which were backed by assurances by the Individual Defendants that the Company's financial statements were accurate and in compliance with GAAP.

36.   Investors relied on these representations.   As set forth below, financial analysts covering KBR published numerous research reports throughout 2013 highlighting the success of KBR's Canadian projects, and identifying the Services business as a stand-out performer whose profits buoyed the Company even during otherwise difficult quarters.

### 1.   Leading up to the Class Period, Defendants Highlight the Strong Performance of KBR's Services Business

37.   On April 25, 2013, prior to the Class Period, KBR announced financial results for the first quarter of 2013 that exceeded analysts' consensus expectations.   In a press release issued that day, the Company attributed these results in large part to the excellent performance of the

14

Company's Canadian projects, stating that, "Services job income was $31 million, up $3 million, or 11%, primarily related to several new module fabrication and turnaround projects ramping in Canada."  The next day, April 26, Defendant Utt reemphasized this message during an investor conference call: "At Services, Q1 was solid, particularly across bookings, revenue, and income at our Canada operations where we had … good execution on the strong bookings delivered in 2012."  He further explained that "[w]e expect continued robust performance from our Canadian operations in 2013…."  Defendant Carter echoed that, while revenues were down in certain parts of the Company, "[w]e did, however, see solid revenue growth in … Services, where the Services group was up nearly 40% led by a near-threefold increase in Canada operations."

38.     Following the investor call, Sterne Agee issued a report discussing the "Key Takeaways from Q1 Conference Call," which highlighted how the "Services business increased considerably as Canadian turnaround and fab[rication] projects showed no sign of a slowdown." In another report, William Blair analysts concluded that "Canada is expected to be one of KBR's strongest growing divisions in 2013" and raised its earnings-per-share estimates to incorporate "greater expected earnings from services (driven foremost by strength in KBR's Canada unit) over the remainder of the year."

39.     During the second quarter of 2013, the Company again focused investor attention on KBR's strong performance in Canada.  In a press release issued on July 25, 2013, KBR announced second quarter financial results that again exceeded analyst expectations, and emphasized that its results were due in large part to KBR's Canadian construction projects, stating that "Services job income was $38 million, up $9 million, or 31%, primarily related to increased activity on several module fabrication and turnaround projects in Canada.…"  During a quarterly conference call held the next day, Defendant Carter added that "Services was up 46%,

led by outstanding growth in Canada operations of 153%...."   Defendant Utt concurred, explaining that "[a]t Services, we had a strong second quarter, with revenue up 46% and job income up 31% year-over-year," specifically noting how "[o]ur Canadian business has doubled in size year-over-year during the first half of 2013."

40.     Analysts again reacted positively to the Company's representations.  Deutsche Bank heralded the "[s]trong service business momentum" at KBR, in which "Service revenues were up 46% [year over year], primarily due to strong growth from the Canadian operations." William Blair analysts similarly commented that "Services revenue was significantly stronger than we had expected," with "growth [being] driven primarily by KBR's Canada unit," and concluded that "Canada remains one of KBR's strongest divisions and it, along with the building and industrial services units, is expected to continue driving services award opportunities over the balance of 2013."

**2.     KBR Falsely Reported Strong Profits From
Its Services Business During the Second Half of 2013**

41.     During the second half of 2013, KBR continued to trumpet its Canadian Services business as a source of financial strength and stability for the Company.  On September 11, 2013, the first day of the Class Period, KBR's Chief Financial Officer made a presentation at an investor conference in San Francisco, California.  Defendant Carter acknowledged how, "[o]n the services side, we've talked a lot about Canada in 2012 and 2013."  She continued to tout KBR's Canada operations, explaining that there had been "a lot of strong bookings with a wide variety of markets, as you can see here, with turnarounds, module fabrication, gas processing, camp support, et cetera."  She assured investors that KBR maintained strict control over its contract costs, stating that the Company was exercising "good cost control, good project

16

management and risk management."  As Defendant Carter explained, the "message" to be taken away from her presentation was that KBR has "strong cost control."

42.    On October 24, 2013, KBR reported EPS of $0.16 for the third quarter of 2013 in its SEC filings, signed by Defendants Utt and Baldwin.  Although the Company's third-quarter 2013 results were below consensus expectations, the Company portrayed its Canadian pipe fabrication projects as a bright spot whose continuing strong performance partially offset sluggish results in other business units.  In its third-quarter press release, issued on October 24, 2013, KBR reported that "Services job income was $31 million, up $16 million, or 107%," which was driven in significant part by "increased activity on several module fabrication projects in Canada."   On a conference call with investors and financial analysts the following day, Defendant Utt elaborated on KBR's successes in Canada, explaining that the fabrication projects were performing very well and experiencing no problems:

> We have had some good bookings continue in Canada on our work up in the oil sands. And also the fabrication work that we are doing, we seem to be doing very well in delivering modules that are built to design and fit up issues are minimal, and we seem to have gotten more than our share on modules and hope we can continue to maintain the very good performance we have in our module fabrication … yards up in Edmonton.

43.    On November 13, 2013, in another conference call with analysts, Defendant Utt again highlighted KBR's purportedly successful pipe fabrication projects, stating that "Our operations there [in Canada] have been very successful in construction fabrication turnarounds."

44.    Analysts again reported on the purportedly strong performance of KBR's Services segment and Canadian projects.  For example, on October 25, 2013, analysts at Jefferies identified KBR's Canadian Services business as a high point in an otherwise "messy" quarter, explaining that "Services bookings were very strong (BtB of 2.3x) driven by higher activity levels in Canada and execution during the quarter was clean." Similarly, on October 28, 2013,

analysts at BB&T Capital Markets reported that "Services revenues of ~$494M were up 18% [year-over-year] due to strength in Canadian fabrication and turnaround services…."

45.     Unfortunately for investors, Defendants' statements about KBR's supposedly successful Canadian Services business were false, and the Company's reported financial results were dramatically inflated throughout the latter half of 2013.  As investors would ultimately learn, contrary to Defendants' repeated statements, KBR's Canadian construction projects had been an unmitigated disaster that had caused the Company to suffer huge losses during the third and fourth quarters of 2013.

### B.     KBR's Financial Results for the Second Half of 2013 Were Artificially Inflated, and Its "Robust Performance" in Canada Was a Fiction

46.     Unknown to investors at the time, KBR's financial results for the third quarter of 2013, the fourth quarter of 2013, and the full year were materially misstated.  By engaging in a clear violation of well-established accounting rules, KBR masked its true financial condition and created the illusion of a much stronger Company and a thriving Canadian Services business.  In reality, the Company's true performance was far below its reported results, and its Canadian pipe fabrication business was a severe, negative drain on KBR's bottom line.  Indeed, contrary to the Company's prior statements, the Services segment was its worst performing business segment by far in 2013, and the only business segment within the entire Company to suffer an annual loss.

47.     Specifically, KBR did not account during 2013 for a staggering $156 million in known pre-tax losses related to seven Canadian pipe fabrication and modular assembly service contracts—an amount that was greater than KBR's net income for all of 2012 and nearly two-thirds of its net income for 2013.[2]  As the Company later acknowledged through the Restatement,

---

[2]     "Net income," as used in the Complaint, refers to a metric identified in the Company's financial statements as "net income attributable to KBR," which excludes income allocated by

these charges were known within KBR by no later than the time it filed its third and fourth quarter 2013 SEC filings, but the Company failed to account for them or otherwise disclose them.  The Company's failure to do so violated the rules under GAAP governing the manner in which KBR was required to account for the Canadian Services contracts.

### 1.    Relevant Accounting Principles

48.    Under GAAP, companies may account for revenue and losses on contracts using the "completed-contract" method.  This method requires companies to wait until a contract is substantially complete before recognizing revenue received from the contract.  As stated by the Financial Accounting Standards Board ("FASB"), for the completed-contract method, "income is recognized only when a contract is completed or substantially completed."  *See* Accounting Standards Codification ("ASC") 605-35-25-88.  Under this accounting method, "billings and costs are accumulated on the balance sheet [during the period of performance of the contract], but no profit or income is recorded before completion or substantial completion of the work."  *Id*.

49.    In certain circumstances, however, GAAP permits entities to recognize revenue prior to the completion of the contract.  This accounting method is referred to as the "percentage-of-completion" method. It allows companies to recognize income as work on a contract progresses, so long as the revenue and expected costs are recognized on a prorated basis according to the percentage of the project that is complete.  *See* ASC 605-35-25-82.  Companies often prefer the percentage-of-completion accounting method because it permits them to book

---

the Company to non-controlling interests.  In calculating the impact of the $156 million in losses from the Canadian contracts on KBR's net income and other financial metrics, the Complaint (unless otherwise noted) excludes the impact of KBR's additional accounting errors identified in the Restatement.

income on a project before the project is actually done and, as a result, issue financials showing profits on a contract prior to its completion.

50.     The percentage-of-completion accounting method is straightforward to apply.  As noted above, revenues and profits are booked according to the percentage of the contract that is complete.  To determine the percentage of the contract that is complete, the company compares its costs incurred to date to the total costs it estimates it will expend to complete the job.  In the language of GAAP, this means that revenues and profits are "measured by the relationship of costs already incurred to the total of costs already incurred and future costs expected to be incurred."  *See* ASC Master Glossary.  Thus, for example, if a company has incurred 50% of the costs that it has estimated it will incur during the life of the project, then it may deem the project 50% complete, and book 50% of the profit.  Conversely, if the company's cost calculations demonstrate that the costs exceed the revenues under the contract, the company must recognize the full contract losses in the reporting period in which they become evident, and not wait until the completion of the contract.

51.     There are limits on when a company may use percentage-of-completion accounting.  Most fundamentally, a company may use percentage-of-completion accounting only if it can reliably estimate its costs on the project.  *See* ASC 605-35-25-56.  As explained by GAAP, "[t]he use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates." *Id.*   When a company cannot reliably estimate its costs, it cannot use the percentage-of-completion accounting method, and must account for the contract using the completed-contract method.  GAAP provides that "[a]n entity using the percentage-of-completion method as its basic accounting policy shall use the completed-contract method for a

single contract or a group of contracts for which reasonably dependable estimates cannot be made or for which inherent hazards make estimates doubtful." ASC 605-35-25-61.

52.   Thus, by disclosing its use of the percentage-of-completion method, KBR represented that the costs related to its Canadian pipe fabrication projects were based on "reasonably dependable estimates." *See* ASC-605-35-25-56. Indeed, as set forth in GAAP, "the ability to produce reasonably dependable estimates is an <u>essential element</u> of the contracting business," and an "entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP." ASC-605-35-25-45 and 58.

53.   In addition, a company must update its cost estimates at each reporting period to reflect any additional costs it has incurred or anticipates incurring. GAAP specifically requires that "estimates of cost to complete … be reviewed periodically and revised as appropriate to reflect new information." *See* ASC 605-35-25-44.   As noted above, once the costs exceed the revenue under the contract, "GAAP requires recognition of the entire anticipated [contractual] loss as soon as the loss becomes evident." ASC 605-32-25-45. KBR's current CFO, Defendant Ferraioli, acknowledged this basic GAAP requirement when he stated during an investor conference call on June 19, 2014 that a company "obviously" must account for contract losses when it believes "there [ar]e additional charges to come" because "[t]hat's what the accounting requires."

54.   KBR represented in its 2013 SEC filings that it appropriately used percentage-of-completion accounting and adhered to the requirements of GAAP. In each of its annual filings, the Company represented that "[r]evenue from contracts to provide construction, engineering, design or similar services is reported on the percentage-of-completion method of accounting."

21

Further, as set forth in greater detail at ¶¶135-136 and 154, certain of the Individual Defendants signed certifications each quarter during the Class Period verifying that the Company followed GAAP and, accordingly, properly accounted for costs and revenues on long-term contracts pursuant to the rules summarized above.

