**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE KBR, INC. SECURITIES LITIGATION | Case No. 4:14-cv-01287<br><br>Judge Lee H. Rosenthal |

**DEFENDANTS' MOTION TO DISMISS**
**LEAD PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Michael C. Holmes
Jeffrey S. Johnston
Amy E. Tankersley
1001 Fannin Street
2300 First City Tower
Houston, Texas 77002-6760

*Attorneys for Defendants*

December 5, 2014

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND........................................................................................................3

STANDARDS FOR DISMISSAL OF SECURITIES FRAUD CLASS ACTIONS ....................7

ARGUMENT AND AUTHORITIES...........................................................................................9

A.    The Complaint Fails to Allege a Claim for Securities Fraud under Section 10(b)
and Rule 10b-5 Because Plaintiffs Fail to Plead a Strong Inference of Scienter................9

    1.    The importance of the Contracts does not support a strong
inference of scienter.........................................................................10

    2.    Senior Management's review of the inaccurate financial statements
does not support a strong inference of scienter.......................................10

    3.    The fact of the Restatement, and Plaintiffs' allegations regarding
the magnitude and nature of the alleged accounting violations, do
not support a strong inference of scienter. ............................................11

    4.    KBR's identification of a material weakness does not support a
strong inference of scienter....................................................................14

    5.    Plaintiffs' allegations regarding Ferraioli's statements regarding
the design drawings do not support a strong inference of scienter
on the part of Ferraioli. ........................................................................15

    6.    Plaintiffs' allegations regarding Utt's stock sales do not support a
strong inference of scienter on the part of Utt. .......................................18

    7.    Plaintiffs' allegations regarding Defendants' receipt of cost
estimates and other reports do not support a strong inference of
scienter. ............................................................................................20

    8.    Plaintiffs' allegations regarding violations of accounting policies
and inaccurate SOX certifications do not support a strong inference
of scienter..........................................................................................21

    9.    The short time between the filing of the misstatements and the
Restatement negates any inference of scienter. .......................................23

    10.    KBR's share repurchase program during the class period negates
any inference of scienter. ......................................................................23

B.    The Amended Complaint Fails to Allege a Claim for Control Person Liability. ..............24

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ............................................................................... 7, 24

*Abrams v. Baker Hughes, Inc.*,
  292 F.3d 424 (5th Cir. 2002) .......................................................................... passim

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir.), *modified and reh'g denied*, 409 F. 3d 653 (5th Cir. 2005) ............... 11

*Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ..................................................................................... 21

*Catogas v. Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) ............................................................................... 3

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
  497 F.3d 546 (5th Cir. 2007) ..................................................................................... 12

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) .................................................................................. 13, 14

*Collmer v. U.S. Liquids, Inc.*,
  268 F. Supp. 2d 718 (S.D. Tex. 2003) ....................................................................... 25

*Dawes v. Imperial Sugar Co.*,
  No. H-11-3250, 2013 WL 5442109 (S.D. Tex. Sept. 27, 2013) ................................ 8, 9, 16, 22

*Dennis v. Gen. Imaging, Inc.*,
  918 F.2d 496 (5th Cir. 1990) .................................................................................... 25

*Dietrich v. Bauer*,
  76 F. Supp. 2d 312 (S.D.N.Y. 1999) ......................................................................... 25

*Dileo v. Ernst & Young*,
  901 F.2d 624 (7th Cir 1990) ..................................................................................... 12

*Ellison v. Am. Image Motor Co.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999) ......................................................................... 25

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F. 3d 278 (5th Cir. 2006) ................................................................................. 3, 7

*Fine v. Am. Solar King Corp.*,
  919 F.2d 290 (5th Cir. 1990) .................................................................................... 11

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ........................................................................ 19

*Higginbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007) ....................................................................... 23

*Horizon Asset Mgmt., Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ....................................................................... 23

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004) ........................................................................ 13

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008) ................................................. 13, 20

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ...................................................................... 18

*In re Century Aluminum Co. Sec. Litig.*,
    749 F. Supp. 2d 964 (N.D. Cal. 2010) .......................................................... 3

*In re Comshare Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999) ...................................................................... 13

*In re Cree, Inc. Sec. Litig.*,
    333 F. Supp. 2d 461 (M.D.N.C. 2004) ....................................................... 21

*In re Dell Inc., Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008) ................................................. 18, 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................ 19

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) .......................................... 3, 12, 20

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) .......................................................... 25

*In re Recoton Corp. Sec. Litig.*,
    358 F. Supp. 2d 1130 (M.D. Fla. 2005) ...................................................... 21

*In re Sec. Litig. BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) ........................................................ 24

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ............................................................... passim

*Johnson v. Siemens AG,*
   No. 09-CV-5310 (JG)(RER), 2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ........................ 24

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001) ................................................................................. 24

*Kushner v. Beverly Enters, Inc.,*
   317 F.3d 820 (8th Cir. 2003) ................................................................................. 13

*Limantour v. Cray Inc.,*
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ................................................................. 18

*Malin v. XL Capital Ltd.,*
   499 F. Supp. 2d 117 (D. Conn. 2007) ...................................................................... 13

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.,*
   499 F. App'x 345 (5th Cir. 2012) ............................................................... 8, 10, 21, 22

*Primavera Familienstiftung v. Askin,*
   No. 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) ...................................... 25

*R2 Invs. LDC v. Phillips,*
   401 F.3d 638 (5th Cir. 2005) .............................................................................. 8, 9

*Ronconi v. Larkin,*
   253 F.3d 423 (9th Cir. 2001) ................................................................................. 19

*Slayton v. Am. Express Co.,*
   604 F.3d 758 (2d Cir. 2010) ................................................................................. 23

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
   365 F.3d 353 (5th Cir. 2004) .............................................................................. 8, 9

*Stambaugh v. Corrpro Companies. Inc.,*
   116 Fed. App'x 592 (6th Cir. 2004) ........................................................................ 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ........................................................................................ 9, 18

*Tuchman v. DSC Commc'ns Corp.,*
   14 F.3d 1061 (5th Cir. 1994) ................................................................................. 10

*UBS AG Sec. Litig.,*
   No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ........................... 24

**Statutes**

15 U.S.C. § 10(b) ........................................................................................ 7, 9, 24

15 U.S.C. § 20(a) ............................................................................................... 24

15 U.S.C. § 21D(b)(1) ........................................................................................... 8

15 U.S.C. § 21E(e) ............................................................................................... 3

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 8

15 U.S.C. § 78u-4(b)(2) ......................................................................................... 9

15 U.S.C. § 78u-5(e) ............................................................................................. 3

Private Securities Litigation Reform Act of 1995,
   Pub. L. 104-67, 109 Stat. 737 (1995).............................................................. passim

**Rules**

Fed. R. Civ. Proc. 10b-5 .................................................................................. 10, 24

Fed. R. Civ. Proc. 12(b)(6) ..................................................................................... 8