55.     Compliance with GAAP is also required by the securities laws.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)) requires that financial statements comply with GAAP.  Relatedly, financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading or inaccurate."  *Id.*

56.     KBR and its senior executives were highly experienced at applying the percentage-of-completion accounting method, and specifically assured investors that they made reliable and conservative cost estimates.  KBR has used percentage-of-completion accounting since its inception, and emphasized in each of its Form 10-Ks for 2009 through 2013 that KBR has "a long history of working with multiple types of projects and in preparing cost estimates." The Company also told investors in its 2013 Form 10-K and its 2014 quarterly reports that its cost estimates warrant investors' trust because "historically, our [cost] estimates have been reasonably dependable regarding the recognition of revenues and profit on percentage of completion contracts."  Defendant Utt further sought to inspire investor confidence by telling the market during an October 25, 2013 investor conference that the Company was cautious when deciding whether to use the percentage-of-completion accounting method and also when applying it, stressing that "we do a pretty good job of being <u>conservative in how we book projects and provision them over the life of the project</u>."

57.     KBR also represented that it had special expertise in its Canadian construction activities, and thus, knew how to properly perform and account for these projects.  According to

its press releases, KBR had "60 years of experience and expertise in the Canadian market" (December 20, 2013 press release), was "a veteran Alberta module fabricator and contractor" (November 20, 2012 press release), and had "expertise on [Canadian] high-profile oil sands projects" (March 10, 2014 press release).

58.     The Individual Defendants knew, based on their decades of accounting experience, that it was critical that KBR accurately report its costs and any losses under the percentage-of-completion accounting method, including for its Canadian Services business.  As noted above, the Company repeatedly touted the supposed performance of KBR's Canadian pipe fabrication contracts as a driver of KBR's growth, and thus understood that the failure to properly account for the costs on those contracts would have a material negative impact on KBR's financial results and the market's evaluation of KBR's worth.  Further, in each of its Form 10-Ks filed with the SEC between 2007 and 2013, KBR identified the percentage-of-completion accounting method as a "critical accounting policy" because it was "fundamental to our results of operations."

### 2.     KBR Senior Management's Involvement in the Cost Estimation Process

59.     The Individual Defendants were integrally involved in the cost estimation process for the Canadian projects at issue.  As KBR stated in its 2013 Form 10-K, "[a]t the outset of each contract, we prepare a detailed analysis of our estimated costs to complete the project." Confidential Witness One ("CW1") described senior management's role in estimating costs at the outset of projects. CW1 was the General Manager of KBR Industrial Services in Canada from 2010 until April 2013, during which time KBR entered into many of the contracts at issue here. During CW1's tenure at KBR, CW1 managed the Turnaround Business for KBR in Canada and was directly involved in the bid approval process for new contracts and cost estimation.

60.     CW1 advised that, when a request for proposal ("RFP") was received on a project that KBR wished to bid upon, a detailed evaluation of that project and its associated cost estimates was prepared and distributed to KBR senior management—a "white paper brief." CW1 was responsible for the preparation of white paper briefs for every project he was involved in procuring, and advised that all KBR projects required the preparation of a similar white paper brief.   The white paper briefs for new projects, CW1 explained, were comprehensive and contained detailed reports designed to provide KBR management with all the information required to decide on the merits of a given project.   CW1 stated that the white paper brief included cost estimates, the basis for those cost estimates, an evaluation of the risks of the project, and an analysis by the KBR Corporate Treasury Department on the financial soundness of the client company.

61.     CW1 explained that the white paper briefs for projects explicitly noted whether design drawings for a project were absent.   In instances when KBR did not have the design drawings, CW1 reported, the white paper brief would indicate "design drawings to follow."   This information was included in the white paper brief because, as CW1 advised, the design drawings for a project are an essential part of the cost estimation process.   When asked to explain the significance of design drawings to the estimation process, CW1 asked rhetorically: "How can you estimate without design drawings?"

62.     The absence of design drawings, CW1 explained, would greatly increase the risk of a project.   The risk was increased so significantly that the approval of the Company's CEO, Defendant Utt, was required before KBR could enter into a contract for a project that lacked design drawings.   In addition, a contract considered for approval without design drawings was presented to the Executive Leadership Team (as defined above, the "ELT") prior to approval,

CW1 explained.  Accordingly, the ELT, CW1 stated, would be aware of the absence of design drawings.

63.    After KBR entered into its Services contracts, KBR's senior management, including the Individual Defendants, remained directly involved in the cost estimation process. As stated in KBR's 2013 Form 10-K, "[a]t least quarterly, significant projects are reviewed in detail by senior management."  The Individual Defendants reviewed and analyzed the cost estimates for the Canadian projects in connection with their roles as members of the ELT.  As noted above, KBR's CEO, Defendant Utt, was the head of the ELT, and Defendants Carter, Baldwin, and Ferraioli were members of the ELT.

64.    The ELT met monthly in Houston.  In advance of each meeting, the ELT members received detailed monthly reports concerning the Company's important projects, including the Canadian projects at issue here.  Confidential Witness Two ("CW2") was responsible for gathering information and compiling monthly reports in advance of ELT meetings relating to KBR's Canadian operations.  CW2 worked as a Financial Analyst for KBR in Canada from April 2011 until September 2013 and then as a Senior Contract Specialist until late November 2013. The monthly ELT reports prepared by CW2 were titled "KBR Monthly Business Unit ELT Reviews" for Canada.  These monthly reports were widely circulated within KBR prior to each monthly ELT meeting.  CW2 recounted that the reports were sent each month to the members of the ELT, Defendant Utt's personal assistant, Karl Roberts (the Senior Vice President of Canada Operations), the Canadian Controller, and members of Accounting.   CW2 explained that Karl Roberts attended the monthly ELT meetings to discuss the status of the Canadian projects with the ELT members.

65.     CW2 explained that the KBR Monthly Business Unit ELT Reviews provided a comprehensive picture of current Canadian operations.  CW2 stated that the KBR Monthly Business Unit ELT Reviews provided critical information about the status of the Canadian projects, including whether KBR had received the design drawings for particular projects.  These detailed monthly reports, which were sometimes over 30 pages long, also set forth (i) the percentage of completion for individual Canadian projects; (ii) the estimated costs to complete individual Canadian projects; (iii) revenue and job income for individual Canadian projects; and (iv) a list of updates and issues encountered on the individual Canadian projects.

### 3.     The Severe Impact of KBR's Accounting Violations

66.     KBR and its senior officers dramatically overbooked profit during 2013 and violated the GAAP provisions discussed above at ¶¶48-55 by failing to take $156 million in required pre-tax charges stemming from contract costs related to KBR's Canadian construction contracts.  As it would eventually admit through the Restatement, $89 million of the $156 million pre-tax charges were known to KBR and required to be taken by no later than the third quarter of 2013.  An additional $67 million in charges were known and required to be taken during the fourth quarter.  Yet KBR did not account for any of these charges or disclose them at either reporting period.

67.     KBR was required under GAAP and the securities laws to record these charges— and the resulting losses—in its financial statements for the third quarter of 2013, the fourth quarter of 2013, and the full year.  Its failure to do so violated GAAP's clear-cut requirements that companies (i) "review periodically" their "estimates of cost to complete … and revise[] [those estimates] as appropriate to reflect new information," *see* ASC 605-35-25-44; and (ii) recognize "the entire anticipated loss [on long-term contracts] as soon as the loss becomes evident" as a result of additional costs incurred, *see* ASC 605-35-25-45. By not accounting for

these charges, Defendants were able to maintain an impression of a highly successful Canadian Services business and an overall profitable Company when, in reality, the opposite was true.

68.     During the third quarter of 2013, KBR overstated its Services operating income by more than 500% and its Company-wide net income by more than 300%, and transformed significant losses into false profits.  In the third quarter of 2013, KBR reported $17 million of pre-tax operating income for its Services business, when, in fact, according to the Restatement, it had suffered a $72 million operating loss.    The impact of these accounting improprieties on KBR's Company-wide performance was equally dramatic.  While KBR reported Company-wide net income of $24 million for the third quarter, in truth, when the undisclosed contractual charges were accounted for in the Restatement, KBR had actually suffered a $55 million loss.

69.     KBR also materially inflated its results for the fourth quarter of 2013.  As disclosed in the Restatement, KBR overstated its Services segment's operating income by 558% and its Company-wide net income by 242%, again transforming significant losses into illusory profits.  In the fourth quarter of 2013, KBR claimed that its Services business had $12 million in pre-tax operating income. Had the Company properly accounted for its Canadian contracts, investors would have learned that, in reality, the Services business had suffered a quarterly operating loss of $55 million.  Moreover, while KBR reported Company-wide net income of $27 million for the quarter, unbeknownst to investors until the Restatement, the Company had in fact suffered a $38 million loss.

70.     KBR also artificially inflated its results for the full-year 2013 by material amounts.  By failing to properly recognize and account for its Canadian contracts, KBR overstated its 2013 annual net income and earnings-per-share by 63%.

71.     In addition to admitting that it materially overstated its key financial metrics during the Class Period, KBR has admitted that the Company's most senior officers made multiple false statements concerning the adequacy of its internal controls over its financial reporting.  During the third and fourth quarters of 2013, the Company's financial statements included Internal Control Certifications and SOX Certifications (defined herein at ¶¶135-137), which were signed by Defendant Utt as CEO and interim CFO, and Defendant Ferraioli as CFO.  These Certifications purported to confirm the accuracy of the financial statements and stated that the Company had implemented "effective" internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

72.     Basic audit standards recognize that the Individual Defendants, as the Company's most senior officers, were directly responsible for ensuring that the Company had robust and well-functioning internal controls.  On this subject, the Auditing Standards set forth by the Public Company Accounting Oversight Board (PCAOB) provide:

> The financial statements are management's responsibility.… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.… The fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility.

*See* AU Section 110.02 of the Public Company Accounting Oversight Board (PCAOB).

73.     KBR's Form 10-Ks filed with the SEC and signed by the Individual Defendants similarly stated that "[m]anagement is responsible for establishing and maintaining adequate internal control over financial reporting."  These mandates were further embodied in KBR's Corporate Policy No. 3-004, titled "Internal Accounting Controls, Procedures and Records," which provided, in relevant part, as follows:

> *Responsibility.* The implementation and maintenance of internal accounting controls, procedures and records that are adequate in all respects to satisfy the requirements of this Corporate Policy will be <u>the primary responsibility of the Chief Financial Officer [i.e., Defendants Carter and Ferraioli]. In addition, the Chief Executive Officer [i.e., Defendant Utt] and Chief Financial Officer [i.e., Defendants Carter and Ferraioli] are responsible</u> for ensuring compliance with all aspects of Sections 302 and 404 of the Sarbanes-Oxley Act, which requires that management assess and report on the effectiveness of the Company's system of internal control over financial reporting at specified intervals.

74.    In the Restatement, KBR admitted that its internal controls over contract cost reporting and the preparation of cost estimates suffered from severe and pervasive material weaknesses in 2013, and thus, that the SOX Certifications and Internal Control Certifications signed by the Individual Defendants were false.  As KBR would ultimately admit in its Restatement, far from having "effective" internal controls, Defendants had fostered a "culture" in KBR's Canadian operations that encouraged accounting manipulation.  KBR's internal controls were further compromised by Defendants permitting "insufficiently trained project managers, project controls, accounting and executive management professionals to perform project oversight reviews and monitor compliance."  As KBR admitted in the Restatement, these material deficiencies "facilitated" the Company's dramatic misstatements of its financial results.