Fed. R. Civ. Proc. 9(b) ........................................................................................ 7, 8

**Exhibits**

**KBR, Inc.'s Annual and Quarterly Reports (Forms 10-K and 10-Q)**

Exhibit 1    KBR, Inc.'s Amended Annual Report (Form 10-K/A) (May 30, 2014) (Ex. 1, 2013 10-K/A)

Exhibit 2    KBR, Inc.'s Annual Report (Form 10-K) (Feb. 27, 2014) (Ex. 2, 2013 10-K)

**KBR, Inc.'s Press Releases (Form 8-K)**

Exhibit 3    KBR, Inc.'s Current Report (Form 8-K) (Dec. 16, 2013) (Ex. 3, 12/16/13 Form 8-K)

Exhibit 4    KBR, Inc.'s Current Report (Form 8-K) (Feb. 28, 2014) (Ex. 4, 2/28/14 Form 8-K)

Exhibit 5    KBR, Inc.'s Current Report (Form 8-K) (Apr. 9, 2014) (Ex. 5, 4/9/14 Form 8-K)

Exhibit 6    KBR, Inc.'s Current Report (Form 8-K) (May 5, 2014) (Ex. 6, 5/5/14 8-K)

Exhibit 7    KBR, Inc.'s Current Report (Form 8-K) (July 31, 2014) (Ex. 7, 7/31/14 Form 8-K)

**KBR, Inc.'s Transcripts of Earnings Calls**

Exhibit 8      Transcript of Q2 2014 Earnings Call (July 31, 2014) (Ex.8, 7/31/14, Q2 Earnings Call Tr.)

**Other Exhibits**

Exhibit 9      Financial Accounting Standards Board Accounting Standard Codification 605-35-25 (Ex. 9, ASC 605-35-25)

Exhibit 10    Yahoo! Finance, Historical Stock Prices for KBR from Oct. 1, 2013 to May 31, 2014       (Ex.       10,       Historical       Stock       Prices)

KBR, Inc. ("KBR" or the "Company"), and William P. Utt ("Utt"), Susan K. Carter ("Carter"), Dennis S. Baldwin ("Baldwin"), and Brian K. Ferraioli ("Ferraioli", collectively the "Individual Defendants") (and with KBR, the "Defendants") respectfully file this Motion to Dismiss Lead Plaintiffs' Consolidated Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

The law is clear that a restatement of prior period financial results does not equate to fraud.  But that is the essence of Plaintiffs' allegations here—KBR's financial statements for the period ending December 31, 2013 had to be corrected, and thus there must be fraud somewhere. Plaintiffs have not pled particularized facts to support this speculation.  There is no indication that any of the Individual Defendants knew KBR's financials were incorrect when published.  It is beyond dispute that KBR became aware of the problem within months, and immediately investigated the issue utilizing independent legal and accounting advisors acting under the direction of KBR's audit committee, publicly disclosed the issue, and restated the erroneous financial statements.  Predictably, immediately following the announcement of the restatement, Plaintiffs filed suit alleging that, because the restatement occurred, there must have been fraud. But the law does not presume that KBR and the Individual Defendants—all senior executives in KBR's Houston office—committed fraud simply because errors occurred in complex cost forecasting at one of KBR's worldwide subsidiaries.

Dismissal is appropriate because Plaintiffs have not alleged facts supporting a strong inference of scienter on the part of the Individual Defendants.  KBR's restatement related to seven fabrication contracts being performed at its Canadian subsidiary.  These contracts were accounted for under the percentage-of-completion method of accounting, which requires the Company to develop estimates as to the total cost at the beginning of the project.  Once those assumptions are in place, revenue can be recognized in proportion to costs as they are incurred,

1

with some significant provisos discussed below.  As the Complaint admits, KBR's restatement was primarily the result of incorrect cost assumptions on these Canadian projects.  The Complaint does not allege the Individual Defendants were involved in those assumptions.

Rather, in order to extrapolate knowledge to the Individual Defendants, Plaintiffs misinterpret several unrelated statements to make specious claims of "admissions" by KBR, namely that KBR was aware of a material weakness in its Canadian cost forecasting and that it subsequently acknowledged that it had no basis to estimate the costs for the Canadian projects at issue here.  These allegations are both false and based on unreliable confidential witnesses.  First, the material weakness Plaintiffs point to was related to foreign currency effects, not cost forecasting on the seven Canadian projects that were the basis for the restatement.  Second, Plaintiffs tout a statement about late received "issued for construction drawings" and jump to the unsupported conclusion that KBR never had any drawings on the seven Canadian projects and thus knew it had no basis to estimate its costs to complete the projects.  These dots do not connect.  "Issued for construction drawings" are not the basis for bids or the initial cost estimates; indeed, those drawings are expected to be received as a project proceeds and often reflect changes in the scope of work by the client.  Late received "issued for construction drawings" are a normal part of a long-term fabrication and module assembly project and do not mean that KBR was unable to create initial and ongoing estimate of costs for the seven Canadian projects.

Plaintiffs' other scienter allegations also fall short.  While Plaintiffs vaguely allege, based on unreliable confidential witnesses, that the Individual Defendants received "reports," there are no factual allegations linking any information contained in these reports to the misstatements.  Also noticeably absent from the Complaint are allegations that these reports contained

information that was contradictory to the misstatements, and thus there can be no inference that the Individual Defendants knew, or were severely reckless in not knowing, of the issues with the projects.  Plaintiffs' allegations regarding Defendant Utt's stock sale also do not support a strong inference of scienter; Utt's retirement, which was announced in 2013, provides a plausible explanation for the stock sale.  Further, none of the other Individual Defendants sold any stock during the Class Period and KBR was in fact repurchasing its stock in the open market.  Also negating any inference of scienter that could arise from Plaintiffs' weak allegations is the short amount of time that passed between the filing of the misstatements and KBR's discovery and correction of the errors; KBR demonstrated good faith and transparency, not any intent to defraud its shareholders.  Plaintiffs' allegations, taken as a whole, are on their face insufficient to plead a strong inference of scienter.  The Consolidated Class Action Complaint should be dismissed with prejudice.