**C.    KBR Is Forced to Disclose a "Material Weakness"
in Its Reporting of Cost Estimates, but Falsely Assures
<u>Investors That Its 2013 Financial Statements Are Accurate</u>**

75.    On February 27, 2014, the first indication emerged that KBR's internal controls were not as represented, and its financial statements could be impacted by improper accounting for its costs and losses on the Company's construction contracts.  That day, KBR announced its fourth-quarter and year-end results, reporting quarterly EPS of $0.18, which was below analysts' consensus expectations.  KBR attributed its disappointing results to a series of unexpected charges totaling $79 million.  As the Company explained in its 2013 Form 10-K filed that day, of these fourth-quarter charges, $17 million was directly attributable to a "material weakness" in the

29

Company's internal controls over the "completeness and accuracy of estimates of revenues, costs and profit" for its construction contracts.

76.     The "material weakness" was identified by KBR's outside auditor, KPMG LLP, and described in its February 27, 2014 *Report of Independent Registered Public Accounting Firm*, which was attached to the Form 10-K (the "February 27 KPMG Report").   In the February 27 Report, KPMG reported that KBR suffered from a "material weakness … related to project reporting over the completeness and accuracy of estimates of revenues, costs and profit at completion for certain long-term construction projects with multiple currencies."   The February 27 KPMG Report explained that "[a] material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."

77.     News of KBR's material weakness in internal controls over its accounting for contract costs, and resulting $17 million charge-off, surprised the market and caused multiple analysts to downgrade the stock.   The news also prompted GMI Ratings in its March 3, 2014 "Governance Insight Alert" to rate KBR an "F" (the worst-possible rating) for potentially "Inaccurate Financial Reporting," and to highlight KPMG's material weakness finding.   The GMI Report expressed concern that the "[m]aterial weaknesses were found related to project reporting over the completeness and accuracy of estimates of revenues, costs and profit at completion for certain long-term construction projects with multiple currencies."

78.     KBR's stock price dropped significantly on news of the Company's material weakness and related charges.   On February 28, 2014, the first trading day after the disclosure,

the Company's stock price declined by 13.5% on heavy trading volume, falling from $31.94 to $27.62.

79.     Notwithstanding the disclosure of this material weakness, KBR and Defendants Utt, Baldwin and Ferraioli continued to falsely assure investors that KBR's 2013 financial statements were accurate.  Specifically, they stated that, in light of KPMG's material weakness finding, they had conducted extensive additional year-end testing on KBR's 2013 financial statements and "ensure[d]" that KBR's reported financial results were accurate, reliable, and in compliance with GAAP:

> In light of the material weakness identified above, <u>we performed additional analysis and other post-closing procedures to ensure</u> our consolidated financial statements were prepared in accordance with generally accepted accounting principles and reflect its financial position and results of operations as of and for the year ended December 31, 2013…. <u>[M]anagement concluded that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented.</u>

80.     In the Form 10-K, KBR and Defendants Utt, Baldwin and Ferraioli further assured investors that the material weakness in calculating costs on construction contracts did not impact the Company's critical Canadian pipe fabrication projects.  According to Defendants, the material weakness related to only one project in the Gas Monetization segment that was "near completion."

81.     During an investor call on February 28, 2014 to discuss KBR's fourth-quarter 2013 results, KBR and Defendants Utt and Ferraioli continued touting KBR's performance in Canada and reporting fictitious profits.  Defendant Utt highlighted that "[a]t Services, we're focused on executing on the substantial work we've won over the past two years, primarily in the Canadian oil sands," and "[i]n Canada, we're expecting to see continued growth."   The Form 10-K, which was signed by Defendants Utt, Ferraioli and Baldwin, further highlighted KBR's

performance in Canada by stating that: "[o]ur Services business segment had a strong year in 2013 with revenues increasing 28% to $2.1 billion primarily driven by construction activities on oil sands-related projects in western Canada."

82.     As a result of these statements, analysts continued to report that, while the Company struggled in certain areas during the fourth quarter of 2013, the Services business in Canada—driven by KBR's Canadian pipe fabrication operations—continued to perform well. BB&T reported on February 28, 2014, how, despite the Company's difficulties with its other business segments, "Services revenue was up 4% to $460M on increased activity on several fabrications contracts in Canada," while Sterne Agee similarly highlighted in its March 2, 2014 report the "robust flow of activity [that] continues from the Canadian Oil Sands."

### D.     KBR's Chief Accounting Officer Abruptly Resigns and Its Chief Executive Officer Sells a Massive Amount of Stock

83.     On March 4, 2014, five days after the Company filed its inflated fourth-quarter and year-end financial results in the Form 10-K, KBR's Chief Accounting Officer, Defendant Baldwin, informed KBR that he was resigning. The resignation of Defendant Baldwin, who had been the Company's Chief Accounting Officer for four years, was not expected. KBR and Defendant Utt did not inform investors of Defendant Baldwin's resignation until March 10, 2014—i.e., six days after KBR was informed.

84.     During that intervening six-day period, Defendant Utt sold an enormous amount of KBR stock. On March 6, Defendant Utt sold 162,741 shares of KBR stock, collecting over $4.5 million in cash proceeds. The timing of Defendant Utt's sales of his personal KBR stock is highly suspicious. Defendant Utt liquidated his shares:

- eight days after KBR issued its materially false quarterly and annual financial results;

- two days after KBR's Chief Accounting Officer abruptly resigned, but before Baldwin's resignation was publicly announced to investors; and

- two months before KBR disclosed its intention to restate its annual financial statements by highly material amounts, which caused the stock to decline and prompted an SEC investigation.

85.     The size of Defendant Utt's stock sale on March 6 is equally striking.  Defendant Utt sold <u>six times</u> more shares on March 6 than he had ever before sold on a single day of trading in his entire eight-year career at KBR.  On that one day, Utt sold <u>72.75%</u> of his total KBR holdings.  Notably, Defendant Utt did not purchase a single share of KBR stock during the Class Period.  As reflected in the chart below, the amount of Defendant Utt's sale on March 6 exceeded the total amount of <u>all 15 of his stock sales over the two prior years combined.</u>



86.     On April 9, 2014, one month after Defendant Utt's insider sales and approximately three weeks before the Restatement was announced, KBR disclosed that Utt was resigning.  While KBR had announced in December 2013 that Utt intended to resign the following year, it had not provided a date for his resignation.  Utt left KBR before his successor, Stuart Bradie, joined the Company in June 2014.  Rather than remain at KBR until Bradie

assumed the CEO role, Utt's resignation was effective immediately, forcing KBR to appoint an "interim principal executive officer."  Thus, weeks after issuing inflated 2013 financial statements, and weeks before the falsity of those financials was revealed, both KBR's Chief Executive Officer and Chief Accounting Officer left the Company.

### E.   KBR's Restatement Wipes Out Its Profits for the Third and Fourth Quarters of 2013 and Decimates Its Year-End Results

87.   On May 5, 2014, KBR surprised investors by disclosing in a Form 8-K that its Audit Committee had concluded that KBR needed to take the drastic step of restating the Company's 2013 financial statements (as defined above, the "May 5 Disclosure").  KBR explained that a restatement was necessary because, "[i]n connection with the preparation of KBR, Inc.'s Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million."  KBR further disclosed that the charges consisted of the "the reversal of $23 million in previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion," and that "the majority of these losses should have been recognized in our consolidated financial statements as of and for the year ended December 31, 2013."  The May 5 Disclosure purported to identify all losses for work released on the Canadian contracts "through March 31, 2014"—i.e., the end of the first quarter of 2014.

88.   KBR also stated that it needed to reverse an additional $9 million in revenue to account for "an overstatement error in [KBR's] revenue recognition on a long-term construction project" and, finally, correct a $6.5 million "understatement of [KBR's] income tax provision." In the aggregate, the Restatement would ultimately reduce KBR's Company-wide net income for

the entire year by 67%, from $229 million to $75 million.  Given the magnitude of KBR's misstatements, the Company withdrew its 2013 financial statements and all related representations, instructing investors that they should not rely upon KBR's "previously issued consolidated financial statements for 2013" or any of "KBR's earnings and press releases and similar communications."

89.    KBR also announced that, as a result of its need to restate its financials, it could not timely file its results for the first quarter of 2014, and was withdrawing its revenue guidance. It further advised that the KBR Audit Committee had retained independent legal and accounting advisors to review these matters, separate from KBR management.

90.    The May 5 Disclosure was an admission by KBR that its 2013 financials were materially false when issued, and that the Canadian contract losses were not the result of new developments or changes in assumptions.   Under GAAP, a restatement is a term of art.   In contrast with a post-period adjustment, a restatement is reserved for those situations in which a company's previously-issued financial statements were materially false as of the time of issuance.  As GAAP explains, a restatement is necessary only when "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." ASC 250-10-20 and ASC 250-10-45-23.  As further explained at ASC 250-10-45-17, a mere "change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods…."

91.    The announcement of KBR's intention to restate its financials surprised the market—especially given KBR's assurances just two months earlier that it had scrutinized its

financial statements and "ensured" they were accurate.  Within hours of the May 5 Disclosure, UBS published an analyst report stating that "[t]he restatement and charges are a disappointing development," and "[i]n light of the news today, we are placing our rating and target under review."  Analysts at Stephens also lowered their price rating for the stock, noting that KBR's Services segment had reported a "gross profit of $70 mil. in 2013, which we expect will be revised to a loss as a result of the accounting errors  associated with the problem projects."

92.     In reaction to KBR's May 5 Disclosure, the price of KBR's stock fell by more than 6%, declining from $25.84 at the close of the trading on May 2 (the last trading day before the disclosure) to close at $24.23 on May 5, on extremely high volume traded of over 4 million shares.

93.     On May 30, 2014, KBR filed its restated Annual Report for the 2013 fiscal year on Form 10-K/A (as defined above, the "Restatement"), in which it restated its financial statements for the third quarter of 2013, the fourth quarter of 2013 and the full year 2013.  In the Restatement, as noted above, KBR admitted that it failed to report $156 million in losses during the third and fourth quarters of 2013.  The Restatement acknowledged the materiality of these losses and their impact on KBR's financial statements, stating that "[t]he restatement was determined to be necessary due to the materiality of the additional estimated costs to complete seven Canadian pipe fabrication and modular assembly contracts within our Services business segment."

94.     The Restatement further showed that the accounting improprieties at KBR had a sweeping impact on KBR's publicly reported financial statements.  KBR restated 12 of 21 different accounting metrics on its income statements for the affected periods, including nearly all of its key metrics, such as gross profit, operating income, net income, and EPS by, in some

cases, <u>more than 300%</u>.[3]  As detailed above and further below in ¶¶131-133 and 143-151, KBR's accounting improprieties through the Restatement eliminated all of KBR's purported profits for the third and fourth quarters of 2013, swung the Company to substantial losses in each of those quarters, and eliminated two-thirds of KBR's profit for all of 2013.

95.    The Restatement also revealed that, contrary to KBR's assurances in the Form 10-K, KBR's material weakness concerning cost estimates was not limited to one project in the Gas Monetization segment, and had resulted in far more than the $17 million charge the Company had initially recorded.  The Restatement included a report by KPMG dated May 30, 2014 (the "May 30 KPMG Report") in which KPMG identified additional severe control deficiencies in KBR's financial reporting relating to KBR's cost estimates, this time in the heart of KBR's highly-touted Canadian Services business.

96.    As KBR admitted in its Restatement, KBR's management had fostered a "culture" at KBR's Canadian operations that encouraged accounting misstatements.  As the Company explained:

> [T]he control environment was ineffective in that <u>the culture at the Canadian pipe fabrication and modular assembly business facilitated delayed identification and communication of project concerns and the proper preparation of complete and accurate estimates of revenues, costs and profit at completion</u>.  As a result, our controls over the completeness and accuracy of information used in our preparation of estimates and our control procedures over our preparation of estimates to complete and our controls over the reviews of such estimates to complete for our Canadian pipe fabrication and modular assembly business also were not effective.