## **FACTUAL BACKGROUND**[1]

KBR is a publicly-owned corporation headquartered in Houston, Texas.[2]  KBR is "a global engineering, construction and services company supporting the energy, hydrocarbons, power, minerals, civil infrastructure, government services, industrial and commercial market segments."[3]  KBR operates in at least seven countries and has over twenty-five subsidiaries.[4]  On May 5, 2014, KBR announced that it had determined that it needed to restate its consolidated

---

[1] Defendants cite information from other sources as accepted for motions to dismiss under the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C. ("PSLRA")): (1) SEC filings; (2) press releases, transcripts of calls, and other documents referenced in the Complaint; and (3) stock prices.  *See* Exchange Act § 21E(e), 15 U.S.C. § 78u-5(e); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 313-14 (5th Cir. 2008).  The court may also take judicial notice of matters of public record, such as public filings in other courts.  *Fin. Acquisition Partners LP v. Blackwell*, 440 F. 3d 278, 282 (5th Cir. 2006).  Finally, the court may take judicial notice of PowerPoint presentations for conference calls with analysts.  *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979 (N.D. Cal. 2010).
[2] Compl. ¶ 23.
[3] Ex. 1, 2013 10-K/A at 6.
[4] Ex. 2, 2013 10-K at Ex. 21.1.

financial statements for the year ending December 31, 2013 ("Restatement").[5]  Subsequent to this announcement, KBR's stock price dropped by approximately 6%.[6]  On May 9, 2014, Plaintiff Joseph Kohut filed the first class action complaint for violations of the federal securities laws.[7]

The Restatement was primarily related to KBR's pipe fabrication and module assembly business located in Edmonton, Alberta, Canada.  As part of the process of preparing its SEC Form 10-Q for the three months ending March 31, 2014, KBR became aware that there were additional estimated costs to complete seven Canadian pipe fabrication and module assembly contracts (the "Contracts").[8]  "The additional estimated costs to complete [the Contracts] resulted in pre-tax charges [of] $156 million in 2013, consisting of the reversal of $24 million in previously recognized pre-tax profits and the recognition of $132 million in pre-tax losses at completion."[9]  KBR promptly initiated an investigation of these matters utilizing independent legal and accounting advisors who reported to KBR's audit committee, which consists entirely of independent directors.  KBR also promptly informed the investing public of the pendency of the investigation and the need for a restatement.[10]

The Contracts involved module fabrication and assembly (*i.e.*, construction) within KBR's Services business unit in Edmonton, Alberta, Canada. The Services business segment, which is one of five business segments within KBR,[11] "delivers direct-hire construction and construction management for stand-alone construction projects in a variety of global markets,"

---

[5] Ex. 6, 5/5/14 8-K.
[6] Compl. ¶ 9.
[7] *See Kohut v. KBR, Inc.*, No. 4:14-cv-01287, Class Action Complaint for Violations of the Federal Securities Laws, filed May 9, 2014 [Dkt. #1].
[8] Ex. 6, 5/5/14 8-K.
[9] Ex. 1, 2013 10-K/A at 28.
[10] Ex. 6, 5/5/14 8-K.
[11] Ex. 1, 2013 10-K/A at 6-7 (describing the five business segments of Gas Monetization, Hydrocarbons, Infrastructure, Government & Power (IGP), Services, and Other).

including module assembly and fabrication "to a broad variety of markets including oil and gas."[12]   Specifically, this unit within KBR fabricates pipe and assembles large trailer-sized modules in its Edmonton yard for transportation to remote locations in Alberta, where the modules are fitted together to create a large structure, such as an oil refinery.

*Unit Rate Contracts.*   The Contracts were unit rate contracts, a type of fixed-price contract where a price is agreed upon for each unit of work to be performed, and often are used where the quantities of work to be performed have not been finalized.   As KBR explained to its shareholders in its 2013 10-K for the period ending December 31, 2013, filed with the SEC,[13] "[t]hese types of contracts are priced based in part on cost and scheduling estimates that are based on assumptions including prices and availability of labor, equipment and materials as well as productivity, performance and future economic conditions."[14]   KBR warned its shareholders that "[its] failure to accurately estimate the resources and time required for fixed-price contracts . . . could result in reduced profits or, in certain cases, a loss for that contract.  If the contract is significant, or [KBR] encounter[s] issues that impact multiple contracts, cost over-runs could have a material adverse effect on [KBR's] business, financial condition and results of operations."[15]   That is what happened here and led to the Restatement.

*Percentage-of-Completion Accounting.*   The Restatement was also the result of a unique aspect of the construction accounting rules.[16]   As KBR has frequently disclosed to its shareholders and the SEC, it recognizes revenue from long-term contracts to provide construction, engineering, and design services using the percentage-of-completion method.[17]

---

[12] *Id.* at 7.
[13] Ex. 2, 2013 10-K at 11.
[14] *Id.* at 13.
[15] *Id.*
[16] *Id.* at 65.
[17] *Id.* at 16.

The Fifth Circuit has explained that under percentage-of-completion accounting, "[t]he company first estimates the total cost of contract performance and then compares the estimate with actual costs over the life of the contract.  As work proceeds, the company records the corresponding percent of the revenue that should be recorded on the company's books."[18]  The Fifth Circuit has also stated that this is the "preferred accounting standard" for such contracts, even though it is "unique and complicated."[19]

The estimated costs to complete the project are thus an important component of KBR's revenue recognition on long term contracts and involve a significant amount of judgment.  As explained to its shareholders in the 2013 10-K, under percentage-of-completion accounting, "[t]he effects of revisions to revenues and estimated costs are recorded when the amounts are known or can be reasonably estimated.  Such revisions could occur in any period and their effects could be material."[20]  Thus, KBR made clear to its shareholders and to the SEC that revisions to estimates of costs at completion could materially impact KBR and its financial results.  KBR also warned its shareholders—in bolded and italicized language—that "*[o]ur use of the percentage-of-completion method of revenue recognition could result in a reduction or reversal of previously recorded revenues and profits.*"[21]  That is precisely what happened here.

As KBR was preparing its SEC Form 10-Q for the first quarter of 2014, it became aware of additional estimated costs to complete the Contracts.[22]  The inclusion of those additional costs

---

[18] *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 536-37 (5th Cir. 2008) (reversed and remanded district court's denial of the defendants' motion to dismiss).

[19] *Id.* at 536.  The other method available for recognizing revenue on long-term construction contracts is the "completed contract method."  Under this method, revenue is recognized after the contract is completed or substantially completed.  However, both the completed contract and percentage-of-completion methods require losses to be recognized when they are identified.  *See* Ex. 9, ASC 605-35-25-45.  Therefore, the restatement to recognize the $156 million in estimated losses on the Canadian Contracts would have been required regardless of whether KBR used percentage-of-completion or the completed contract method of revenue recognition.

[20] Ex. 2, 2013 10-K at 16.

[21] *Id.*

[22] Ex. 6, 5/5/14 8-K.

6

meant that the Contracts were projected to lose a total of $156 million.[23]   Due to the relevant percentage-of-completion accounting rules, which require forecasted contract losses to be recognized in the period in which the losses are identified,[24] and the materiality of the additional costs to complete the Contracts, KBR determined that it must restate its consolidated financial results for the period ending December 31, 2013.   Thus, on May 30, 2014, KBR filed an amended SEC Form 10-K for the period ending December 31, 2013, restating its financial statements to reverse $24 million in previously recognized pre-tax profits, and recognized an additional $132 million in estimated losses at completion.[25]

Plaintiffs claim – with no factual support – that the Restatement was not the result of errors made in forecasting costs to complete the Contracts, but rather was part of an intentional scheme to defraud KBR's shareholders.[26]   But Plaintiffs do not support this allegation with the particularized facts required by the PSLRA.   Thus, this matter should be dismissed.