97.    KBR further admitted that this severe deficiency was exacerbated by the fact that the Company's "accounting and executive management" had failed to "monitor compliance"

---

[3]      The 12 restated accounting metrics include: revenues, cost of revenues, gross profit, general and administrative expenses, operating income, income before income taxes and noncontrolling interests, provision for income taxes, net income, net income attributable to noncontrolling interests, net income attributable to KBR, basic EPS, and diluted EPS.

with required accounting principles, stating that "[w]e determined that a material weakness in internal control over financial reporting existed in our Canadian pipe fabrication and modular assembly business within our Services business segment resulting from the Company having insufficiently trained project managers, project controls, accounting and executive management professionals to perform project oversight reviews and monitor compliance with the Company's standard processes and controls."

98.     The material weaknesses were so widespread that KBR was forced to overhaul its accounting control environment and implement multi-faceted "plans for remediation of the material weaknesses."   The remediation plan, as set forth in the Restatement, required (i) "[i]mplement[ing] standard project management oversight from corporate management"; (ii) "[c]hang[ing] certain management and increase[ing] the number of qualified professionals"; (iii) "provid[ing] training to new and key personnel on roles and responsibilities, including line of communications in the event of concerns"; (iv) "implement[ing] and monitor[ing] execution of KBR standard project controls work processes and systems across the Canada pipe fabrication and module assembly projects"; and (v) "provid[ing] training to new and key personnel on Company standard processes and systems across all project operations, oversight and support functions, including project management and module yard management."

99.     In other words, the Individual Defendants, who were personally responsible for ensuring that KBR maintained effective internal controls, had abandoned any semblance of proper accounting procedures with respect to KBR's key Canadian Services business.  Far from a rogue employee problem, the entire "culture" at KBR "facilitated" the misstatements at issue here.  The material weaknesses at KBR were so pervasive that KBR has devoted at least two financial quarters trying to remediate the deficiencies, without fully rectifying the problems.

KBR disclosed in its Form 10-Q at the end of the second quarter of 2014 that it still suffers from the same material weaknesses identified in the Restatement.

> **F.    KBR Stuns Investors with an Additional $82 Million in Losses on Its Canadian Contracts, and Finally Admits That It Lacked <u>the Information Required to Accurately Estimate Contract Costs</u>**

100.    Based on the Company's Restatement and May 5 Disclosure, investors were led to believe in May 2014 that the Company had carefully inspected its accounting books and the Canadian Services contracts, identified extant costs, and accounted for them.

101.    In its May 5 Disclosure, the Company told the market that it had identified approximately $158 million in losses for work released "through March 31, 2014"—<u>i.e.</u>, the end of the first quarter of 2014.   In its subsequent Restatement, the Company confirmed that it had failed to report $156 million in losses in its 2013 financial statements.  Accordingly, investors were led to believe that KBR's losses from the Canadian contracts through March 31, 2014 had now been identified and accounted for.  As investors would eventually learn, this was not true. In reality, KBR had incurred $41 million in additional losses on these contracts during the first quarter of 2014, ending March 31, 2014.  KBR knew by May 5, or was severely reckless in not knowing before issuing the May 5 Disclosure, of the additional $41 million in losses.  Indeed, by the time that KBR issued the May 5 Disclosure, more than a month had passed since the first quarter ended.

102.    In addition, KBR failed to disclose that, with respect to certain of the Canadian contracts at issue, KBR was unable to reliably estimate the costs of completing its work because it lacked the design drawings for the projects.   These drawings, by the Company's later admission, were necessary for it to reasonably calculate estimated costs because they define the "scope of work" for the project, including the amount and type of construction materials, labor, and time needed to complete the project.  Without these drawings, as KBR would ultimately

admit on July 31, 2014, it was "<u>really impossible</u>" for the Company to prepare reasonably dependable cost estimates. KBR's failure to disclose that it was unable to reliably estimate its costs and losses was, by itself, materially misleading. It also violated GAAP, which specifically provides that "the ability to produce reasonably dependable estimates is an <u>essential element</u> of the contracting business," and an "entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP," as set forth above in ¶¶51-54.

103.    On June 19, 2014, KBR issued a press release announcing its financial results for the first quarter of 2014. KBR reported a loss of $0.29 per share, far below consensus expectations of a $0.38 per share profit. Contrary to the Company's prior representation in the May 5 Disclosure that it had accounted for losses on work released under the seven Canadian contracts at issue in the Restatement through the first quarter of 2014, KBR's press release revealed that the Company had suffered "<u>$41 million of additional losses</u> in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada…."

104.    These additional losses had a material negative impact on the Company's performance for the first quarter of 2014. As new CEO Stuart Bradie stated in the Company's June 19, 2014 press release, the Company's overall results "'were negatively impacted by losses stemming from our Service segment's pipe fabrication and module assembly facility in Canada….'" In its slide presentation to investors that day, KBR explained that these losses slashed KBR's diluted EPS by $0.28, thus accounting for nearly all of the Company's losses for the quarter.

105.    Investors were surprised to learn that KBR was still recording large losses on the same Canadian contracts. For example, in its "Key Takeaway" for the quarter, analysts at

Jefferies expressed disappointment that "KBR's 1Q EPS were substantially below estimates, as the impact of problem projects in Canada (along with other issues) continued into 1Q14." Analysts at Credit Suisse explained that "[t]he segment saw an operating loss of $60M vs. a gain of $18M last year driven by $41M in losses related to the Canadian pipe fabrication problem projects."  Analysts at Cowen reported that KBR "widely miss[ed] estimates primarily due to continued losses on fabrication contracts in its Services segment," with KBR's profits in some business segments "offset by continued major losses from its Services segment's Canadian pipe fabrication/modular assembly contracts ($41MM) and other charges."

106.    The market reacted sharply to KBR's disclosure of the additional Canadian service contract losses.  On June 19, the day of the disclosure, the price of KBR's stock fell by more than 7%, from $26.32 (the price at the close of trading on the prior day) to $24.46. Trading volume was particularly heavy for the day, with over 13 million shares traded.

107.    The full truth, however, about KBR's losses on its Canadian contracts was not revealed to investors until July 31, 2014, when KBR announced its results for the second quarter of 2014.   On that date, investors were told that KBR had suffered another $41 million in additional Canadian contract losses for the second quarter and, worse yet, that KBR's prior cost estimates had no reasonable basis.

108.    For the second quarter of 2014, KBR announced an overall loss of $0.06 per share, compared with consensus expectations of a $0.25 per share profit.  The Company again attributed its poor performance to an additional $41 million in losses on the same Canadian contracts.  As KBR explained in its press release, for the Services business, "[g]ross profit was a loss of $40 million, down $60 million," which was primarily driven by "$41 million in increased

construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects."

109.    During the July 31, 2014 conference call to discuss the Company's second-quarter 2014 results, analysts questioned why the Company continued to record enormous losses on these same Canadian service contracts.  An analyst at Barclays asked Defendant Ferraioli to "talk about the losses a little bit more in Canada," and tell investors why they should believe there will not be additional losses in the remainder of 2014 and into 2015.

110.    In response, Defendant Ferraioli revealed, for the first time, that KBR had not been able to reliably determine the costs required to complete certain of the contracts because, until then, KBR had not had the design drawings that were necessary to make reasonably reliable cost estimates.  Specifically, Defendant Ferraioli stated:

> The difference is that the scope of work is defined by drawings we received from our clients.  On the remaining contracts the majority of the drawings have now been received from the clients and therefore we're able to do the takeoffs to understand exactly what the scope of work is.  When the quantity of work increases based upon drawings, that's what's driving the results for this quarter. It was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house. As we get to the backend of these projects the drawings are in, and now we have defined the scope, and therefore we're much better suited to be able to estimate what those costs are to complete.

111.    Analysts criticized KBR for these belated revelations.  For example, in a report published that day titled "In The Penalty Box On Canadian Charges," analysts at Macquarie criticized how KBR's quarterly "loss was driven primarily by a US$41m increase in construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects—the same projects that caused issues for the company last quarter."  Analysts at Cowen found that "KBR reported 2Q results well below estimates as Canadian pipe fabrication contract losses continue to weigh on results."  Analysts at William Blair expressed disappointment in

KBR's performance and its "greater-than-expected incremental costs to complete Canadian module fabrication projects."  BB&T's analysts published a report days later similarly explaining how "KBR posted another net loss for Q2'14, driven by losses in Canada."

112.   In response to this news, on July 31, KBR's stock price fell nearly 7%, dropping from the prior day's closing price of $22.16 to $20.66 on extremely high trading volume.

113.   The misconduct alleged herein has triggered a government investigation of KBR and has had a lasting impact on KBR's shareholders.  As noted above, after KBR's Audit Committee announced its decision to issue the Restatement, the SEC immediately launched an investigation into the propriety of KBR's disclosures to investors.  According to a public filing by KBR on May 13, 2014, the SEC's probe concerns the circumstances that resulted in the Restatement.  The investigation is ongoing, and neither KBR nor the SEC has disclosed anything further.  KBR's stock price still has not recovered from Defendants' misstatements and omissions during the Class Period.  As of October 20, 2014, KBR's stock traded at $18.10 per share, or approximately 50% below the Class Period high of $36.29.

## V.  ADDITIONAL ALLEGATIONS OF SCIENTER

114.   Numerous facts give rise to the strong inference that, throughout the Class Period, Defendants Utt, Carter, Ferraioli and Baldwin knew or were severely reckless in disregarding that KBR's financial results were materially misstated, its internal controls over financial reporting suffered from material weaknesses, and its other disclosures were materially false and misleading.

115.   First, as detailed above, KBR and the Individual Defendants repeatedly told investors that the Canadian pipe fabrication contracts were a key driver of KBR's financial performance, were highly profitable, and were experiencing no issues.  As summarized above, at each reporting period during 2013, the Individual Defendants singled out the purportedly strong

43

performance of the Canadian pipe fabrication operation and its supposedly material positive impact on KBR's bottom line.  Further, the Individual Defendants were well aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Canadian projects.  Given that the Individual Defendants repeatedly stressed to investors that these contracts supposedly had a material positive impact on KBR's financial results, any failure to confirm that their repeated statements were materially accurate constitutes an extreme departure from the standards of ordinary care.

116.  <u>Second</u>, the false assertion in KBR's 2013 Form 10-K, that senior management had conducted a detailed review of KBR's financial results and "ensure[d]" those results were accurate, further supports a strong inference of scienter.  As noted above, by no later than February 27, 2014, Defendants were unquestionably aware of a material weakness in the Company's internal controls concerning the calculation of cost estimates.  As KBR admitted in a May 15 response to an SEC Comment Letter, which was recently made public, "[t]he root cause of the material weakness [identified in the February 27 KPMG Report] first began <u>in 2008</u>"— over five years earlier—and went unaddressed until its auditor's finding.  To reassure investors that KBR's financial statements were accurate, the Company stated that "management, including our Chief Executive Officer [Defendant Utt] and Chief Financial Officer [Defendant Ferraioli]," had performed "additional analysis and other post-closing procedures" beyond the Company's normal review, and had confirmed that KBR's reported results were correct.  However, in reality, as noted above, KBR's critical financial metrics were overstated by highly material amounts.  Either senior management, including Defendants Utt and Ferraioli, actually performed the detailed review they claimed to have undertaken, in which case they knew KBR's financial

44

results were misstated, or they did not undertake the review they claimed to have done, in which case their conduct was severely reckless.

117. <u>Third</u>, Defendant Utt's insider trading further supports an inference of scienter as to him. As detailed above, on March 6, 2014, Defendant Utt sold more than 162,000 shares of KBR stock for proceeds of over $4.5 million—an amount greater than 72% of his KBR stock. This large sale occurred eight days after KBR issued its materially misstated 2013 financial results; two days after former Chief Accounting Officer Baldwin internally informed KBR he was resigning, but before the resignation was publicly announced; and two months before the Restatement was issued. Further, this sale was more than six times larger than any sale of KBR stock by Utt during his eight-year tenure at KBR, and larger than all of his KBR stock sales over the prior two years combined. The suspicious timing and amount of Defendant Utt's insider sales are additional evidence of scienter.