## STANDARDS FOR DISMISSAL OF SECURITIES FRAUD CLASS ACTIONS

To assert a claim under Section 10(b) of the Securities Exchange Act of 1934, as amended by the PSLRA, "a plaintiff must allege, in connection with the purchase or sale of securities[:] (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately [injured him]."[27]   To survive a motion to dismiss, Plaintiffs must allege facts supporting each of these elements.   Because Plaintiffs' allegations sound in fraud, they must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that Plaintiffs plead fraud with particularity by "specify[ing] the statements contended to be fraudulent, identify[ing] the speaker, stat[ing] when and where the

---

[23] Ex. 1, 2013 10-K/A at 57.
[24] Ex. 9, ASC 605-32-25.
[25] Ex. 1, 2013 10-K/A at 57.
[26] Compl. ¶¶ 1, 4-5.
[27] *Fin. Acquisition Partners*, 440 F.3d at 286  (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002)).

statements were made, and explain[ing] why the statements were fraudulent."[28]   In addition to Rule 12(b)(6) and Rule 9(b), a securities-fraud plaintiff must also meet the heightened pleading standards set forth in the PSLRA:  (1) Plaintiffs must plead the factual basis for their claims with particularity; and (2) Plaintiffs must plead a strong inference of scienter.[29]

> *Allegations Pleading Factual Basis with Particularity*.   The PSLRA enhances the particularity requirement of Rule 9(b), which requires the "'who, what, when, where and how' to be laid out in the complaint."[30]   Plaintiffs must specify the factual basis for their claims in detail. This pleading standard forbids conclusory, generalized allegations of fraud and demands that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."[31]

> *Allegations Pleading a Strong Inference of Scienter.*   The PSLRA requires a heightened pleading standard for all allegations of scienter.  Scienter is the "intent to deceive, manipulate or defraud" and cannot be shown through "mere[ ] simple or even inexcusable negligence. . . ."[32] Instead, scienter requires at least a showing of "severe recklessness," which is:

> > Limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.[33]

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference

---

[28] *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (internal quotation marks omitted)).

[29] *See Dawes v. Imperial Sugar Co.*, No. H-11-3250, 2013 WL 5442109, at *13 (S.D. Tex. Sept. 27, 2013) (dismissing complaint in part because the plaintiffs did not plead allegations supporting a strong inference of scienter).

[30] *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 349 (5th Cir. 2012) (citation omitted).

[31] Exchange Act § 21D(b)(1), 15 U.S.C. § 78u-4(b)(1).

[32] *Pipefitters*, 499 F. App'x at 349 (citing *Southland*, 365 F.3d at 366).

[33] *Shaw Grp., Inc.*, 537 F.3d at 533 (citation omitted).

that the defendant acted with the required state of mind" with respect to "each act or omission alleged."[34] This required state of mind must be linked to the individual corporate officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish the information or language for inclusion therein . . .)."[35] A complaint will fail to plead a claim against a corporation when it fails to allege a strong inference of scienter with respect to any of the individual actors within that corporation.

To determine whether plaintiffs have alleged a "strong inference of scienter," courts "must engage in a comparative evaluation," considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."[36] An allegation will survive a motion to dismiss under the PSLRA only if the inference of scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."[37] Stated differently, when considered in light of other explanations, the inference of scienter must be more than "merely 'reasonable' or 'permissible'"—it must be so cogent and compelling that it is as strong as all other inferences that could be drawn from Plaintiffs' allegations.[38]

## ARGUMENT AND AUTHORITIES

### A.   The Complaint Fails to Allege a Claim for Securities Fraud under Section 10(b) and Rule 10b-5 Because Plaintiffs Fail to Plead a Strong Inference of Scienter.

Plaintiffs fail to plead a strong inference of scienter, as required by the PSLRA. To plead scienter, Plaintiffs must allege an intent to deceive, manipulate or defraud, or severe recklessness.[39] That is because the "securities laws do not protect investors against negligence"[40]

---

[34] *R2 Invs.*, 401 F.3d at 641 (quoting 15 U.S.C. § 78U-4(b)(2)); *see also Imperial Sugar Co.*, 2013 WL 5442109 at *14.

[35] *Southland*, 365 F.3d at 366; *see also Imperial Sugar Co.*, 2013 WL 5442109 at *16.

[36] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 317 (2007).

[37] *Id.* at 314 (emphasis added).

[38] *Id.* at 324; *see also Imperial Sugar Co.*, 2013 WL 5442109 at *15.

[39] *Shaw Grp.*, 537 F.3d at 533 (internal quotation marks omitted).

[40] *Id.* at 539.

and "corporate mismanagement does not, standing alone, give rise to a 10b-5 claim."[41]  And to survive dismissal, Plaintiffs' scienter allegations must go to the state of mind of the Individual Defendants rather than to the collective knowledge of KBR.[42]  Plaintiffs' allegations can be found to be "plausible" and still not meet the requisite heightened pleading standard.[43]

Plaintiffs cannot meet this strict standard.  Their scienter allegations, even when viewed in the aggregate, are not sufficient to plead a strong inference of scienter, as required by the PSLRA, and thus Plaintiffs' claims must be dismissed.

### 1. The importance of the Contracts does not support a strong inference of scienter.

Plaintiffs first allege in Section V of the Amended Complaint that Defendants must have known the December 31, 2013 financial statements were inaccurate because KBR had previously stated that the Canadian fabrication contracts "were a key driver of KBR's financial performance, were highly profitable, and were experiencing no issues."[44]  But this argument rests on circular logic: because the Contracts were important, Defendants must have known that estimates of costs at completion were wrong.   This is rank speculation and lacks any particularized factual support.[45]

### 2. Senior Management's review of the inaccurate financial statements does not support a strong inference of scienter.

Plaintiffs next argue that the fact that KBR "senior management" allegedly "review[ed] KBR's financial results and 'ensure[d]' those results were accurate further supports a strong

---

[41] *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994).
[42] *Shaw Grp.*, 537 F.3d at 533.
[43] *Pipefitters*, 499 Fed. App'x at 347.
[44] Compl. ¶ 115.
[45] *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (holding that the mere publication of false information does not establish scienter, the party must know that it is publishing materially false information, or must be severely reckless in publishing such information).

inference of scienter."[46]  But this argument is also circular.  Plaintiffs are essentially arguing that because KBR published information that was incorrect, it must have known the information was incorrect.  However, Plaintiffs do not make any particularized factual allegations that any of the Individual Defendants "reviewed" the specific erroneous estimates of costs at completion for the Contracts or that, in 2013, the Individual Defendants knew, or were severely reckless in not knowing, that the estimates of costs at completion were inaccurate.  This argument is based on pure speculation and does not satisfy Plaintiffs' burden to plead particularized facts supporting a strong inference that Defendants knew the information was incorrect when published.