118. <u>Fourth</u>, the magnitude of the accounting improprieties revealed by the Restatement supports a strong inference of scienter. As detailed above, in 2013, KBR's senior management dramatically overstated virtually all of the Company's key financial metrics. By way of example only, during the third and fourth quarters of 2013, the Company overstated its net income by, respectively, 329% and 242%, transforming significant losses into false profits. The accounting improprieties also caused KBR's 2013 net income to be artificially inflated by over 60%. Misstatements of this magnitude—especially in an area of the business that Defendants repeatedly highlighted and knew investors were focused on—are highly indicative of scienter.

119. <u>Fifth</u>, the nature of the accounting violations supports a strong inference of scienter. As detailed above, the accounting rules that KBR violated have been in place for more

than 30 years, their application is straightforward, and KBR repeatedly assured investors that it had extensive experience applying these provisions.  Further, these accounting provisions were critical to KBR's business—indeed, in its SEC filings, KBR identified percentage-of-completion accounting as one of its "critical accounting policies" that was "fundamental to [its] results of operations."  Accordingly, throughout the Class Period, KBR's application of these accounting provisions was the subject of significant attention by the Individual Defendants.  Nevertheless, as noted above, KBR violated these accounting provisions in obvious ways—i.e., by simply disregarding $156 million in pre-tax charges, which reflected known costs on several of its key Canadian projects.  Accounting violations of this type demonstrate a high degree of recklessness on the part of the Individual Defendants.

120.    Sixth, even after issuing the Restatement, KBR and Defendant Ferraioli were, at a minimum, severely reckless in failing to disclose that KBR was not able to reliably estimate its losses on certain of the key Canadian contracts.  As noted above, these Canadian contracts were the centerpiece of the Restatement, and their impact on KBR was the focus of investors and securities analysts in early 2014.  Nevertheless, Ferraioli did not disclose until the end of the Class Period, after KBR had incurred another $82 million in losses on these contracts, that KBR was unable to reliably estimate its costs and losses on certain of the contracts because it did not have design drawings that were essential to its ability to properly account for its ongoing losses.

121.    Seventh, the severe and pervasive nature of KBR's material weaknesses in internal controls is additional compelling evidence of scienter.  As detailed above, the Company admitted that Defendants created a "culture" which infected its entire Canadian construction business and permitted serious accounting improprieties.  The Company identified numerous, significant weaknesses in internal controls at every level of KBR management, including its

"accounting and executive management professionals."   These control deficiencies were so serious that they required an extensive remediation plan and, as of the second quarter of 2014, had not been fixed.  In short, internal weaknesses of this scope and depth were obvious to anyone who cared to look.   The fact that Individual Defendants Utt and Ferraioli certified the effectiveness of KBR's internal controls notwithstanding these facts is strong evidence of severe recklessness.

122.   Eighth, as discussed above, the Individual Defendants received numerous reports during the Class Period that detailed the cost estimates for the Canadian projects and stated whether KBR had received the design drawings for the projects.  As detailed above, Defendant Utt and members of the ELT, including the Individual Defendants, would be advised, and their approval would be required, before KBR entered into a project without design drawings.  In addition, the Individual Defendants received "KBR Monthly Business Unit ELT Reviews" for Canada in advance of each monthly ELT meeting, which provided the estimated costs to complete projects, a list of updates and issues encountered on projects, and noted if KBR had not received the design drawings for projects.  The ELT members who received these reports, including the Individual Defendants, met in Houston each month with Karl Roberts (the Senior Vice President of Canada Operations) to discuss, among other things,  the status of the Canadian projects.   The Individual Defendants' personal involvement in the cost estimation process strongly supports an inference of severe recklessness at a minimum.

123.   Finally, the Individual Defendants' decades of accounting experience further support a strong inference of severe recklessness.  Defendant Utt was CEO of KBR for eight years, and had more than 20 years of financial experience in the engineering and construction industries.  Defendant Carter was CFO of KBR for four years, and prior to that, had nearly 30

years of accounting experience in the engineering and construction industry. Similarly, Defendant Baldwin was KBR's Chief Accounting Officer for four years, and had 26 years of accounting experience in the engineering and construction industry. Likewise, Defendant Ferraioli had 34 years of accounting experience in the engineering and construction industry before joining KBR, and served as the Company's interim principal executive officer for a portion of the Class Period. The fact that these individuals had decades of experience at applying percentage-of-completion accounting further demonstrates their severe recklessness in misstating KBR's financial results to such an extraordinary degree.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

124. Throughout the Class Period, Defendants made materially false and misleading statements and omissions concerning KBR's financial performance and condition. Specifically, as explained in detail above and summarized below:

(a) The Company admitted in the Restatement that its financial statements for the third quarter of 2013, the fourth quarter of 2013 and the full year 2013 were materially misstated at the time they were issued because KBR failed to take required charges of $156 million related to its Canadian pipe fabrication and modular assembly contracts in the Services segment. The Company's improper accounting resulted in artificially inflated reported figures for net income and EPS, among other critical metrics, for each of the affected periods;

(b) In the Company's Form 10-Q for the third quarter of 2013, Defendant Utt certified that KBR's internal controls over financial reporting were "effective" and that its financial statements were accurate and complied with GAAP. As the Company admitted in the 2013 Form 10-K and the Restatement, in reality, KBR's internal financial reporting controls

48

relating to cost estimates for use of percentage-of-completion accounting suffered from material weaknesses that caused its financial statements to be materially misstated and violate GAAP;

(c)     The May 5 Disclosure purported to identify and account for all Canadian contract losses on work released "through March 31, 2014"—i.e., the end of the first quarter of 2014.  This disclosure, however, was false and misleading because it did not disclose $41 million in additional losses on the Canadian contracts that KBR knew or should have known of when it spoke on the matter on May 5 (i.e., more than a month after the close of the first quarter of 2014); and

(d)     After announcing and then issuing the Restatement, KBR still failed to disclose that, for the upcoming reporting periods, it did not have the ability to reliably estimate its costs and losses because it did not have design drawings for certain of its Canadian contracts that were essential to its ability to do so.

A.     **Materially False and Misleading Statements and Omissions Concerning the Third Quarter 2013**

125.     On September 11, 2013, shortly before the end of the third quarter (on September 30, 2013), KBR's former CFO, Defendant Carter, made a presentation at an investor conference in San Francisco, California.  Defendant Carter stated that there had been "a lot of strong bookings" in Canada's Services business in 2012 and 2013.  Defendant Carter also represented to investors that there was a strong financial control environment at KBR, stating that the Company was "exercising a lot of discipline in terms of managing KBR's overall business," with "good cost control, good project management and risk management."  As Defendant Carter explained, a key "message" to be taken away from her presentation was that KBR has "strong cost control."

126.     Defendant Carter's statements at the September 11, 2013 investor conference were false and misleading when made and omitted material facts.  Contrary to the statement that

KBR had achieved "a lot of strong bookings" in Canada's Services business in 2012 and 2013, as KBR ultimately disclosed in the Restatement, the Canadian projects booked in 2012 and 2013 required the Company to take $89 million in pre-tax charges during the third quarter of 2013, and caused the Company to suffer a loss of $55 million for that quarter.

127.    Defendant Carter's representations about KBR's internal controls were also materially false and misleading when made.  Contrary to the representations that KBR was "exercising a lot of discipline in terms of managing KBR's overall business," had "good cost control, good project management and risk management," and "strong cost control," KBR had severe, pervasive and undisclosed material weaknesses in its internal controls, as detailed above at ¶¶75-76 and 95-99.

128.    On October 24, 2013, KBR filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q"). It reported net income of $24 million, EPS of $0.16, operating income of $166 million, and gross profit of $201 million. Defendants Utt and Baldwin signed the Third Quarter 2013 Form 10-Q.

129.    KBR also issued a press release on October 24, 2013, entitled "KBR Announces Earnings Per Diluted Share of $0.16 for Third Quarter 2013" ("Third Quarter 2013 Press Release"), which was filed that same day with the SEC as an exhibit to a Form 8-K ("Third Quarter Form 8-K").  The Third Quarter 2013 Press Release reported the same figures for net income, EPS, and operating income as set forth in ¶128, above.  It additionally reported that "Services job income was $31 million, up $16 million, or 107%," which was primarily driven by "increased activity on several module fabrication projects in Canada."

130.    KBR's financial results reported in the Third Quarter 2013 Form 10-Q, Third Quarter 2013 Press Release, and Third Quarter Form 8-K were materially false and misleading

when issued.   As KBR admitted in the Restatement, during the third quarter of 2013, it improperly failed to take an $89 million charge for costs on its Canadian pipe fabrication and modular assembly contracts, which caused its reported results to be materially misstated.

131.   Specifically, KBR's improper accounting caused its third quarter 2013 net income, EPS, operating income and gross profit to be overstated by the material amounts set forth in the chart below:

**Overstatement of Key Financial Results for the Third Quarter of 2013**

|  | Reported Figure | Actual Figure | Percent Overstatement |
|---|---|---|---|
| Net Income (Loss) | $24 Million | ($55 Million) | 329% |
| Diluted EPS | $0.16 | ($0.37) | 333% |
| Operating Income | $166 Million | $77 Million | 54% |
| Gross Profit | $201 Million | $112 Million | 44% |

132.   KBR's improper accounting also caused it to overstate its operating income by 524% for its highly-touted Services business during the third quarter of 2013.  For the quarter, KBR reported in its Form 10-Q a profit of $17 million in operating income for its Services business.   In reality, as reported in the Restatement, KBR suffered a $72 million loss in its Services business during the third quarter of 2013.

133.   KBR's improper accounting also caused it to overstate by approximately 6% its revenues for its Services business during the third quarter of 2013.  KBR reported in its Form 10-Q revenues of $494 million in its Services business when, in reality, KBR's Services revenues for the quarter were $466 million, as ultimately set forth in the Restatement.

134.   In addition, as noted above, KBR stated in its Third Quarter Press Release that "job income" in its Services business was $31 million, up $16 million.  However, in truth, "job

income" for KBR's Services business was a loss of $58 million – or 287% percent less than represented to investors.

135.   The Third Quarter 2013 Form 10-Q also contained SOX Certifications by Defendant Utt.  The SOX Certifications affirmed that KBR's financial statements were accurate, and that Defendant Utt had designed and implemented internal controls over financial reporting that provided reasonable assurance that KBR's financial reporting was reliable and complied with GAAP.  Specifically, the SOX Certifications provided, in relevant part:

1. I have reviewed this quarterly report on Form 10-Q of KBR, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

136.   The SOX Certification by Defendant Utt was materially false and misleading when made in multiple respects.  Contrary to the representations that the Third Quarter 2013 Form 10-Q did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of KBR, the Third Quarter 2013 Form 10-Q materially misstated KBR's key financial metrics, as set forth above at ¶¶130-134.  In addition, contrary to the statement that Defendant Utt had implemented internal controls that "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles," KBR's internal controls suffered from several material weaknesses, and its financial results were materially misstated in violation of GAAP.

137.   The Third Quarter 2013 Form 10-Q contained further assurances that the Company's senior management, including Defendant Utt, had specifically evaluated KBR's disclosure controls and procedures, and concluded that they were effective to provide reasonable assurance that KBR's reported results were accurate ("Internal Control Certifications").  Specifically, the Third Quarter 2013 Form 10-Q provided as follows:

In accordance with Rules 13a-15 and 15d-15 under the Securities and Exchange Act of 1934 as amended (the "Exchange Act"), we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this

53

report. <u>Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2013 to provide reasonable assurance that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.</u> Our disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

138.   Contrary to the assurances that KBR's internal controls "were effective as of September 30, 2013 to provide reasonable assurance that" the Third Quarter 2013 Form 10-Q was accurate and complete, KBR has now admitted that its internal controls suffered from the pervasive material weaknesses described above that caused its financial results to be materially misstated.