### 3.  The fact of the Restatement, and Plaintiffs' allegations regarding the magnitude and nature of the alleged accounting violations, do not support a strong inference of scienter.

The mere fact of the Restatement offers no inference of scienter.  The Fifth Circuit has repeatedly held that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."[47]  "To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the 'party [knew] that it [was] publishing materially false information, or the party [was] severely reckless in publishing such information."[48]  As the Fifth Circuit noted in *Abrams*, restatements "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action."[49]  Any argument by Plaintiffs that simply because Defendants had to restate its 2013 financial statements, there must have been fraud, is insufficient to adequately plead scienter.

---

[46] Compl. ¶ 116.
[47] *Shaw Grp.*, 537 F.3d at 534 (internal quotation marks omitted) (reversed and remanded district court's denial of the defendants' motion to dismiss).
[48] *Id.* (quoting *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir.), *modified and reh'g denied*, 409 F. 3d 653 (5th Cir. 2005) (quoting *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990))).
[49] *Abrams*, 292 F.3d at 433.

Plaintiffs cannot meet their pleading burden without including facts showing that an Individual Defendant's misstatement was belied by his actual knowledge or by facts so obvious that the defendant had to have been aware of it.[50]   Plaintiffs have not done this.   Instead, Plaintiffs' allegations, in sum, provide that the Individual Defendants made statements about KBR's financials and that KBR later had to restate these financials.   That is not fraud.   Missing from this argument is any allegation linking the alleged misstatements to the alleged bases for scienter.[51]   Without this link, Plaintiffs' scienter allegations are not sufficient.

Plaintiffs' conclusory allegation regarding the magnitude of the Restatement[52] is also not sufficient to plead a strong inference of scienter.   The Fifth Circuit has held that "bold statements" regarding the magnitude and egregiousness of premature revenue recognition "cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements."[53]   Such particularized assertions are lacking here, and thus the allegation regarding the magnitude of the Restatement does not contribute to a strong inference of scienter.

Plaintiffs' allegation that the "nature of the accounting violations supports a strong inference of scienter" also fails.[54]   Plaintiffs claim that the accounting rules at issue here were well known to KBR and straightforward, and thus any errors must have been intentional.   This is conclusory and does not carry Plaintiffs' burden to plead particularized facts.   As KBR fully disclosed to its shareholders, the Restatement was the result of the identification of additional estimated costs to complete the Contracts.[55]   Regardless of whether the accounting rules at issue

---

[50] *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011).

[51] *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 555 (5th Cir. 2007).

[52] Compl. ¶ 118.

[53] *Shaw Grp.*, 537 F.3d at 540; *see also Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (holding that the size of the error is insufficient to establish scienter).

[54] Compl. ¶ 119.

[55] Ex. 1, 2013 10-K/A at 58.

are straightforward or complex,[56] the issue was the accuracy of KBR's forecasts of costs to complete the seven projects.  Estimating future costs involves a significant amount of judgment and KBR had previously warned its shareholders that "the uncertainties inherent in the estimating process make it possible for actual costs to vary materially from estimates."[57] Plaintiffs have not alleged any facts to suggest that the Individual Defendants knew, or were reckless in not knowing, that the cost estimates on the Canadian Contracts were inaccurate as of December 31, 2013.

Further, given that the accounting violations occurred in Canada, at just one of KBR's many worldwide subsidiaries, an inference that the Individual Defendants knew of the issues leading to the Restatement is even more farfetched.[58]  The Individual Defendants are top level management, located in Houston, Texas.  There are no allegations that the Individual Defendants should have paid particular attention to the accounting for the Canadian Contracts or to the revenue figures coming out of KBR's Canadian subsidiary.  As courts routinely have found, "[f]raud cannot be inferred simply because [a parent company] might have been more curious or

---

[56] *Shaw Grp.*, 537 F.3d at 536 (noting that the percentage-of-completion accounting method is "unique and complicated").

[57] Ex. 2, 2013 10-K at 16.

[58] *See, e.g., In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3d Cir. 2004), *abrogated on other grounds by* Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) (affirming dismissal of similar complaint based on alleged subsidiary-level accounting improprieties because, among other things, the "[c]omplaint [was] devoid of any allegations which would establish that AHD's Brazil division was so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives."); *see also Stambaugh v. Corrpro Companies. Inc.*, 116 Fed. App'x 592, 597-98 (6th Cir. 2004) (finding that the only inference from the plaintiff's allegations was that the defendants were negligent in managing the Australian subsidiary); *Kushner v. Beverly Enters, Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) (rejecting claim that parent's officers were severely reckless by failing to "interpret extraordinarily positive performance by its subsidiary. . . as a sign of problems and thus to investigate further"); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir. 1999) (improper to "presume recklessness . . . from a parent corporation's reliance on its subsidiary's internal controls"); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *see also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) (holding that scienter was not adequately pled because "allegations of accounting improprieties at a subsidiary are not enough to demonstrate scienter by a parent corporation and its officers); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 164 (D. Conn. 2007) (dismissing complaint because there was no allegation that any of the defendants were actually aware of the alleged accounting improprieties at the Bermuda subsidiary).

concerned about the activity of [its] subsidiary."[59]   Thus, Plaintiffs' conclusory allegations regarding the nature of the accounting violations do not support a strong inference of scienter.

### 4. KBR's identification of a material weakness does not support a strong inference of scienter.

Plaintiffs next claim that KBR must have known that its forecasts of the costs at completion were incorrect, and thus its December 31, 2013 financial results were incorrect, because its original SEC Form 10-K filed on February 27, 2014, admitted that it had "a material weakness in the Company's internal controls concerning the calculation of cost estimates."[60] Plaintiffs would have this Court believe that this material weakness was related to the Contracts. But the facts are to the contrary, and this argument is disingenuous at best and intentionally misleading at worst. Indeed, the very document that Plaintiffs cite as evidence of this material weakness – the original SEC Form 10-K – makes abundantly clear that the material weakness was limited to issues unrelated to the Contracts or the Restatement. The actual statement that KBR made about the material weakness is as follows:

> ***Material weakness related to project reporting over the completeness and accuracy of estimates of revenues, costs and profit at completion for certain long-term construction projects with multiple currencies.*** We determined that a material weakness in internal control over financial reporting existed since controls were not properly designed to determine *that actual and estimated foreign currency effects* were included in our estimates of revenues, costs and profit at completion for long-term construction contracts *that contain multiple currencies*. Additionally, our control to monitor the inclusion of *foreign currency effects* in our estimates of revenues, costs and profit at completion was not properly designed.[61]

---

[59] *Chill*, 101 F.3d at 270.
[60] Compl. ¶ 116.
[61] Ex. 2, 2013 10-K at 111 (emphasis added).

It is abundantly clear that this material weakness was limited to foreign currency effects. The Restatement had nothing to do with foreign currency effects.  Thus, this material weakness is irrelevant here and does not support a strong inference of scienter.