139.   On October 25, 2013, KBR conducted a conference call to discuss its third-quarter financial results with investors.  Defendants Utt and Baldwin participated for KBR and answered financial analysts' questions.  During the call, Defendant Utt stated "<u>we do a pretty good job of being conservative in how we book projects and provision them over the life of the project</u>."  This statement was false and misleading and omitted material information.  Contrary to Defendant Utt's assertion that KBR was "conservative" in how it booked and provisioned projects, the Company failed to account for $89 million of pre-tax charges on key Canadian contracts during the third-quarter of 2013 alone, which had a material negative impact on its reported financials, as set forth above.

140.   During the same investor conference, Defendant Utt stated:

We have had some good bookings continue in Canada on our work up in the oil sands. And also the fabrication work that we are doing, we seem to be doing very well in delivering modules that are built to design and fit up issues are minimal, and we seem to have gotten more than our share on modules and hope we can

54

continue to maintain the very good performance we have in our module
fabrication … yards up in Edmonton.

This statement was false and misleading when made.  Contrary to Defendant Utt's statements
that KBR had "good bookings continue in Canada," was "doing very well in delivering modules
that are built to design and fit up issues are minimal," and had "very good performance … in our
module fabrication … yards up in Edmonton," KBR's Canadian operations had caused KBR to
suffer a substantial loss for the third quarter.

### B.   Materially False and Misleading Statements and Omissions Concerning the Fourth Quarter and Full Year 2013

141.   On February 27, 2014, KBR filed with the SEC its Form 10-K for the year ended
2013 (the "2013 Form 10-K").  Defendants Utt, Baldwin, and Ferraioli signed the 2013 Form
10-K.  In the 2013 Form 10-K, KBR reported fourth-quarter net income of $27 million, EPS of
$0.18, operating income of $49 million, and gross profit of $84 million.

142.   KBR also issued a press release on February 27, 2014, entitled "KBR Announces
Fourth Quarter and Annual 2013 Financial Results" ("Fourth Quarter 2013 Press Release"),
which was also filed with the SEC as an exhibit to a Form 8-K ("Fourth Quarter Form 8-K").
The press release reported the same materially false and misleading financial results set forth in
the 2013 Form 10-K for KBR's fourth quarter net income, EPS, operating income, and gross
profit.  It further stated that the Services business's "[g]ross profit was $10 million, up $62
million," which was primarily driven by "increased activity on several module fabrication
contracts in Canada."

143.   KBR's reported financial results in the 2013 Form 10-K, Fourth Quarter 2013
Press Release, and Fourth Quarter Form 8-K were materially false and misleading when issued.
As KBR admitted in the Restatement, during the fourth quarter of 2013, KBR improperly failed
to take a $67 million charge for losses on its Canadian pipe fabrication and modular assembly

contracts, which caused its reported results to be materially misstated.  Specifically, KBR's improper accounting caused its reported figures for net income, gross profit, and EPS for the fourth quarter of 2013 to be overstated by the material amounts set forth in the chart below:

**Overstatement of Key Financial Results for the Fourth Quarter 2013**

|  | Reported Figure | Actual Figure | Percent Overstatement |
|---|---|---|---|
| Net Income (Loss) | $27 Million | ($38 Million) | 242% |
| Diluted EPS | $0.18 | ($0.26) | 244% |
| Operating Income (Loss) | $49 Million | ($18 Million) | 137% |
| Gross Profit | $84 million | $17 Million | 80% |

144.    The 2013 Form 10-K also reported financial results for the full year, including full year 2013 net income of $229 million, diluted EPS of $1.54, operating income of $471 million, and gross profit of $581 million. These same full-year results were included in the Company's Fourth Quarter 2013 Press Release and Fourth Quarter Form 8-K.  Each of these reported figures for KBR's 2013 full-year performance was materially false and misleading.

145.    As KBR also admitted in the Restatement, for the full year 2013, it improperly failed to take $156 million in charges for costs on its Canadian pipe fabrication and modular assembly contracts, which caused its year-end financial results to be materially misstated. Specifically, KBR's improper accounting caused its reported figures for its 2013 full year operating income, net income, gross profit, and diluted EPS to be overstated by the highly material amounts set forth in the chart below:

**Overstatement of Key Financial Results for the Full Year 2013**

|  | Reported Figure | Actual Figure | Percent Overstatement |
|---|---|---|---|
| Net Income | $229 million | $85 million | 63% |
| Diluted EPS | $1.54 | $0.57 | 63% |
| Operating Income | $471 million | $315 million | 33% |
| Gross Profit | $581 million | $425 million | 27% |

146.    In the 2013 Form 10-K, KBR also materially misstated its most critical balance sheet metric as a result of the accounting improprieties relating to the Canadian pipe fabrication and modular assembly projects.   Specifically, KBR materially overstated its shareholders' equity—i.e., the value of the Company to its common stock holders.   In the 2013 Form 10-K, KBR reported that the value of its equity was $2.6 billion as of December 31, 2013.   In reality, as the Company admitted in the Restatement, due to the accounting improprieties described above, KBR's equity was $2.4 billion, meaning that it was overstated in the 2013 Form 10-K by approximately 6%.

147.    KBR's improper accounting also caused it to overstate its operating income for its highly-touted Services business by 556% during the fourth quarter of 2013 and by 223% for the entire year.   For the fourth quarter, KBR reported in its 2013 Form 10-K a profit of $12 million in operating income for its Services business.   In reality, as a result of the accounting improprieties described above, KBR's Services business actually suffered a $55 million loss in the fourth quarter of 2013.   For the full year, it recorded a profit of $70 million in operating income for its Services business in its 2013 Form 10-K, but in actuality the Services business suffered a loss of $86 million.

148.    KBR's improper accounting also caused it to overstate its revenues for its Services business during the fourth quarter of 2013 by approximately 7%.   KBR reported in its 2013 Form 10-K revenues of $450 million in its Services business for the fourth quarter of 2013 when, in reality, KBR's Services revenues for the quarter were $419 million, as ultimately set forth in the Restatement.

149.    KBR's improper accounting also rendered false and misleading the statements about its Services business in its Fourth Quarter and Full Year Press Release.   As noted above,

KBR stated that, for the fourth quarter of 2013, the Services business's "[g]ross profit was $10 million, up $62 million," primarily driven by "increased activity on several module fabrication contracts in Canada," among other things.  In truth, KBR suffered a gross operating loss of $57 million for its Services business during the fourth quarter.

150.    The 2013 Form 10-K also set forth the following statement about KBR's Services business during 2013:

> Our Services business segment had a strong year in 2013 with revenues increasing 28% to $2.1 billion primarily driven by construction activities on oil sands-related projects in western Canada. Gross profit increased $106 million from 2012 due to the higher volume of business and the impact in 2012 from profit reversals and project losses. We expect western Canada to remain a strong market for our construction services in 2014.

151.    These statements were false and misleading and omitted material facts because they failed to account for KBR's $156 million in contract charges in its Services business. Acknowledging the false and misleading nature of the above statements, KBR substantially rewrote in the Restatement this section of the 2013 Form 10-K.  Recognizing that the Services business segment did not have a "strong year in 2013," as represented in the 2013 Form 10-K, KBR excised that statement in the Restatement.  KBR also rewrote the statement in its 2013 Form 10-K that, for the Services business, gross profit "increased $106 million from 2012."  As KBR admitted in the Restatement, contrary to the representation in the Form 10-K, gross profit actually "decreased from a loss of $49 million in 2012 to a loss of $99 million in 2013" as a result of the Canadian contract losses.

152.    In the 2013 Form 10-K, KBR and Defendants Utt, Baldwin and Ferraioli assured investors that, in light of a material weakness in KBR's internal controls over cost reporting, they had undertaken an additional detailed review of its financial results, and "ensured" that KBR's financial results were accurately stated and in conformity with GAAP:

In light of the material weakness identified above, <u>we performed additional analysis and other post-closing procedures to ensure our consolidated financial statements were prepared in accordance with generally accepted accounting principles and reflect its financial position and results of operations as of and for the year ended December 31, 2013</u>. We identified that the known financial error was attributable to one major project that is near completion. As a result, notwithstanding the material weakness as described above, management concluded that <u>the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows</u> for the periods presented.

153. The statements set forth above were materially false and misleading when made. Contrary to the statement that Defendants Utt, Baldwin and Ferraioli had "ensured" that "the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position [and] results of operations" and comported with GAAP, KBR admitted in the Restatement that its 2013 financial statements were materially misstated in violation of GAAP.

154. In addition, the 2013 Form 10-K contained SOX Certifications by Defendants Utt and Ferraioli in the form set forth above in ¶135, except that they were made as of year-end 2013. The SOX Certifications by Defendants Utt and Ferraioli were materially false and misleading when made. Contrary to the representations that the 2013 Form 10-K did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of KBR, the 2013 Form 10-K materially misstated KBR's key financial metrics for the fourth quarter and the year, as set forth above at ¶¶144-151.

### C. Materially False and Misleading Statements and Omissions Concerning the First and Second Quarters of 2014

155. On May 5, 2014, KBR issued a press release entitled "KBR, Inc. Announces Intention to Restate Consolidated Financial Statements for the Year 2013" (as defined above, the "May 5 Disclosure"), which was filed that same day with the SEC as an exhibit to a Form 8-K

("May 5 Form 8-K").  The May 5 Disclosure identified approximately $158 million in pre-tax losses that KBR had previously failed to account for.  The May 5 Disclosure further stated that the $158 million in approximate "pre-tax losses noted above include estimated losses … for work released to [KBR] through March 31, 2014," i.e., through the end of the first quarter.  Contrary to this statement, the May 5 Disclosure did not identify the Canadian contract losses through the end of the first quarter of 2014.  As KBR disclosed in its First Quarter 2014 10-Q, issued on June 19, 2014, it had suffered $41 million in additional losses attributable to the Canadian contracts during the first quarter of 2014, which were not mentioned in the May 5 Disclosure.

156.   The May 5 Disclosure was also false and misleading and omitted material facts because it did not disclose that the Company did not have the ability to reliably estimate costs and losses for certain of its Canadian pipe fabrication contracts.  As noted above, KBR ultimately admitted that it did not have the design drawings for certain of the Canadian contracts that were the subject of the May 5 Disclosure and Restatement and that, without these drawings, it could not produce reliable cost or loss estimates for those contracts.

157.   On June 19, 2014, KBR filed with the SEC its Form 10-Q for the first quarter of 2014, which was signed by Defendant Ferraioli ("First Quarter 2014 Form 10-Q").   KBR also issued a press release on June 19, 2014, entitled "KBR Inc. Announces First Quarter and 2014 Financial Results" ("First Quarter 2014 Press Release"), which was also filed with the SEC as an exhibit to a Form 8-K ("First Quarter Form 8-K").  In the First Quarter 2014 Form 10-Q, First Quarter 2014 Press Release, and First Quarter Form 8-K, KBR disclosed "$41 million of additional losses in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada."

158.     However, the First Quarter 2014 Form 10-Q, First Quarter 2014 Press Release, and First Quarter 2014 Form 8-K (collectively, the "First Quarter 2014 SEC Filings") did not reveal the full truth and, in fact, were false and misleading and omitted material facts.

159.     First, the First Quarter 2014 Form 10-Q stated that "historically, our estimates have been reasonably dependable regarding the recognition of revenue and profit on percentage of completion contracts."   This statement was materially false and misleading and omitted material facts because, as Defendant Ferraioli eventually admitted, KBR lacked the ability to make reasonably reliable estimates with respect to the Canadian pipe fabrication and module assembly projects.

160.     Second, the First Quarter 2014 SEC Filings stated that there were "$41 million of additional losses in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada."  KBR's $41 million loss figure was false and misleading because it lacked any reasonable basis.  As noted above, this loss figure misleadingly omitted the material fact that the Company could not reliably estimate its costs and losses on certain of the projects.