> **5.      Plaintiffs' allegations regarding Ferraioli's statements regarding the design drawings do not support a strong inference of scienter on the part of Ferraioli.**

Plaintiffs next allege that Defendant Ferraioli was severely reckless in failing to disclose in 2014, after the Restatement, that going forward KBR was not able to reliably estimate its costs on certain of the Contracts.[62]  This argument is based on the uncorroborated and unreliable statement from an anonymous witness and a tortured misreading of certain statements from Ferraioli.  These allegations do not support a strong inference of scienter.

Plaintiffs base this argument on a statement Ferraioli made on July 31, 2014, months after the Restatement, while discussing KBR's results for the second quarter of 2014.  Ferraioli was responding to a question from a stock market analyst about the continued losses on the Canadian Contracts and whether KBR would continue to experience losses on the Contracts going forward.  Mr. Ferraioli replied that:

> The difference is that the scope of work is defined by drawings we received from our clients. On the remaining contracts the majority of the drawings have now been received from the clients and therefore we're able to do the takeoffs to understand exactly what the scope of work is. So, when the quantity of work increases based upon drawings, that's what's driving the results for this quarter. So, it was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house. So, as we get to the backend of these projects the drawings are in, and now we have defined the scope, and therefore we're much better suited to be able to estimate what those costs are to complete.[63]

The context for this statement is important.  Prior to the question, Ferraioli had noted that:

---

[62] Compl. ¶ 120.
[63] Ex. 8, 7/31/14, Q2 2014 Earnings Call Tr. at 9.

> [T]he quarter's results were again dominated by Canadian projects, particularly the pipe fabrication and modular assembly contracts . . . .These contracts represented significant sales growth, but the modules that we are manufacturing and assembling [are] far larger and more complex than we had historically [ ] completed.  The cost increase and productivity decrease and that's what's driving the financial results. . . .The three projects that remain are tied to unit rates based on weight of the modules and therefore any increased welding or other assembly work that is required when we receive the drawing from our clients increases [our] costs but it doesn't allow us to increase the revenues because the weight in many cases did not change.  That's what's driving the 41 million estimate to complete the additional three modules that you see here.[64]

Ferraioli was not conceding that KBR was unable to estimate the costs or the losses of the Contracts.  Rather, he was referring to a concept that it is inherent in any unit rate construction contract—the client may change the scope of work after the project begins, and when that happens, KBR is required to update its estimates of costs at completion.  And not surprisingly, when the contract at issue is losing money on a unit rate basis, additions to the quantities of units to be completed will increase the losses.

Plaintiffs further claim that Ferraioli's statement in July 2014 that "[i]t was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house" is a concession that KBR could not reliably estimate the costs on the Contracts.[65]  Plaintiffs also allege, based on the uncorroborated statements of a confidential witness, CW1,[66] that it is impossible to estimate costs without "design drawings" and that any KBR project without "design drawings" would have to be approved by Defendant Utt.[67]   From these allegations, Plaintiffs conclude KBR and the

---

[64] *Id.* at 4.
[65] Compl. ¶¶ 102, 110.
[66] The Court should discount these allegations because they come from a confidential source.  "The Fifth Circuit approach requires giving relatively less weight to the allegations from anonymous sources."  *Imperial Sugar Co.*, 2013 WL 5442109 at *19.
[67] Compl. ¶¶ 61, 62.

Individual Defendants knew that KBR had no basis for its costs estimates and that the costs estimates KBR used in 2013 and going forward in 2014 were incorrect.[68]  This is simply wrong.

First, CW1 and Ferraioli are clearly talking about two different things:  CW1 refers to "design drawings" and Ferraioli refers to "issued for construction drawings."  As is apparent from the plain meaning of the terms and acknowledged in the Complaint, "design drawings" are received before KBR bids on a project and are typically part of the information used to prepare the initial costs estimate.[69]  In contrast, "issued for construction drawings" are provided at the "backend" of a long-term project and reflect any client-requested changes to the scope of the project, such as changes to the final number of quantities of units to be provided.[70]  The lack of "issued for construction drawings" does not reflect an inability to create an initial or ongoing estimate of costs at completion, as Plaintiffs suggest, as the quantities may or may not change from the original design drawings. Nowhere do Plaintiffs allege, and KBR has never stated, that the Contracts were bid without design drawings or similar information necessary to create an initial estimate of costs.  "Issued for construction drawings" are simply not the basis for the initial cost estimate and the nature of unit rate contracts are intended to commercially recognize that quantities may change during the life of a contract.

Second, CW1 has no basis for the statements he makes and those statements should be disregarded.  He admits that he did not work in the fabrication and module assembly group—he worked in Turnarounds, an entirely different business that typically does not use unit rate contracts.[71]  He does not claim to have knowledge of the estimates of costs at completion for the

---

[68] *Id.* ¶ 120.
[69] *Id.* ¶¶ 59-61.
[70] *Id.* ¶ 110.
[71] *Id.* ¶ 59.

Contracts or how those estimates were calculated.[72]  And he left KBR in April 2013, six months prior to the actual filing of the third quarter 2013 financial statements on SEC Form 10Q and more than a year before the Restatement was announced and, thus, can have no knowledge of the reasons for the Restatement.[73]  CW1 is not reliable and his statements cannot support a strong inference of scienter.

### 6. Plaintiffs' allegations regarding Utt's stock sales do not support a strong inference of scienter on the part of Utt.

Plaintiffs next allege that during the proposed class period, Utt sold stock at an artificially inflated price and thus possessed a motive to commit fraud.[74]  However, "courts 'will not infer fraudulent intent from the mere fact that some officers sold stock.'"[75]  Instead, insider stock sales may only be indicative of scienter "if they occur in 'suspicious amounts or at suspicious times.'"[76]  "Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."[77]  In addition, pursuant to the Supreme Court's ruling in *Tellabs*, "both culpable and nonculpable explanations for stock sales, as revealed in the pleadings and associated documents, must be considered."[78]  Plaintiffs' allegations regarding Utt's stock sales do not satisfy this standard and thus cannot support a strong inference of scienter.

One plausible explanation for Utt's large stock sale is that he wanted to sell his stock prior to retiring from KBR.  On December 16, 2013, KBR announced that Utt was planning to retire from KBR in 2014 and that the Company had entered into a transition agreement with Utt

---

[72] *Id.* ¶¶ 59-62.
[73] *Id.* ¶ 59.
[74] *Id.* ¶ 117.
[75] *Shaw Grp.*, 537 F.3d at 543 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) (Alito, J.)).
[76] *Shaw Grp.*, 537 F.3d at 543 (quoting *Abrams*, 292 F.3d at 435).
[77] *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1149 (W.D. Wash. 2006) (citation omitted) (emphasis omitted); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 896 (W.D. Tex. 2008).
[78] *Shaw Grp.*, 537 F.3d at 543.

on December 13, 2013.[79]  Utt made his stock sale on March 6, 2014, subsequent to the 2013 announcement of his plan to retire in 2014 and prior the announcement of his retirement on April 9, 2014.[80]   The Southern District of Texas has stated that "[r]eadily available plausible explanations for a sale, such as that the insider is leaving the company or retiring in a few months might make a sale nonsuspicious."[81]   Additionally, "[i]f an insider sells when the stock price is not at a high point . . . the stock sale may not be suspicious."[82]   Utt sold while KBR's stock price was declining,[83] so a strong inference of scienter cannot be derived from his sales.