161.     Third, the First Quarter 2014 SEC Filings stated that the Company's financial statements had "been prepared in accordance with accounting principles generally accepted in the United States ('U.S. GAAP')."  This statement was false and misleading.  KBR's first quarter 2014 financial statements violated GAAP because KBR continued to use percentage-of-completion accounting to calculate its losses on the Canadian contracts even though it lacked the ability to make "reasonably dependable estimates" of costs and losses on these contracts, and, thus, failed to meet an "essential requirement" of GAAP, as set forth above at ¶¶51-53.

162.     On June 19, 2014, KBR held its first-quarter 2014 earnings conference call. During that call, Defendant Ferraioli stated that "the client drawings on this project have now

largely been issued, so hopefully the commodity, or the quantity risk is largely behind us." This statement was false and misleading and omitted material facts. It was materially misleading for Defendant Ferraioli to represent that KBR had received sufficient drawings to reliably estimate the Company's losses on the Canadian contracts when, in reality, it had not.

## VII.    LOSS CAUSATION

163.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, KBR's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created the false impression, among other things, that (i) KBR's statements about the Company's financial results during the Class Period were accurate and in accordance with GAAP; (ii) KBR's controls over financial reporting were effective and ensured that its statements about its financial results during the Class Period were accurate and in accordance with GAAP; and (iii) KBR's performance in its Canadian pipe fabrication operations and Services business was consistent with Defendants' repeated representations. As a result of Defendants' materially false and misleading statements and omissions, the market prices of KBR's securities were inflated throughout the Class Period.

164.    Certain disclosures on these topics revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions.

165.    First, on February 27, 2014, KBR filed the 2013 Form 10-K, which included KPMG's February 27 Audit Report. KPMG found that "KBR Inc. has not maintained effective internal control over financial reporting as of December 31, 2013." It explained that "[a] material weakness has been identified and included in management's assessment … related to project reporting over the completeness and accuracy of estimates of revenues, costs, and profit at completion for certain long-term construction projects with multiple currencies." As a result

of this material weakness, KBR was required to take a charge to earnings in the amount of $25 million pre-tax and $17 million post-tax, which negatively impacted its financial results, as explained above.

166.    When the truth about KBR's material weakness in financial reporting began to be revealed to the market through the 2013 Form 10-K, the price of the Company's stock declined in response, as some of the artificial inflation caused by the materially false and misleading statements and omissions was removed from the price of KBR's stock, thereby causing damage to Lead Plaintiffs and other members of the Class.   On February 28, 2014, the first day of trading after the disclosure of KBR's material weakness, the Company's stock price declined by 13.5%, from $31.94 to 27.62, on extremely high-volume trading of 13,683,681 shares.

167.    KBR and Defendants Utt, Baldwin, and Ferraioli mitigated the impact of the disclosures in the 2013 Form 10-K and prevented the full truth from being revealed by making contemporaneous false and misleading statements that minimized and denied the true facts at issue here.   Among other things, these Defendants represented unequivocally that they (i) "performed additional analysis and other post-closing procedures to ensure our consolidated financial statements were prepared in accordance with generally accepted accounting principles and reflect its financial position and results of operations as of and for the year ended December 31, 2013" and, as a result (ii) "management concluded [after its supposedly rigorous analysis] that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented."   These Defendants further misrepresented that any material weakness concerning KBR's accounting for project costs, revenue and profits was limited to one project that was "near completion" in the Gas Monetization segment.   Through these assurances, these Defendants

successfully prevented the full truth from being revealed to the market, and the price of KBR's stock price remained artificially inflated.

168.   Second, before the market opened on May 5, 2014, KBR issued a press release announcing, among other things, the need to restate its prior financial statements for 2013 to account for "estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment," which "will result in pre-tax charges of $158 million, consisting of the reversal of $23 million in previously recognized pre-tax profits."

169.   KBR's revelations in its May 5 Disclosure caused a decline in the Company's stock price.  When the truth about KBR's continued failure to maintain effective internal controls over financial reporting and its inaccurate financial statements and prior representations statements about its Canadian Services business was revealed to the market, the price of the Company's stock declined significantly in response, as more of the artificial inflation caused by the Company's materially false and misleading statements and omissions was removed from the price of KBR's stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.  On May 5, 2014, the day of KBR's revelations, the Company's stock price fell an additional 6.2%, from $25.84 to $24.23, on extremely high-volume trading of over 4 million shares.

170.   KBR and Defendant Ferraioli mitigated the impact of the May 5 revelations and prevented the full truth from being revealed by making contemporaneous false and misleading statements and omissions that minimized and denied the true facts at issue here.  The May 5 Disclosure falsely stated that it identified losses on work released under the seven Canadian contracts through the end of the first quarter 2014 when, in reality, KBR had incurred an additional $41 million in losses during that time period that were not mentioned in the May 5

Disclosure.  In addition, KBR and Defendant Ferraioli did not tell investors that the Company was not able to make reasonably dependable cost estimates for certain of its Canadian projects because it lacked the design drawings that were essential to its ability to do so.

171.   Third, before the market opened on June 19, 2014, KBR announced that, contrary to the May 5 Disclosure, it had incurred an additional $41 million in Canadian contract losses during the first quarter.  When the truth about KBR's additional Canadian contract costs was revealed to the market, the price of the Company's securities declined significantly in response, as more of the artificial inflation caused by Defendants' materially false and misleading statements and omissions was removed from the price of KBR's securities, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.  On June 19, the day of the disclosure, the price of KBR's stock fell by more than 7% on particularly heavy trading of 13.4 million shares, from $26.32 at the close of the trading on June 18 (the last trading day before the disclosure) to close at $24.46 on June 19.

172.   KBR, however, still did not tell the market until the end of the Class Period that it was not able to make reasonably dependable cost estimates for certain of its Canadian projects.  To the contrary, it continued to represent that "historically, our [cost] estimates have been reasonably dependable regarding the recognition of revenue and profit on percentage of completion contracts."

173.   Fourth, before the market opened on July 31, 2014, KBR announced that it needed to report yet an additional $41 million in Canadian contract losses because, prior to that point, it did not have the ability to make reliable estimates of costs and losses.  When these facts were revealed to the market, the price of the Company's securities declined significantly in response, as more of the artificial inflation caused by Defendants' materially false and

misleading statements and omissions was removed from the price of KBR's stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.  On July 31, the day of the disclosure, the price of KBR's stock fell by approximately 7%, from $22.16 at the close of the trading on July 30 (the last trading day before the disclosure) to close at $20.66 on July 31, on heavy trading of 4.6 million shares.

174.   It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of KBR's securities.  It was also foreseeable to Defendants that the revelation of the truth about KBR's financial results, its Canadian pipe fabrication and modular assembly projects and Services business, and its financial reporting controls would cause the price of the Company's securities to drop as the inflation caused by their misstatements and omissions was corrected.  Thus, the stock price declines discussed herein were directly caused by Defendants' materially false and misleading statements and omissions.

## VIII.   PRESUMPTION OF RELIANCE

175.   At all relevant times, the market for KBR's securities was efficient for the following reasons, among others:

(a)   KBR's stock met the requirements for listing, and was listed and actively traded on New York Stock Exchange (the "NYSE"), a highly efficient and automated market;

(b)   As a regulated issuer, KBR filed periodic reports with the SEC and NYSE;

(c)   KBR regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d)     KBR was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

176.     As a result of the foregoing, the market for KBR stock reasonably promptly digested current information regarding KBR from all publicly available sources and reflected such information in KBR's stock price.  Under these circumstances, all purchasers of KBR securities during the Class Period suffered similar injury through their purchase of KBR securities at artificially inflated prices, and a presumption of reliance applies.

## IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

177.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

178.     None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about KBR's financial results, its reported net income, earnings per share, gross profit, operating income, balance sheet accounts, and internal controls over financial reporting, among others.

179.     Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, including KBR's Forms 8-K, Forms 10-Q and Form 10-K issued throughout the Class Period.

180.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from

those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding KBR's financial results, its reported net income, earnings per share, gross profit, operating income, balance sheet accounts, and internal controls over financial reporting, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by KBR were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

181.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the false forward-looking statement was authorized and/or approved by an executive officer of KBR who knew that the statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

182.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of KBR between September 11, 2013 and July 30, 2014, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of KBR at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest.  For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of KBR's employees.

68

183.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, KBR shares were actively traded on the NYSE.  As of June 30, 2014, KBR had approximately 290,443,158 shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class.  Class members who purchased KBR securities may be identified from records maintained by KBR or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

184.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

185.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

186.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and internal controls of KBR;

(c)    whether Defendants acted with scienter; and

(d)    the proper way to measure damages.

187.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants KBR, Utt, Carter, Ferraioli and Baldwin)

188.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

189.    This Count is asserted on behalf of all members of the Class against Defendants KBR, Utt, Carter, Ferraioli and Baldwin for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

190.    During the Class Period, Defendants disseminated or approved the false statements specified below, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of KBR securities during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, the Company's publicly reported financial results for the third quarter of 2013, the fourth quarter of 2013, the full year 2013, and the first quarter of 2014; and statements of compliance with GAAP in preparing KBR's financial statements and statements of the effectiveness of KBR's internal controls over financial reporting.

192.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of KBR securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, KBR's artificially inflated financial statements, and the Company's failure to comply with GAAP and failure to maintain effective internal controls over financial reporting; (b) artificially inflate and maintain the market price of KBR securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase KBR securities at artificially inflated prices and suffer losses when the true facts became known.

193.    Defendant KBR is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

    (a) KBR's September 11, 2013 Investor Presentation (*see* ¶¶125-127);

    (b) KBR's Third Quarter 2013 Form 10-Q and the SOX Certifications therein filed on October 24, 2013 (*see* ¶¶128-138);

    (c) KBR's Third Quarter 2013 Form 8-K filed on October 24, 2013 (*see* ¶¶129-134);

    (d) KBR's Third Quarter 2013 Press Release issued on October 24, 2013 (*see* ¶¶129-134);

    (e) KBR's October 25, 2013 Third Quarter Investor Conference Call (*see* ¶¶139-140);

    (f) KBR's 2013 Form 10-K filed on February 27, 2014 (*see* ¶¶141-154);

    (g) KBR's Fourth Quarter 2013 Form 8-K filed on February 27, 2014 (*see* ¶¶142-149);

    (h) KBR's Fourth Quarter and Full Year 2013 Press Release issued on February 27, 2014  (*see* ¶¶142-149);

    (i) KBR's Form 8-K filed on May 5, 2014 (*see* ¶¶155-156);

    (j) KBR's Press Release Announcing the Intention to Restate issued on May 5, 2014 (*see* ¶¶155-156);

    (k) KBR's First Quarter 2014 Form 10-Q and the SOX Certifications therein filed on  June 19, 2014 (*see* ¶¶157-161);

    (l) KBR's First Quarter 2014 Press Release issued on June 19, 2014 (*see* ¶¶157-161);

    (m) KBR's 2014 First Quarter Form 8-K filed on June 19, 2014 (*see* ¶¶157-161); and

    (n)  KBR's June 19, 2014 First Quarter Investor Conference Call (*see* ¶162).

194.    Defendants Utt, Carter, Ferraioli and Baldwin are liable for the false and misleading statements they made and for which they were responsible, as set forth above, including:

(a) Defendant Utt's false and misleading statements and omissions in the Company's Third Quarter 2013 Form 10-Q and the SOX Certifications therein, the October 25, 2013 Third Quarter Investor Conference Call, the Third Quarter 2013 Form 8-K, the Third Quarter 2013 Press Release, the 2013 Form 10-K and SOX Certification therein, the Fourth Quarter 2013 Form 8-K, the Fourth Quarter and 2013 Full Year Press Release.

(b) Defendant Carter's false and misleading statements and omissions in the September 11, 2013 Investor Presentation.