Finally, "unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period."[84]   "An insider's 'sales do not support the "strong inference" required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.'"[85]   Plaintiffs do not allege that any of the other Individual Defendants sold shares during the Class Period, or that such sales, if any, were unusual.  Thus, Utt's stock sale does not give rise to a strong inference of scienter.

---

[79] Ex. 3, 12/16/13 Form 8-K.
[80] Ex. 5, 4/9/14 Form 8-K.
[81] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 594 (S.D. Tex. 2003) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company . . . to sell shares.  Indeed, they often have a limited period of time to exercise their company stock options.")).
[82] *In re Enron Corp.*, 258 F. Supp. 2d at 594.
[83] *See* Ex. 10, Historical Stock Prices (showing that stock prices for KBR were steadily declining at the time Utt sold his shares in March 2014).
[84] *Abrams*, 292 F.3d at 435.
[85] *In re Enron*, 258 F. Supp. 2d at 594 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434-35 (9th Cir. 2001)).

7.    **Plaintiffs' allegations regarding Defendants' receipt of cost estimates and other reports do not support a strong inference of scienter.**

Plaintiffs' vague allegations regarding "reports" the Individual Defendants received are insufficient to support a strong inference of scienter.[86]   First, the Court "must discount" these allegations because they come solely from confidential witnesses,[87] which "detract[s] from their weight in the scienter analysis."[88]   Second, there are no allegations in the Complaint that these "reports" contained information that would have made the Individual Defendants aware of any issues with the Contracts.[89]   These "reports" allegedly contained "the estimated costs to complete projects, a list of updates and issues encountered on projects, and noted if KBR had not received the design drawings for [the] projects."[90]   But Plaintiffs have not pled any facts to suggest that the Individual Defendants knew the estimated costs for projects undertaken by its Canadian subsidiary were wrong.   There is no allegation that there were any "reports" contradicting what was publicly disclosed,[91] or that the Individual Defendants ever received such "reports."   Additionally, Plaintiffs' group-based allegations that "senior management" received these

---

[86] Compl. ¶ 122.

[87] Plaintiffs base a large proportion of their allegations on statements from "CW2."  Plaintiffs' allegations based on statements from CW2 should be disregarded due to the lack of specificity regarding CW2.  CW2's alleged titles of "Financial Analyst" and "Senior Contract Specialist" do not provide a sufficient link between CW2's knowledge and the cost forecasting issues on the Canadian Contracts that led to the Restatement.

[88] *In re Franklin Bank  Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011).

[89] *In re Dell*, 591 F. Supp. 2d at 894 (finding no inference of scienter where "Individual Defendants oversaw accounting functions, had unfettered access to information, and approved high-level decisions, but allege nothing specific about what the Individual Defendants knew or intended, or even what 'fraudulent' decisions they approved"); *In re Franklin Bank Corp.*, 783 F. Supp. 2d at 387-400 (declining to find an inference of scienter where the individual defendants had access to reports issued to them by the FDIC because plaintiffs' details regarding such reports did not substantiate allegations that the defendants knowingly misrepresented information or omitted material statements); *Shaw Grp.*, 537 F.3d at 538 (finding allegations "too vague to allow an inference of scienter" when plaintiffs failed to specify the contents of a letter to senior insiders); *In re Bausch & Lomb, Inc.*, 592 F. Supp. 2d at 341 (finding scienter inadequately pled because plaintiffs did not identify any report received by an individual defendant raising a red or yellow flag about the foreign subsidiaries' accounting prior to the publicly disclosed investigation).

[90] Compl. ¶ 122.

[91] *Shaw Grp.*, 537 F.3d at 540 (faulting the plaintiffs' complaint for not including allegations "that the reports or the meetings included information at odds with [the defendant company's] public statements").

"reports" are prohibited by the PSLRA.[92]   Thus, these allegations cannot support a strong inference of scienter.[93]

### 8.  Plaintiffs' allegations regarding violations of accounting policies and inaccurate SOX certifications do not support a strong inference of scienter.

Plaintiffs also allege that scienter is shown by the allegedly "severe and pervasive nature of KBR's material weaknesses in internal controls."[94]   The Fifth Circuit has found allegations that accounting policies were violated and inaccurate certifications signed by management pursuant to the Sarbanes-Oxley Act ("SOX Certifications") insufficient to show the requisite strong inference of scienter.[95]   KBR's "after-the-fact admissions that it 'did not maintain effective control over'" the costs and revenue forecasting for the Canadian Contracts, do not show that KBR or any of its officers "acted with scienter in making the initial inaccurate financial statements."[96]   Plaintiffs have not pled that the Individual Defendants knew about the inaccurate information or recklessly ignored evidence of its falsity.   Rather, their allegations show a company acting in a responsible way to identify the cause of the problem and make improvements going forward.

The SOX certification "is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.   There must be, in other words, facts establishing that the officer who signed the certification had a reason to know, or should have suspected . . . that the financial statements contained material misstatements or

---

[92] *Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) (rejecting allegations that contrary information "was well known within Chubb," the subject of "[r]umors circulated within the Company," and "openly discussed" by "Chubb's operations employees"); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004) (allegation that fraud was "well-known" within company too general); *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1144-45 & n.25 (M.D. Fla. 2005) (allegation that certain contrary facts became "manifest and widely known" or that an event became "hot and heavy" insufficient to allege a strong inference of scienter because there was no suggestion that any particular defendant had knowledge of the facts).

[93] *Abrams,* 292 F.3d at 433; *Shaw Grp.*, 537 F.3d at 538.

[94] Compl. ¶ 121.

[95] *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.* , 499 Fed. App'x 345, 350 (5th Cir. 2012) (affirming dismissal of complaint by district court).

[96] *Id.*

omissions."[97]  Plaintiffs have not come close to meeting this standard as they have not pled that at the time Utt or Ferraioli signed the certifications, they had reason to know of any misstatements or omissions.  Without more, Plaintiffs' conclusory allegations, such as the allegation that "internal weaknesses of this scope and depth were obvious to anyone who cared to look,"[98] are not sufficient to establish a strong inference of scienter.

Further, Plaintiffs' claim that KBR "admitted that [it] created a 'culture' which infected its entire Canadian construction business" is false.[101]  Defendants did not say the company *created* a culture that permitted serious accounting improprieties; the 10-K/A says that it determined after the fact that "the control environment was ineffective in that the culture at the Canadian pipe fabrication and modular assembly business facilitated delayed identification and communication of project concerns."[102]  There is no factual allegation that the Individual Defendants were aware of this issue with the control environment in Canada prior to the Restatement.  Thus, nothing about that statement establishes a strong inference of scienter on the part of the Individual Defendants.