(c) Defendant Ferraioli's false and misleading statements and omissions in the Company's 2013 Form 10-K and the SOX Certification therein, the Fourth Quarter 2013 Form 8-K, the Fourth Quarter 2013 and Full Year Press Release, the May 5, 2014 Press Release Announcing the Intention to Restate, the  May 5, 2014 Form 8-K, First Quarter 2014 Form 10-Q and SOX Certification therein, the First Quarter 2014 Form 8-K, the First Quarter 2014 Press Release, and the June 19, 2014 First Quarter Investor Conference Call.

(d) Defendant Baldwin's false and misleading statements and omissions in the Company's Third Quarter 2013 Form 10-Q, the Third Quarter 2013 Form 8-K and the Third Quarter 2013 Press Release, the 2013 Form 10-K, the Fourth Quarter 2013 Form 8-K, and the Fourth Quarter and Full Year Press Release.

195.   As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of KBR stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

196.   The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at KBR, which resulted in continuous and material overstatements of the Company's most important financial metrics, establish a strong inference that Defendants Utt, Carter, Baldwin, and Ferraioli acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

197.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for KBR securities, which inflation was removed from their price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased KBR securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

198.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of KBR securities during the Class Period.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Utt, Carter, Ferraioli and Baldwin)

199.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

200.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

201.    During their tenures as officers and/or directors of KBR, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of KBR, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by KBR during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

74

202.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Utt, Carter, Ferraioli and Baldwin had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   Defendants Utt, Ferraioli and Baldwin signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by KBR during the Class Period.   Defendant Utt, as Chief Executive Officer and interim Chief Financial Officer, Defendants Ferraioli and Carter, as Chief Financial Officers, and Defendant Baldwin, as Chief Accounting Officer, were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by KBR during the Class Period.   As a result of the foregoing, Defendants Utt, Carter, Ferraioli and Baldwin, as a group and individually, were controlling persons of KBR within the meaning of Section 20(a) of the Exchange Act.

203.    As set forth above, KBR violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons of KBR and as a result of their own aforementioned conduct, Defendants Utt, Carter, Ferraioli and Baldwin are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired KBR securities.   Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of KBR, each of these

Defendants was culpable for the material misstatements and omissions made by KBR, including such misstatements as the Company's false financial statements, as set forth above.

204.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of KBR securities.

## XII.   PRAYER FOR RELIEF

205.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable, injunctive and other relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

206.    Lead Plaintiffs hereby demand a trial by jury.

Dated:  October 20, 2014

**LABATON SUCHAROW LLP**

By: _s/   Louis Gottlieb_____
Louis Gottlieb (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477
Email: lgottlieb@labaton.com

**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**

By: _s/   John Rizio-Hamilton_____
John Rizio-Hamilton (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
Email: johnr@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

Thomas R. Ajamie
(Texas Bar No. 00952400)
**AJAMIE LLP**
Penzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile:  (713) 860-1699
Email: tajamie@ajamie.com

*Liaison Counsel*

Exhibit A

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Gail H. Stone, on behalf of Arkansas Public Employees Retirement System ("APERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Executive Director of APERS.  I have reviewed a complaint filed in this matter.  APERS has authorized the filing of this motion for appointment as lead plaintiff.

2.  APERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  APERS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. APERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  APERS's transactions in the KBR, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.  APERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re Central European Distribution Corp. Securities Litigation*, No. 11-cv-6247 (D.N.J.)

6.  APERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

    *Joseph DeAngelis v. Jon Corzine*, No. 11-cv-7866 (S.D.N.Y.)
    *Weinstein v. McClendon*, No. 12-cv-465 (W.D. Okla.)

7.  APERS will not accept any payment for serving as a representative party on behalf of the Class beyond APERS's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __7th__ day of July 2014.

Gail H. Stone
Executive Director
*Arkansas Public Employees Retirement System*

**Arkansas Public Employees Retirement System**
**Transactions in KBR, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 10/15/2013 | 4,200 | 33.2567 |
| Purchase | 10/15/2013 | 3,400 | 33.4461 |
| Purchase | 10/15/2013 | 2,700 | 32.8724 |
| Purchase | 10/16/2013 | 2,800 | 33.8643 |
| Purchase | 10/16/2013 | 300 | 33.6450 |
| Purchase | 10/16/2013 | 6,400 | 33.7557 |
| Purchase | 10/17/2013 | 1,700 | 34.7071 |
| Purchase | 10/17/2013 | 500 | 34.4400 |
| Purchase | 10/17/2013 | 600 | 34.3283 |
| Purchase | 10/18/2013 | 5,300 | 35.5380 |
| Purchase | 10/21/2013 | 500 | 36.1450 |
| Purchase | 10/21/2013 | 10,700 | 35.9379 |
| Purchase | 10/22/2013 | 6,300 | 36.3834 |
| Purchase | 10/25/2013 | 4,600 | 32.8382 |
| Purchase | 1/13/2014 | 15,100 | 31.7619 |
| Purchase | 1/14/2014 | 14,600 | 31.1478 |
| Sale | 2/28/2014 | (16,000) | 27.4618 |
| Sale | 3/12/2014 | (6,500) | 27.7733 |
| Sale | 3/13/2014 | (3,200) | 27.6945 |
| Sale | 3/14/2014 | (7,200) | 27.8848 |
| Sale | 3/14/2014 | (2,800) | 27.8450 |
| Sale | 3/14/2014 | (4,300) | 27.6484 |
| Sale | 3/17/2014 | (7,700) | 28.1033 |
| Sale | 3/18/2014 | (3,000) | 28.0681 |
| Sale | 3/18/2014 | (12,900) | 28.1809 |
| Sale | 3/19/2014 | (14,800) | 28.2622 |
| Sale | 3/19/2014 | (1,300) | 28.2350 |

## CERTIFICATION

I, Thomas Mittelbrun, III, as Administrator of the I.B.E.W. Local No. 58 Annuity Fund, the Electrical Workers Pension Trust Fund of Local Union #58, I.B.E.W., Detroit, Michigan, the Electrical Workers' Insurance Fund, and the International Brotherhood of Electrical Workers Local Union No. 58 Sound and Communications Division Pension Fund (the "IBEW Local No. 58 / SMC NECA Funds"), hereby certify as follows:

1.       I am fully authorized to enter into and execute this Certification on behalf of the IBEW Local No. 58 / SMC NECA Funds.  I have reviewed the Consolidated Class Action Complaint prepared against KBR, Inc. ("KBR") alleging violations of the federal securities laws, and authorized its filing;

2.       The IBEW Local No. 58/SMC NECA Funds did not purchase securities of KBR at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       The IBEW Local No. 58/SMC NECA Funds are willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.       The IBEW Local No. 58/SMC NECA Funds' transactions in KBR's securities during the Class Period are reflected in Exhibit A, attached hereto;

5.       The IBEW Local No. 58/SMC NECA Funds specified below sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*City of Austin Police Retirement System v. Kinross Gold Corp.*, No. 1:12-cv-01203 (S.D.N.Y.)
(Annuity, Pension, and Sound and Communications)

*In re SAIC, Inc. Securities Litigation*, No. 1:12-cv-01353 (S.D.N.Y.)
(Annuity and Pension)

*In re Magnum Hunter Resources Corp. Securities Litigation*, No. 1:13-cv-02668 (S.D.N.Y.)
(Annuity)

*Megly v. Turquoise Hill Resources Ltd.*, No. 1:13-cv-08846 (S.D.N.Y.)
(Annuity, Pension, and Sound and Communications)

*Iron Workers District Council of New England Pension Fund v. NII Holdings, Inc.*,
No. 1:14-cv-00227 (E.D. Va.)
(Annuity, Pension, Insurance, and Sound and Communications)

*In re KBR, Inc. Securities Litigation*, No. 4:14-cv-01287 (S.D. Tex.)
(Annuity, Pension, Insurance, and Sound and Communications)

*Waterford Township Police & Fire Retirement System v. Ply Gem Holdings, Inc.*,
No. 1:14-cv-03577 (S.D.N.Y.)
(Annuity and Pension)

6.     The IBEW Local No. 58/SMC NECA Funds sought to serve as a representative

party in the following class action under the federal securities laws filed during the last three years:

*IBEW Local No. 58 Annuity Fund, and Electrical Workers Pension Trust Fund of IBEW Local No. 58,
Detroit, Michigan v. EveryWare Global, Inc.*, No. 2:14-cv-01838 (S.D. Ohio)
(Annuity and Pension)

7.     The IBEW Local No. 58/SMC NECA Funds are currently serving as a lead plaintiff

in the following class actions filed under the federal securities laws during the last three years:

*Iron Workers District Council of New England Pension Fund v. NII Holdings, Inc.*,
No. 1:14-cv-00227 (E.D. Va.)
(Annuity, Pension, Insurance, and Sound and Communications)

*In re KBR, Inc. Securities Litigation*, No. 4:14-cv-01287 (S.D. Tex.)
(Annuity, Pension, Insurance, and Sound and Communications)

8.     Beyond their pro rata share of any recovery, the IBEW Local No. 58/SMC NECA

Funds will not accept payment for serving as a lead plaintiff and representative party on behalf of

the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as

ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 20th day of October, 2014.

Thomas Mittelbrun, III, Administrator
I.B.E.W. Local No. 58 Annuity Fund,
Electrical Workers Pension Trust Fund of Local
Union #58, I.B.E.W., Detroit, Michigan,
Electrical Workers' Insurance Fund, and
International Brotherhood of Electrical Workers
Local Union No. 58 Sound and
Communications Division Pension Fund

3

EXHIBIT A

<u>TRANSACTIONS IN KBR, INC.</u>

I.B.E.W. Local No. 58 Annuity Fund

| Transaction  Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 09/18/13 | 26,542.00 | $33.35 | ($885,157.12) |
| Purchase | 09/19/13 | 2,501.00 | $33.59 | ($84,002.09) |
| Purchase | 02/24/14 | 12,491.00 | $31.42 | ($392,406.01) |
| Purchase | 04/08/14 | 7,331.00 | $26.66 | ($195,448.86) |
| Purchase | 05/08/14 | 20,787.00 | $23.66 | ($491,845.36) |

Electrical Workers Pension Trust Fund of Local Union #58, I.B.E.W., Detroit, Michigan

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 09/18/13 | 19,691.00 | $33.35 | ($656,681.07) |
| Purchase | 09/19/13 | 1,856.00 | $33.59 | ($62,338.21) |
| Purchase | 02/24/14 | 5,125.00 | $31.42 | ($161,002.39) |
| Purchase | 04/08/14 | 5,106.00 | $26.66 | ($136,129.02) |
| Purchase | 05/08/14 | 13,613.00 | $23.66 | ($322,099.92) |

Electrical Workers' Insurance Fund

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 09/18/13 | 1,797.00 | $33.35 | ($59,929.95) |
| Purchase | 09/19/13 | 169.00 | $33.59 | ($5,676.71) |
| Purchase | 02/24/14 | 878.00 | $31.42 | ($27,586.76) |
| Purchase | 04/08/14 | 552.00 | $26.66 | ($14,716.32) |
| Purchase | 05/08/14 | 1,455.00 | $23.66 | ($34,425.30) |

International Brotherhood of Electrical Workers Local Union No. 58
Sound and Communications Division Pension Fund

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 09/18/13 | 1,349.00 | $33.35 | ($44,988.21) |
| Purchase | 09/19/13 | 127.00 | $33.59 | ($4,265.60) |
| Purchase | 02/24/14 | 661.00 | $31.42 | ($20,765.38) |
| Purchase | 04/08/14 | 414.00 | $26.66 | ($11,037.49) |
| Purchase | 05/08/14 | 1,092.00 | $23.66 | ($25,838.03) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: _s/   John Rizio-Hamilton_____
John Rizio-Hamilton (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: johnr@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and the
Class*