---

[97] *Shaw Grp.*, 537 F.3d at 545 (internal quotation marks omitted); *see also Imperial Sugar Co.*, 2013 WL 5442109 at *19 (disregarding the plaintiff's SOX certification allegations because it "fail[ed] to point to any 'glaring accounting irregularities or 'red flags'").
[98] Compl. ¶ 121.
[99] *Pipefitters*, 499 Fed. App'x at 350.
[100] *Shaw Grp.*, 537 F.3d at 540.
[101] Compl. ¶ 121.
[102] Ex. 1, 2013 10-K/A at 123.

Plaintiffs' conclusory allegations that the Individual Defendants knew, or should have been aware, of those problems in its Canadian subsidiary is not sufficient to make the requisite showing of a strong inference of scienter.[103]

9.     **The short time between the filing of the misstatements and the Restatement negates any inference of scienter.**

The short time between the filing of the misstatements on February 25, 2014 and the announcement of the Restatement on May 5, 2014, negates any inference of scienter.  The short timeframe is more in line with an inference of good faith on the part of Defendants rather than an inference of fraudulent intent.[104]  The decision to investigate the issues with the Contracts as soon as Defendants were alerted to an issue was "a prudent course of action that weakens rather than strengthens an inference of scienter."[105]  Defendants were entitled to a reasonable time to investigate.[106]  Defendants swiftly and efficiently investigated and disclosed the erroneous cost estimates with the assistance of independent legal and accounting advisors who reported to the independent directors on KBR's audit committee;[107] these actions are contradictory to an inference of fraudulent intent.  The timing of the Restatement thus negates any inference of scienter.

10.    **KBR's share repurchase program during the class period negates any inference of scienter.**

Also negating any inference of scienter is the fact that in the time period prior to the Restatement, KBR was engaging in a share repurchase program, that is, it was actually buying back its stock in the market.  On February 27, 2014, KBR announced that its Board of Directors

---

[103] *Shaw Grp.*, 537 F.3d at 539.
[104] *See Slayton v. Am. Express Co.*, 604 F.3d 758, 776-77 (2d Cir. 2010) (finding that the defendants' decision to announce the write-down shortly after the alleged misstatement negated an inference of scienter).
[105] *See Horizon Asset Mgmt., Inc. v. H & R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009).
[106] *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) (stating that "[t]aking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").
[107] Ex. 6, 5/5/14 Form 8-K.

had authorized a new $350 million share buyback program.[108]  This new program replaced and terminated a buyback program that had been announced in 2011.[109]

Share buyback programs negate an inference of scienter because "such a strategy of repurchasing stock at a knowingly inflated price would be economically irrational."[110]  "Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent."[111]  It would not make sense for KBR to repurchase in excess of $90 million of its own shares at an intentionally and artificially inflated price,[112] and thus KBR's share buyback program negates any inference of scienter.

### B.   The Amended Complaint Fails to Allege a Claim for Control Person Liability.

Plaintiffs bring additional claims under Section 20(a) of the Exchange Act against the Individual Defendants as alleged "control persons."[113]  Control person liability under Section 20(a) is derivative of a primary and independent violation of securities laws.  If a plaintiff fails to allege an underlying violation of the securities laws, the related control person claims also fail.[114]  Because Plaintiffs fail to allege any underlying violation under Section 10(b) or Rule 10b-5, no control person liability exists.

Even if the Court finds that Plaintiffs properly pled an underlying violation, they have failed to allege any claim for control person liability against the Individual Defendants.  To make a prima facie case for control person liability, Plaintiffs must plead with particularity that each defendant "had actual power or influence over the controlled person and . . . each induced or

---

[108] Ex. 4, 2/28/14 Form 8-K at 5, 8.

[109] *Id.*

[110] *See UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *13 (S.D.N.Y. Sept. 28, 2012).

[111] *See Johnson v. Siemens AG*, No. 09-CV-5310 (JG)(RER), 2011 WL 1304267, at *14 (E.D.N.Y. Mar. 31, 2011) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (internal quotation marks omitted) (holding that the share buyback program was "incompatible" with the defendant's share buyback program)).

[112] Ex. 7, 7/31/14 Form 8-K.

[113] Compl. ¶ 200.

[114] *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 n.123 (5th Cir. 2002); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 916-17 (S.D. Tex. 2001).

participated in the alleged violation."[115]   A pleading of control person liability must meet the particularity requirement.[116]   Thus, pleading officer or director status is not enough.[117]   Similarly, pleading legal conclusions does not suffice.[118]

## **CONCLUSION**

For these reasons, Defendants respectfully request that the Court dismiss with prejudice the claims asserted in Lead Plaintiffs' Consolidated Class Action Complaint and grant Defendants such other and further relief to which they may be justly entitled.

---

[115] *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).

[116] *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 725 n.7 (S.D. Tex. 2003) (requiring "particularized facts as to the controlling person's culpable participation in (exercising control over) the fraud perpetrated by the controlled person" to avoid dismissal) (quoting *Ellison v. Am. Image Motor Co.,* 36 F. Supp. 2d 628, 637-38 (S.D.N.Y. 1999) for this proposition and noting that it applied the same test to 1933 and 1934 Act claims)).

[117] *See In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) (collecting cases).  *But see Dietrich v. Bauer*, 76 F. Supp. 2d 312, 335 (S.D.N.Y. 1999) ("[O]wner and . . . president . . . [are] positions from which control 'can be directly inferred without more.'" (citation omitted)).

[118] *See Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904, at *11 (S.D.N.Y. Aug. 30, 1996) (court need not accept as true allegations that amount to legal conclusions in evaluating sufficiency of complaint on a motion to dismiss).

Dated:  December 5, 2014                 Respectfully submitted,

VINSON & ELKINS LLP

/s/ Michael Holmes
_____

Michael C. Holmes
Attorney-in-Charge
TX Bar No. 24002307 / SDTX Bar No. 23716
Jeffrey S. Johnston
TX Bar No. 24002368 / SDTX Bar No. 22089
1001 Fannin Street, Suite 2500
Houston, TX 77002
Telephone: 713.758.2825
Facsimile: 713.615.5928
mholmes@velaw.com
jjohnston@velaw.com

Amy E. Tankersley
TX Bar No. 24068623 / SDTX Bar No. 1171440
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
Telephone: 214.220.7817
Facsimile: 214.999.7817
atankersley@velaw.com

**Counsel for KBR, Inc., William P. Utt,
Brian K. Ferraioli, Susan K. Carter,
and Dennis S. Baldwin**

## CERTIFICATE OF SERVICE

I certify that on the 5th day of December 2014, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

/s/ Michael Holmes
_____
Michael Holmes

26