**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOSEPH KOHUT, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1287 |
| | § | |
| KBR, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION and ORDER**

The lead plaintiffs in this securities class action, the Arkansas Public Employees Retirement System and IBEW Local No. 58 / SMC NECA Funds (together, "the plaintiffs"), sued KBR, Inc. and four of its officers, former Chief Executive Officer William P. Utt, former Chief Financial Officer Susan K. Carter, former Chief Accounting Officer and Senior Vice-President Dennis S. Baldwin, and Chief Financial Officer and former principal executive officer Brian K. Ferraioli (together, the "Individual Defendants"). The plaintiffs alleged securities fraud under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, and sought to represent a class of investors who purchased KBR's stock between September 11, 2013 and July 30, 2014. (Docket Entry No. 60, at 4). The plaintiffs allege that during this period, , the defendants artificially inflated KBR's stock price by misrepresenting the profits and losses from seven contracts to construct oil and gas facilities in Canada. When KBR announced that it would restate the financial statements and identified the losses resulting from the contracts, the company's stock price fell. The decline was from a high during the class period of $36.29 per share to $20.66 the day after

1

KBR announced a second round of losses.

The defendants have moved to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). The basis for the motion is that the plaintiffs failed to plead a strong inference of scienter. (Docket Entry No. 66, at 8). The plaintiffs responded, (Docket Entry. No. 67), and the defendants replied, (Docket Entry No. 70). The court held a hearing in which counsel argued the motion. (Docket Entry No. 74). Based on the pleadings; the motion, response, and reply; the record; counsel's arguments; and the relevant law, the defendants' motion to dismiss is denied. A status and scheduling conference is set for September 28, 2015 at 5:00 p.m., to consider and set a scheduling order for discovery, subsequent motions, and trial.

The reasons for these rulings are explained below.

## I.    The Plaintiffs' Allegations

### A.    Background Facts

KBR, headquartered in Houston, Texas and incorporated in Delaware since 2006, is a "global engineering, construction and services company supporting the energy, hydrocarbons, power, minerals, civil infrastructure, government services, industrial, and commercial market segments." (Docket Entry No. 66, at 10 & Ex. 1) (quotations omitted). KBR operates in at least seven countries. (*Id.*, Ex. 1). KBR has five business segments—Gas Monetization, Hydrocarbons, Infrastructure, Government & Power, Services, and Other—and has over 25 subsidiaries. (*Id.*). KBR's common stock is publicly traded on the New York Stock Exchange.

The lawsuit arises out of seven construction contracts related to KBR's pipe fabrication and module assembly business in Edmonton, Alberta, Canada. (Docket Entry No. 66, at 11). These and

similar construction contracts are generated by KBR's Services business segment, which delivers direct-hire and construction-management services to dispersed markets. The contracts were to fabricate pipe and assemble "large trailer-sized modules" in KBR's "Edmonton yard for transportation to remote locations in Alberta, where the modules are fitted together to create a large structure, such as an oil refinery." (*Id.*, at 11–12).

On May 5, 2014, KBR announced that it would restate its consolidated financial statements for the year ending December 31, 2013. KBR asserts that in preparing its S.E.C. Form 10-Q[1] for the first quarter of 2014, it discovered additional costs related to the seven Canadian construction contracts. (Docket Entry No. 66, at 13–14). KBR had previously recognized $24 million in pre-tax profits. The restatement recognized $132 million in pre-tax losses, a reversal of $156 million. (*Id.*). The plaintiffs allege that in the 2013 financials, KBR "artificially inflated its income by violating well-established accounting rules that were central to its business." (Docket Entry No. 60 ¶ 1). The motive was that these profits were important to KBR's 2013 financial results. The plaintiffs point to the Individual Defendants' public statements emphasizing the profits from the Canadian pipe-fabrication and module-assembly contracts. (*Id.*).

On June 19, 2014, KBR reported a $41 million loss for the first quarter of 2014 on the contracts. (*Id.* ¶ 11). Finally, on July 31, 2014, KBR reported an additional $41 million loss for the second quarter of 2014 on the Canadian contracts. (*Id.* ¶ 13).

The amended complaint filed in this case alleges that the losses resulted from inaccurate cost estimates for the contracts. The complaint alleges that the Individual Defendants were "integrally

---

[1] Publicly traded companies must submit a quarterly form 10-Q to the S.E.C.. The form 10-Q contains information relevant to a company's financial position.

involved in the cost estimation process for the Canadian projects at issue." (Docket Entry No. 60 ¶ 59). These allegations come, in part, from two confidential witnesses. Confidential Witness One ("CW1") was a general manager of KBR Industrial Services in Canada from 2010 to April 2013. (*Id.*). The plaintiffs contend that CW1 managed the Canadian Turnaround Business and was directly involved in approving bids for new contracts and cost estimation. (*Id.*). Confidential Witness Two ("CW2") was a financial analyst for KBR in Canada from 2011 to September 2013 and a Senior Contract Specialist until November 2013. (*Id.* ¶ 64). The amended complaint includes allegations about the information CW1 and CW2 provided.

According to CW1, KBR would prepare a "detailed analysis of [its] estimated costs to complete the project" at the start of a project involving construction contracts. (Docket Entry No. 60 ¶ 59) (quotations omitted). When KBR received a Request for Proposal ("RFP"), a white-paper brief was prepared for and given to senior management. (*Id.* ¶ 60). CW1 prepared white-paper briefs for the projects he worked on. He described the briefs as comprehensive accountings of a project's merits. (*Id.*). The briefs would include cost estimates, an explanation of how they were done, risk evaluation, and an analysis from KBR's Corporate Treasury Department before entering into contracts like the seven Canadian contracts. (*Id.*). The briefs would also note the presence or absence of "design drawings," which the plaintiffs allege are essential to making reliable construction-contract cost estimates. (*Id.* ¶ 61). CW1 noted that "[a]fter KBR entered into its Services contracts, KBR's senior management, including Individual Defendants, remained directly involved in the cost estimation process." (*Id.* ¶ 63).

According to CW1, KBR viewed entering new construction contracts without design drawings as such a significant risk that it required the approval of KBR's CEO, William Utt, and the

Executive Leadership Team ("ELT"). (*Id.* ¶ 62). Besides Utt, the ELT included Individual Defendants Baldwin, Carter, and Ferraioli. The ELT had to evaluate and approve contracts that lacked design drawings. ELT members knew when these drawings were not part of the estimated costs. (*Id.*). Projects with design drawings, by contrast, did not require Utt's or the ELT's specific approval. (*Id.*).

The amended complaint alleges that the ELT "reviewed and analyzed the cost estimates for the Canadian projects." (Docket Entry No. 60 ¶ 63). KBR's 2013 Form 10-K noted that "[a]t least quarterly, significant projects are reviewed in detail by senior management." (*Id.*) (quotations omitted). At monthly ELT meetings in Houston, ELT members received detailed reports on KBR projects, including the seven Canadian contracts. (*Id.* ¶ 64).

CW2 was allegedly responsible for gathering the information and compiling the reports about KBR's Canadian operations. (*Id.*). He confirmed that before the monthly meetings, the Individual Defendants received "KBR Monthly Business Unit ELT Reviews" for Canada. (*Id.*). The amended complaint alleges that these reports contained information about "the Canadian projects at issue here." (*Id.*). During the meetings, they discussed the status of the Canadian projects with Karl Roberts, the Senior Vice-President of Canada Operations. (*Id.*). These reports and meetings provided the Individual Defendants with a comprehensive picture of the Canadian operations, including the estimated completion costs, revenue income, status updates, and problems. (*Id.* ¶ 65).

**B.    The Public Statements Made by KBR and the Individual Defendants**

The amended complaint alleged that between September 11, 2013 and July 31, 2014, the defendants made material misstatements and omissions to conceal the poor performance of the seven Canadian construction contracts and its impact on KBR's overall performance. Before the class

period began, KBR allegedly primed the market to view the Canadian contracts as important achievements by the public statements emphasizing the profitability of the Services segment's Canadian operations. In an April 26, 2013 investor conference call, KBR's CEO Utt said, "[a]t Services, Q1 was solid, particularly across bookings, revenue, and income at our Canadian operations . . . . [W]e expect continued robust performance from our Canadian operations in 2013." (Docket Entry No. 66 ¶ 37) (quotations omitted). CFO Carter emphasized that "the Services group was up nearly 40% led by a near-threefold increase in Canada operations." (*Id.*) (quotations omitted). Analysts reacted by noting that "Canada is expected to be one of KBR's strongest growing divisions in 2013." (*Id.* ¶ 38) (quotations omitted). KBR press releases and statements from Utt and Carter issued after the second quarter 2013 earnings were announced made similar points and evoked similar reactions from investors. (*Id.* ¶ 39–40).

On September 11, 2013, the first day of the class period, Carter gave a presentation at an investor conference in California. She praised the Canadian operations for its "strong bookings with a wide variety of markets, . . . with turnarounds, module fabrication, gas processing, camp support, et cetera." (Docket Entry No. 60 ¶ 41) (quotations omitted). She emphasized KBR's "good cost control [and] good project management and risk management," (*id.*) (quotations omitted), though these statements did not specifically relate to the Canadian division.

On October 24, 2013, KBR issued its third-quarter S.E.C. filings in a Form 10-Q signed by CEO Utt and CAO Baldwin. (Docket Entry No. 60 ¶ 42). The overall results were below market expectations, but a press release portrayed the Canadian construction work as a bright spot. "Services job income was $31 million, up $16 million, or 107% . . . [driven by] increased activity on several module fabrication projects in Canada." (*Id.*) (quotations omitted). Utt elaborated the

6

following day:

> And also the fabrication work we are doing, we seem to be doing very well in delivering modules that are built to design and fit up issues are minimal, and we seem to have gotten more than our share on modules and hope we can continue to maintain the very good performance we have in our module fabrication . . . yards up in Edmonton.

(Docket Entry No. 60 ¶ 42) (quotations omitted).

Utt emphasized these points in another investor conference call on November 13, 2013. "Our operations there [in Canada] have been very successful in construction fabrication turnarounds." (Docket Entry No. 60 ¶ 43) (quotations omitted). Analysts reacted by noting that "Services revenues of ~$494M were up 18% [year-over-year] due to strength in Canadian fabrication and turnaround services." (*Id.* ¶ 44) (quotations omitted).

Utt also made statements about KBR's accounting practices for its construction and fabrication contracts. At an October 25, 2013 investor conference, Utt stated that "we do a pretty good job of being conservative in how we book projects and provision them over the life of the project." (Docket Entry No. 60 ¶ 56) (emphasis omitted) (quotations omitted). The 2013 Form 10-K[2] and 2014 quarterly reports similarly stated that "historically, our [cost] estimates have been reasonably dependable regarding recognition of revenues and profit on percentage-of-completion contracts." (*Id.*) (quotations omitted). The 2013 Form 10-K acknowledged that percentage-of-completion was a "critical accounting policy" fundamental to KBR's financial results. (*Id.* ¶ 58) (internal quotation marks omitted).

On February 27, 2014, KBR announced fourth-quarter and year-end results for 2013 that

---

[2] Publicly traded companies must submit a form 10-K, a comprehensive annual report detailing a company's financial performance, to the S.E.C..

were below analysts' expectations. KBR attributed $17 million out of $79 million in "unexpected charges" to a material weakness in internal controls over the accuracy of construction contract costs. (Docket Entry No. 60 ¶ 75). The material weakness identified by KBR's outside auditor related to KBR's accounting treatment of construction projects using multiple currencies. (*Id.* ¶ 76). The amended complaint claims that KBR and the Individual Defendants "falsely assured investors" that the previous year's financial statements were accurate, stating that KBR had conducted extensive testing of the 2013 statements after the auditors identified the material weakness:

> In light of the material weakness identified above, we performed additional analysis and other post-closing procedures to ensure our consolidated financial statements were prepared in accordance with generally accepted accounting principles and reflects its financial positions and results of operations as of and for the year ended December 31, 2013. . . . [M]anagement concluded that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented.

(Docket Entry No. 60 ¶ 79) (emphasis omitted).

During a February 28, 2014 investor call, Utt again discussed KBR's Canadian operations. "[W]e're focused on executing on the substantial work we've won over the past two years, primarily in the Canadian oil sands . . . [I]n Canada, we're expecting to see continued growth." (Docket Entry No. 60 ¶ 81) (quotations omitted). The Form 10-K, which Utt, Ferraioli, and Baldwin signed, stated that increased revenues in the Services segment were primarily driven by construction activities on oil-sands projects in Canada. (*Id.*).

On April 9, 2014, KBR publicly announced Utt's resignation as CEO. (Docket Entry No. 60 ¶ 86). The company told investors in December 2013 that Utt would be stepping down soon but did not identify when until April 2014. The amended complaint alleges that Utt sold large amounts of his KBR stock in March 2014, and that these sales are evidence of culpable knowledge in light

of the May, June, and July 2014 losses and announcements.

On May 5, 2014, KBR filed a Form 8-K announcing that it would restate the company's 2013 financials. (Docket Entry No. 60 ¶ 87). The Form 8-K noted:

> In connection with the preparation of KBR Inc.'s Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million.

(Docket Entry No. 60 ¶ 87).

The Form 8-K stated that the "majority of these losses should have been recognized in our consolidated financial statements as of and for the year ended December 31, 2013," (Docket Entry No. 60 ¶ 87) (quotations omitted), and cautioned against relying on "previously issued consolidated financial statements for 2013 . . . [or on] KBR's earnings and press releases and similar communications." (*Id.* ¶ 88) (quotations omitted).

On May 30, 2014, KBR released the Form 8-K restated financials for the third and fourth quarters of 2013 and the 2013 year-end financials, the results reflected "the materiality of the additional estimated costs to complete seven Canadian pipe fabrication and modular assembly contracts within our Services business segment." (Docket Entry No. 60 ¶ 93) (quotations omitted). KBR explained that:

> the control environment was ineffective in that the culture at the Canadian pipe fabrication and modular assembly business facilitated delayed identification and communication of project concerns and the proper preparation of complete and accurate estimates of revenues, costs and profit at completion. As a result, our controls over the completeness and accuracy of information used in our preparation of estimates and our control procedures over our preparation of estimates to complete and our controls over the reviews of such estimates to complete for our Canadian pipe fabrication and modular assembly business also were not effective.

(Docket Entry No. 60 ¶ 96) (emphasis omitted).

KBR also acknowledged KPMG had identified a material weakness in financial controls "in our Canadian pipe fabrication and modular assembly business . . . resulting from the Company having insufficiently trained project managers, project controls, [and] accounting and executive management professionals to perform project oversight reviews" reflecting KBR's standards.  (Docket Entry No. 60 ¶ 97) (quotations omitted).

On June 19, 2014, KBR issued a press release announcing first-quarter 2014 financial results. (Docket Entry No. 60 ¶ 103).  The release reported "$41 million of additional losses in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada." (*Id.*) (emphasis and quotations omitted).  Analysts at the Jefferies investment-banking firm noted that "KBR's 1Q EPS [earnings per share] were substantially below estimates, as the impact of problem projects in Canada (along with other issues) continued into 1Q14." (*Id.* ¶ 105) (quotations omitted).

On July 31, 2014, KBR released its second-quarter results, announcing another $41 million loss relating to the seven Canadian construction contracts. (Docket Entry No. 60 ¶ 107). KBR stated in a press release that the losses in the Services segment were driven by "$41 million in increased construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects." (*Id.* ¶ 108) (quotations omitted).  On a conference call that same day, a Barclays analyst asked Ferraioli to explain the continued losses in 2014.  Ferraioli responded:

> The difference is that the scope of work is defined by drawings we received from our clients.  On the remaining contracts the majority of the drawings have now been received from the clients and therefore we're able to do the takeoffs to understand exactly what the scope of work is.  When the quantity of work increases based upon drawings, that's what's driving the results for this quarter.  It was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house.  As we get to the backend of

these projects the drawings are in, and now we have defined the scope, and therefore we're much better suited to be able to estimate what those costs are to complete.

(Docket Entry No. 60 ¶ 110) (emphasis omitted).

The restated financials and announcements led to an S.E.C. investigation into the circumstances leading to their issuance.  (Docket Entry No. 60 ¶ 113).

### C.   The Results of the May, June, and July 2014 Disclosures

On February 28, 2014, the first trading day after KPMG's material-weakness finding, KBR's stock price fell from $31.94 to $27.62 a share, a 13.5% decline. (Docket Entry No. 60 ¶ 78). On May 5, 2014, after KBR announced that it would restate its 2013 financials, the per share value fell from $25.84 (at the close of trading on May 2, the last trading day before the disclosure) to $24.23, roughly a 6% decline. (*Id.* ¶ 92). The stock traded at an "extremely high volume" of over four million shares. (*Id.*).  On June 19, 2014, when KBR announced $41 million in additional losses from the seven Canadian contracts, the stock price again fell, from $26.32 to $24.46, a nearly 7% decline.  (*Id.* ¶ 106).  When the second $41 million in losses was announced on July 31, 2014, the price fell from $22.16 to $20.66, a nearly 7% decline. (*Id.* ¶ 112).  During the class period, the stock had peaked at $36.29.  (*Id.* ¶ 113).

The complaint filed on May 9, 2014 asserted claims under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(A), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  (*Id.* ¶ 7).  On September 8, 2014, this court approved the appointment of the Arkansas Public Employees Retirement System and IBEW Local No. 58 / SMC NECA Funds as lead plaintiffs under the PSLRA. (Docket Entry No. 55).

On October 20, 2014, the plaintiffs filed a consolidated class action complaint under Federal

Rules of Civil Procedure 23(a) and (b)(3), defining the putative class as all those who purchased KBR securities between September 11, 2013 and July 31, 2014. (Docket Entry No. 60, at 1). The amended complaint alleges that KBR's S.E.C. filings, press releases, and conference calls during the class period contained material misstatements and omissions and that the Individual Defendants—each "control persons" under § 20(a)—were at least severely reckless in not learning and quickly disclosing the inaccurate information about the seven Canadian construction contracts. (Docket Entry No. 60 ¶ 200–01). The amended complaint alleges that KBR "artificially inflated its income by violating well-established accounting rules that were central to its business." (*Id.* ¶ 1).

The defendants moved to dismiss the plaintiffs' § 10(b) claim based on an absence of individual allegations supporting a strong inference of scienter. (Docket Entry No. 66, at 16–31). The defendants moved to dismiss the plaintiffs' derivative § 20(a) claim based on the absence of a viable § 10(b) claim. (*Id.* at 31–32). The plaintiffs responded, and the defendants replied. (Docket Entry Nos. 67, 70). The court held a hearing on the motion on March 5, 2015 and heard argument.

### D.    Scienter

The only disputed Rule 10b-5 element is scienter. (Docket Entry No. 66, at 8). The amended complaint makes specific allegations that the plaintiffs contend give rise to a strong inference of scienter on the part of KBR and the Individual Defendants. First, the plaintiffs allege that KBR and the Individual Defendants were severely reckless in not confirming the strong performance of the seven disputed Canadian contracts. (Docket Entry No. 60 ¶ 115). The Individual Defendants repeatedly told investors that the Canadian pipe-fabrication contracts were a key driver of KBR's successful financial performance. (*Id.*). The defendants highlighted the strong performance of these operations in public statements that market participants relied on. The plaintiffs contend that making

12

the statements without confirming their basis shows at least severe recklessness. (*Id.*).

Second, the amended complaint alleges that the defendants acted with scienter by not undertaking the comprehensive review of the company's internal accounting controls that they promised. (Docket Entry No. 60 ¶ 116). KBR sought to reassure investors that its financial statements were accurate after the February 27, 2014 report from KPMG identifying a material weakness in the company's internal controls related to the calculation of foreign currency conversions. (*Id.*). Because the defendants did not find or disclose the 2013 losses that would later be revealed in the restatement, "senior management, including Defendants Utt and Ferraioli," either knowingly misstated the 2013 end-of-year results or were severely reckless in performing—or in failing to perform—the review the company claimed to have undertaken. (*Id.*).

Third, the amended complaint alleges that former CEO Utt's sale of his KBR stock supports an inference of scienter. (Docket Entry No. 60 ¶ 117). On March 6, 2014, Utt sold roughly 72% of his stock for $4.5 million in proceeds. The sale occurred shortly after (1) the materially misstated 2013 financial results were released and (2) Individual Defendant Baldwin informed the company internally that he was resigning from his position as KBR's Chief Accounting Officer. (*Id.*). The amended complaint alleges that the March 2014 sale was more than six times greater than any other stock sale Utt made while at KBR and is "additional evidence of scienter." (*Id.*). The complaint does not mention, however, that KBR had announced on December 16, 2013 that Utt was planning to retire from the company in 2014 and that his retirement was eventually announced on April 9, 2014, shortly after he sold the stock. (Docket Entry No. 66, at 18).

Fourth, the amended complaint alleges that the magnitude of the losses the restatement revealed supports a strong inference of scienter on the part of the Individual Defendants. (Docket

Entry No. 60 ¶ 118). KBR overstated third-quarter 2013 net income by 329% and its fourth-quarter income by 242%, indicating a significant amount of "false profits." (*Id.*). The complaint alleges that KBR inflated its 2013 income by 60%. (*Id.*). According to the complaint, the magnitude of the misstatements combined with the fact that the defendants highlighted the Canadian contracts and knew that investors had focused on the success of those contracts are "highly indicative of scienter." (*Id.*). The defendants counter that the restated revenue, though significant, represented only 2% of KBR's total year 2013 revenue of $7.214 billion and total costs of revenues of $6.797 billion. (Docket Entry No. 70, at 10).

Fifth, the amended complaint alleges that the nature of the accounting violations supports a strong inference of scienter. (Docket Entry No. 60 ¶ 119). KBR recognizes revenue from long-term construction contracts using the percentage-of-completion accounting method,[3] estimating the total performance cost for the contract and booking a corresponding percentage of revenue during the construction work but before the contract is completed. (Docket Entry No. 67, at 6). Given the importance of percentage-of-completion accounting to KBR, the plaintiffs contend that its applicaton to the Canadian contracts deserved careful attention. The amended complaint alleges that the

---

[3] The Fifth Circuit has described the "percentage-of-completion" accounting method, as follows:

> The company first estimates the total cost of contract performance and then compares the estimate with actual costs over the life of the contract. As work proceeds, the company records the corresponding percent of the revenue that should be recorded on the company's books. When, however, reasonably dependable estimates cannot be made of 'inherent hazards' relating to contract conditions make profit predictions unreliable, the 'completed-contract' method becomes preferable; it recognizes revenue and expenses incurred on a contract only in the year of completion.

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 536–37 (5th Cir. 2008).

14

"[a]ccounting violations" on the Canadian contracts "demonstrate a high degree of recklessness on the part of the Individual Defendants." (Docket Entry No. 60 ¶ 119).

Sixth, the amended complaint alleges that "KBR and Defendant Ferraioli" were severely reckless in not disclosing KBR's inability to reliably estimate losses on these key Canadian contracts until July 31, 2014. (Docket Entry 60 ¶¶ 109, 120). KBR and the Individual Defendants had emphasized the seven contracts and made them a focal point of investor and securities-analyst research in early 2014. The amended complaint alleges that the defendants were severely reckless or worse in not revealing KBR's inability to reliably estimate the costs of these contracts. (*Id.*). It was after KBR's announcements of $82 million in losses from the first and second quarters of 2014 that Ferraioli made a public statement about KBR not having updated "issued for construction" or project drawings when the contracts were entered. The defendants respond that the plaintiffs ignore the differences between "design drawings," which are necessary to make an initial cost estimate for percentage-of-completion accounting, and backend "issued for construction drawings," which reflect later client requests that define and may increase the scope of project work and resulting costs. (Docket Entry 66, at 17).

Seventh, the amended complaint generally alleges that the "severe and pervasive" material weaknesses in KBR's internal controls present "compelling evidence of scienter." (Docket Entry No. 60 ¶ 121). The defendants allegedly created a culture that "infected" its entire Canadian construction business and permitted the serious accounting improprieties that led to both the restatement and the revelation of $82 million in additional losses. (*Id.*). Had the Individual Defendants bothered to look, the plaintiffs argue, the internal-control weaknesses and their effect would have been discovered earlier. The defendants counter that any issue with lax controls in the Canadian business cannot be

15

attributed to the Individual Defendants in Houston. (Docket Entry No. 70, at 13–14). The defendants point out that there are no factual allegations that any Individual Defendant knew about issues with the control environment in Canada before the restatement. (Docket Entry No. 67, at 22).

Eighth, the amended complaint alleges that the Individual Defendants received reports during the class period with cost estimates for the Canadian contracts and information about whether KBR had received design drawings for the projects. (Docket Entry No. 60 ¶ 122). The Individual Defendants received monthly reports for Canada in advance of ELT meetings, and at these meetings, talked to Karl Roberts, Senior Vice President of Canada Operations, about the status of the Canadian construction projects. (*Id.*). The defendants respond that the amended complaint lacks sufficiently particularized allegations about the dates of the meetings, which defendants attended, and what information was actually presented and discussed. (Docket Entry No. 70, at 14). Without such details, the defendants contend, no strong scienter inference arises. (*Id.*).

Finally, the amended complaint alleges that the Individual Defendants' "decades of accounting experience" lend further support to a strong inference of scienter. (Docket Entry No. 60 ¶ 123). Each of the Individual Defendants had, at a minimum, 20 years of financial experience in the engineering and construction industries. (*Id.*). The Individual Defendants' experience and presumed familiarity with percentage-of-completion accounting are further evidence of severe recklessness, given the "extraordinary degree" to which KBR's financial results were misstated. (*Id.*). The defendants, however, respond that the "mere fact of the Restatement offers no inference of scienter," regardless of the Individual Defendants' experience. (Docket Entry No. 67, at 11).

The legal and factual sufficiency of the amended complaint, considered with including the documents appropriately considered with the motion, are analyzed under the applicable legal

16

standards.

## II.    The Legal Standards

### A.    Rules 8(a), 9(b), and 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*. The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

For fraud claims, including securities fraud, Rule 9(b) also requires a complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d

1171, 1174 (5th Cir. 2006) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." (quotations omitted)).

When a plaintiff's complaint fails to state a claim, the court should generally give at least one chance to amend under Rule 15(a) before dismissing with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A plaintiff, however, should be denied leave to amend a complaint if the court determines that the "proposed amendment . . .advanc[es] a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed. 2010); *see also Rio Grande Royalty Co. v. Energy Transfer Partners*, 620 F.3d 465, 468 (5th Cir. 2010) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss.").

**B.     Section 10(b) of the Securities Exchange Act**

Section 10(b) makes it unlawful for any person, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [§] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material

18

fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, facts suggesting that the defendants (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) on which the putative class relied, (5) that proximately caused their injury. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 227 (5th Cir. 2009).

Claims under § 10(b) and Rule 10b-5 must also satisfy the pleading requirements of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs I)*, 551 U.S. 308, 320 (2007) (stating that the PSLRA "installed both substantive and procedural controls" that were "[d]esigned to curb perceived abuses of the § 10(b) private action [such as] nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." (quotations and citations omitted)). The PSLRA requires a complaint alleging a material misstatement or omission to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA's pleading requirements incorporate Rule 9(b)'s fraud-pleading standard, requiring a plaintiff to specify the allegedly fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent. *Id.*; *see also* FED. R. CIV. P. 9(b). A district court must dismiss a securities-fraud

claim failing to satisfy either the PSLRA or Rule 9(b). *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

In sum, to plead a securities fraud claim sufficiently under the Federal Rules of Civil Procedure and the PSLRA, a complaint must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading. *Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003). "This is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." *Id.* Particularity differs with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).

## C.    Scienter

The PSLRA requires a complaint "to state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Scienter requires "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quotations omitted). "Severe recklessness is limited to those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (quotations and citation omitted).[4]

In *Tellabs I*, the Supreme Court described how to analyze the sufficiency of scienter allegations on a motion to dismiss a securities-fraud case under the PSLRA. 551 U.S. at 322–23. The district court determines the factually sufficient complaint allegations and takes them as true, considers documents incorporated in the complaint by reference and matters subject to judicial notice, and takes into account plausible inferences opposing as well as supporting an inference of scienter, evaluating the factual allegations collectively, and not in isolation. *Id.* at 322–23. To be sufficient, the inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs 1*, 551 U.S. at 324 (quotations omitted). But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.*

"The strength of an inference cannot be decided in a vacuum." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent

---

[4] In *Tellabs I*, the Supreme Court did not decide whether recklessness is sufficient for civil liability under § 10(b) and Rule 10b–5 because the question was not presented in that case. The Court noted that the courts of appeals all permit § 10(b) claims based on reckless behavior but define "recklessness" differently. *Tellabs 1*, 551 U.S. at 319 n.1.

and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The issue is whether the plaintiffs' amended complaint supports a strong inference of scienter. The defendants identify some general deficiencies with the complaint—particularly relating to group pleading and the use of confidential witnesses—as well as specific deficiencies related to each scienter allegation against each defendant. The arguments and responses are analyzed below.

## III.   Analysis

### A.   The General Pleading Issues

#### 1.   Group Pleading

The defendants argue that the plaintiffs inappropriately rely on group pleading throughout the amended complaint. (Docket Entry No. 70, at 8) (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004); *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 690 (S.D. Tex. 2013)). The defendants object to the plaintiffs' use of "Individual Defendants" and "senior management" to refer to the four KBR executives. (*Id.*; *see* Docket Entry No. 60 ¶ 59, 60, 63, 116, 137).

In *Southland*, the Fifth Circuit stated that group pleading "conflicts with the scienter requirement of the PSLRA because, even if a corporate officer's position supports a reasonable inference that he likely would be negligent in not being involved in the preparation of a document . . . the PSLRA state of mind requirement is severe recklessness or actual knowledge." *Id.* at 365. Fifth Circuit courts look to the individual corporate officers' states of mind. It is "insufficient to impute to each defendant a kind of collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Dawes*, 975 F. Supp. 2d at 690. When the

plaintiffs cannot identify misstatements that "support an inference that the individual officers knowledgeable about the company generally would have known that the statements were false when made," courts decline invitations to "use corporate scienter to rely on group pleading to support an inference of the Individual Defendants' scienter." *Dawes*, 975 F. Supp. 2d at 692.

A court looks at each complaint allegation to determine whether it provides particularized evidence of scienter for each defendant. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2008). The complaint must distinguish the role, intent, and knowledge of each defendant. *Southland*, 365 F.3d at 365 (courts may not "construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded").

KBR contends that the plaintiffs used improper group pleading in nearly 40 paragraphs of the amended complaint by referring to "KBR" or "Individual Defendants." (Docket Entry No. 70, at 9). For example, the amended complaint alleges that "KBR's misconduct described herein has continued to have a severe negative impact on the Company's shareholders," and that "[b]y engaging in a clear violation of well-established accounting rules, KBR masked its true financial condition and created the illusion of a much stronger Company and a thriving Canadian Services Business." (Docket Entry No. 60 ¶¶ 16, 46). Like the plaintiffs in *Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015), the plaintiffs occasionally used "general terms like 'Individual Defendants,'" and "some allegations are not tied to a particular defendant." *Id.* at 537 (citing *Blackwell*, 440 F.3d at 287).

But unlike the plaintiffs in *Owens*, as well as in *Dawes* and other similar cases, the plaintiffs have not asked this court to treat the defendants as a group by using corporate scienter to plead each

defendant's scienter. *Compare Dawes*, 975 F. Supp. 2d at 691 ("Carpenters contends in a footnote in its response to the motion to dismiss that is has sufficiently alleged scienter under what it refers to as 'the prevailing theory of corporate scienter.'"); *id.* at 690 (rejecting the plaintiffs' assertion that "'it is appropriate to treat Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications . . . are the collective actions of the narrowly defined group of Defendants.'").

The plaintiffs contend that the amended complaint's references to KBR, the Individual Defendants, and senior management primarily served to introduce particularized allegations describing each defendant's role. (Docket Entry No. 74, at 23–24). For example, the defendants argue that the amended complaint used improper group pleading by alleging that "KBR emphasized at numerous investor conferences during 2013 that the Company's Services business, propelled by these construction projects, had performed very well during each quarter and at year-end." (Docket Entry No. 60 ¶ 35).[5] But only two paragraphs later, the amended complaint specifically alleged that CEO "Utt reemphasized this message during an investor conference call: 'At Services, Q1 was solid, particularly across bookings, revenue, and income at our Canada operations . . . .'" (*Id.* ¶ 37). The amended complaint also specifically alleged that CFO "Carter echoed that, while revenues were down in certain parts of the Company, '[w]e did, however, see solid revenue growth in . . . Services, where the Services group was up nearly 40% led by a near three-fold increase in Canada operations.'" (*Id.*).

---

[5] As another example, the defendants cite the following allegation: "KBR artificially inflated its results for the full-year 2013 by material amounts. . . . KBR overstated its 2013 annual net income and earnings-per-share by 63%." (Docket Entry No. 60 ¶ 70). In the next paragraph, however, the plaintiffs specifically identify CEO Utt and interim CEO Ferraioli as having signed Sarbanes-Oxley ("SOX") certifications for KBR's 2013 financial statements, confirming their accuracy and verifying that the company had adequate internal controls. (*Id.* ¶ 71).

While it is "appropriate to disregard the group-pleaded allegations," *Owens*, 789 F.3d at 538, the plaintiffs' complaint is not dismissed on this basis. The court does "not commend [the] plaintiffs' inclusion of group-pleaded allegations interspersed with defendant-specific allegations." *Id.* Although the amended complaint refers to KBR, Individual Defendants, and senior management, it did not to plead only group scienter. Instead, the specific allegations for the Individual Defendants identified in subsequent paragraphs identify a factual basis for inferring scienter. Because the amended complaint allows the court to "'separat[e] the wheat from the chaff,' . . . outright dismissal is unwarranted" on the basis of improper group pleading. *Id.* (quoting *In re Enron Corp. Secs. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 611 (S.D. Tex. 2003)).

### 2.   The Use of Confidential Witnesses

The defendants argue that allegations from the confidential sources must be discounted. (Docket Entry No. 66, at 27) (quotations omitted). However, "[c]onfidential source statements are a permissible basis on which to make an inference of scienter." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007). The witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002); *see also Owens*, 789 F.3d at 542 n.11 (citing *Tchuruk* with approval). In lieu of names, the plaintiffs must provide details, such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter." *Dawes*, 975 F. Supp. 2d at 692; *see Cent. Laborers'*, 497 F.3d at 552.

For CW1 and CW2, the plaintiffs provided all four categories of the necessary information. The defendants argue that it is nonetheless insufficient because: the confidential witnesses did not have positions in KBR giving them access to the information needed to make the allegations; the witnesses had left the company before the alleged misstatements and omissions were made; and the amended complaint did not provide sufficient detail. (Docket Entry No. 74, at 8–9). In reviewing the amended complaint, the court must consider the allegations about the information the confidential sources provided. The court discounts them because confidential source allegations do not allow a court to draw "plausible competing inferences." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). The court will give less weight to allegations from confidential sources.

## B. The Specific Pleading Issues

### 1. Whether the Defendants Were Severely Reckless in Not Confirming the Strong Performance of the Canadian Contracts

The plaintiffs alleged that KBR and the Individual Defendants acted with scienter by repeatedly telling investors that the seven Canadian contracts were key to KBR's financial performance, highly profitable, and experiencing no issues. (Docket Entry No. 60 ¶ 115). On September 11, 2013, CFO Carter praised the company's Canadian operations, describing "strong bookings within a wide variety of markets." (*Id.* ¶ 41). On November 13, 2013, CEO Utt explained on a conference call with investors and financial analysts that "[o]ur operations [in Canada] have been very successful in construction fabrication turnarounds." (*Id.* ¶ 43). Without accepting the plaintiffs'

26

conclusory description of the contracts as an "unmitigated disaster," the amended complaint clearly alleges that KBR suffered significant losses on the seven contracts in the third and fourth quarters of 2013. (*Id.* ¶ 45).

The defendants contend that the plaintiffs' argument about the importance and performance of the Canadian fabrication contracts "rests on circular logic: because the Contracts were important, Defendants must have known that estimates of costs at completion were wrong." (Docket Entry No. 66, at 17). The defendants also argue that the plaintiffs did not allege intentionally false statements but "routine and innocuous statements made as part of larger discussions of KBR's business as a whole." (Docket Entry No. 70, at 11).

The Canadian contracts were only one part of one business segment in KBR. But they were important to analyst views of KBR's performance, as the amended complaint repeatedly alleges. Deutsche Bank, to cite but one example, "highlighted the 'strong growth from the Canadian operations.'" (Docket Entry No. 60 ¶ 3). The case law, however, does not support the plaintiffs' argument.

In *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002), the court held that alleging the publication of false information does not give rise to a strong inference of scienter because "[t]he party must know that it is publishing materially false information, or must be severely reckless in publishing such information." In *Abrams*, the plaintiffs alleged that the defendants issued "positive representations to the investing community" that the company's financial reports were "reasonably accurate." *Id.* at 431–32. The plaintiffs argued that because these statements were false when made, the circumstantial evidence showed that the defendants were at least severely reckless in making them. *Id.* The court found no strong inference of scienter because the complaint "point[ed] to no specific internal or external report available [to the defendants] at the time of the alleged

misstatements." *Id.* at 432.

The plaintiffs argue that repeatedly highlighting the success of the Canadian contracts supports an inference that the Individual Defendants were, "at minimum, severely reckless in not confirming the accuracy of their public statements." (Docket Entry No. 67, at 17). In *Southland*, the defendant's CEO told securities analysts that one of the company's contracts would add $0.05 per share to its earnings and generate $35 million in year-one revenues. 365 F.3d at 379. A month later, the company lowered its earnings forecast, citing lower-than-anticipated margins on the contract. *Id.* The *Southland* court held that the CEO's "personal involvement . . . touting the increased revenues and earnings it would produce" was enough to support a strong inference of scienter. *Id.* at 380. The court, however, did not evaluate whether the inference arose solely from the CEO's statements about the contract. *Id.* Instead, the court found that scienter had been adequately pleaded, "albeit only barely so," considering "this sequence of events . . . including [the CEO's] position[,] . . . his total sales throughout the class period of over 40 percent of his . . . stock, and his personal involvement in promoting the . . . contract." *Id.* Because the court "barely" found that scienter was adequately pleaded by considering all the complaint allegations, not merely the statements, *Southland* does not stand for the proposition that emphasizing the success of certain contracts supports a strong inference of scienter.

Two additional factors, neither present in this case, may have contributed to the *Southland* court's finding that allegations showed scienter, "albeit barely so." *Id.* at 380. The record in *Southland* showed that when the company revised its 1999 earnings forecast downward, the CEO had no knowledge "that [he] lacked" a month earlier, when the rosy statements were made. *Id.* at 379. KBR and the Individual Defendants, by contrast, argue that they first learned that the estimates on the Canadian contracts were inaccurate in May 2014, well after KBR filed its 2013 third- and fourth-

28

quarter and year-end financials. (Docket Entry No. 70, at 10). Another distinction between *Southland* and the present case is that in *Southland*, the day after the CEO's announcement of the reduced earnings forecast, the stock dropped by 42%. *Id.* at 379. The magnitude vastly outstrips any drop in KBR's share price during the class period,[6] and suggests that *Southland*'s CEO would have had a greater incentive than the KBR Individual Defendants to probe the details of the contract that was so critical to the company's stock price.

The plaintiffs also cite *In re BP p.l.c. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012), in support of their contention that the defendants acted with at least severe recklessness in touting the success of the Canadian contracts. (Docket Entry No. 67, at 17). The *BP* court held that the CEO's statements touting company safety weighed "strongly in favor of the inference that [he] paid special attention to [its] process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements." (*Id.*) (quoting *In re BP*, 843 F. Supp. 2d at 783). The statements the CEO made in *BP* are different from what the KBR Individual Defendants allegedly said. In *BP*, the CEO made "verbal commitments revealing that he took responsibility for BP's process safety efforts and was the key individual tracking that progress." *In re BP*, 843 F. Supp. 2d at 783. He was "committed to 'focus on safety like a laser'" and championed process safety. *Id.* The statements placed BP's CEO at the center of the company's safety efforts and made him, personally, a "champion for BP's reform efforts." *Id.* The plaintiffs do not argue that the KBR Individual Defendants stated that they had a similar degree of involvement in the Canadian contracts. While the Individual Defendants admit that they made the statements about the performance of the Canadian contracts, they were only one part of descriptions about KBR's overall performance. The statements

---

[6] The largest single-day decrease in KBR's share price during the class period was 13.5%. (Docket Entry No. 60 ¶ 78).

the plaintiffs rely on do not show that the defendants were markedly more familiar with the Canadian fabrication contracts than with other parts of KBR's Service operations around the world. BP's CEO put himself at the center of the company's safety efforts; the KBR defendants made no similar claims about their role in, or knowledge about, the Canadian contracts. The amended complaint does not allege that the Individual Defendants were responsible solely or primarily for overseeing KBR's Services business segment in Canada. The amended complaint alleges that they were severely reckless in making statements about the success of the Canadian contracts, which turned out to be illusory. In the absence of further allegations, the competing inference—that the Individual Defendants's failure to know about the costs overruns on the seven Canadian contracts, which were one part of the Services business segment, which was one part of KBR—is more compelling. But, as discussed in detail below, the amended complaint plausibly alleges that KBR did not have design drawings for the Canadian contracts and could not estimate their costs when the Individual Defendants made the statements touting the contracts. *See infra* Part III.B.6. Taking these allegations as true, the particularized allegations that the Individual Defendants touted the contracts knowing that no design drawings were used in estimating costs contributes to a strong inference of scienter.

2.      **Whether Senior Management's Failure to Confirm the Accuracy of KBR's Financial Results Supports a Strong Inference of Scienter**

On February 27, 2014, KBR's outside auditor released a report detailing a material weakness[7] in the company's internal accounting controls. (Docket Entry No. 60 ¶ 116). The amended complaint alleges that after that report issued, KBR assured the public that "'management, including our Chief

---

[7] In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), the Supreme Court held that a statement is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." In its February 27, 2014 report, KBR's auditor, KPMG, noted that "a material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." (Docket Entry No. 60 ¶ 76).

Executive Officer [Defendant Utt] and Chief Financial Officer [Defendant Ferraioli],' had performed 'additional analysis and other post-closing procedures,'" (*id.*), and KBR confirmed the accuracy of the 2013 Form 10-K. On May 5, 2014, however, KBR admitted that it would have to restate its 2013 financials. The plaintiffs argue that either: (1) Utt and Ferraioli performed the additional analysis described and knew the financials were incorrect; or (2) they were severely reckless in not doing so or in doing so poorly. (*Id.*). In either case, the plaintiffs contend that the defendants' actions support a strong inference of scienter.

The defendants respond that the amended complaint mischaracterizes the material weakness KPMG identified. The weakness was not related to the Canadian contracts but instead to the "accuracy of estimates of revenues, costs and profit at completion for certain long-term construction projects with multiple currencies." (*Id.* at 21) (emphasis omitted). These "foreign currency effects" had little to do with the need to restate the cost estimates for the Canadian contracts. KBR's Form 10-K specifically stated that the internal review of controls was undertaken "[i]n light of the material weakness described," which made the review specific to the foreign currency issue. (Docket Entry No. 74, at 14). The material weakness was a "totally separate issue[]" from the contracts that later became the subject of the restatement. (*Id.*, at 15).

The plaintiffs argue because "KBR, Utt, Ferraioli and Baldwin" assured investors that they had "conducted extensive 'additional analysis and other post-closing procedures to ensure our consolidated financial statements' were accurate," (Docket Entry No. 67, at 13), they assumed an obligation to conduct a comprehensive review of the accuracy of KBR's 2013 financial statement after the material-weakness finding. (*Id.*, at 25); (*see also* Docket Entry No. 74, at 36) ("[A] fair reading of defendant's statement to the public is that because they found one material weakness, in order to ensure that the entire company's financials complied with GAAP, we're doublechecking

31

everything."). But failing to identify the inaccurate cost estimates in the Canadian contracts after promising to review KBR's 2013 financials in light of the unrelated material weakness is not enough to support a strong inference of scienter. Severe recklessness is "not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." *Owens*, 789 F.3d at 536 (citing *Abrams*, 292 F.3d at 430). The defendants' statements after the material-weakness finding do not by themselves support an inference that KBR, Utt, Ferraioli, and Baldwin were severely reckless.[8]

### 3. Whether KBR CEO Utt's March 2014 Stock Sale Supports a Strong Inference of Scienter

On March 6, 2014, Utt sold roughly 162,000 shares of his KBR stock, representing over 70% of his holdings in the company. (Docket Entry No. 60 ¶ 117). The plaintiffs argue that the "suspicious timing and amount . . . are additional evidence of [Utt's] scienter." (Docket Entry No. 60 ¶ 117; 67, at 18). The sale occurred eight days after KBR released the misstated 2013 financials and two days after CAO Baldwin told company representatives about his own impending resignation. (Docket Entry No. 60 ¶ 117). The sale was six times larger than any Utt had made over his eight-year

---

[8] Although not entirely apposite because they are undertaken without specific assurances in the context of a material weakness finding, the defendants' Sarbanes Oxley ("SOX") certifications are instructive. In signing SOX certifications, an executive officer must certify that, to his or her knowledge, the company's financial statements fairly represent material aspects of its financial position. (*Id.*). Promising to ensure the accuracy of the financial statements with regard to the seven contracts would only give rise to scienter if the "facts establishing that the officer who signed the certification had a reason to know, or should have suspected . . . that the financial statements contained material misstatements or omissions." *Shaw*, 537 F.3d at 545 (quotations and citation omitted). In *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corporation*, 499 F. App'x 345, 350 (5th Cir. 2012), the court held that although the defendant officers signed SOX certifications, the plaintiffs' allegation did not show that the defendants knew about the inaccurate information or recklessly ignored evidence of such information. The plaintiffs' alleged, in part, that the individual defendants "wanted to inflate Zale's earnings due to a change in the jewelry warranty program," that they falsely claimed to have carefully examined the company's advertising expenses, and that they improperly accepted as true unreliable *accounting* numbers from the Vice President of marketing. *Id.* at 347–48. The SOX certifications signed by the defendants, without additional evidence, did not give rise to a strong inference of scienter.

tenure and more than "all his KBR stock sales over the prior two years combined." (*Id.*).

The defendants argue that there is an equally compelling explanation for Utt's sale—he wanted to unload his shares before retiring as KBR's CEO. (Docket Entry No. 66, at 25). Three months before the sale, on December 12, 2013, KBR and Utt entered into a transition agreement. Three days after that, KBR publicly announced Utt's plan to retire. (*Id.*). One month after the stock sale, on April 9, 2014, KBR announced that Utt had retired.[9]

"Insider stock sales may be probative of scienter . . . if they occur in 'suspicious amounts or at suspicious times.'" *Shaw*, 537 F.3d at 543 (quoting *Abrams*, 292 F.3d at 435). Sales that are "'out of line with prior trading practices or [made] at times calculated to maximize personal profit'" may generate suspicion, and both "culpable and nonculpable explanations for stock sales . . . must be considered." *Id.* (quoting *Cent. Laborers'*, 497 F.3d at 553). During the nine-month class period in *Shaw*, two insiders sold large blocks of company stock. The plaintiffs claimed that the sales were out of line with the defendants' previous trades and were near the peak price. *Id.* But one of the insiders' sales was immediately after a lock-up period ended, and the other's sales were in line with his previous sales. *Id.* at 543–44. The court held that when "[p]laced in context, the allegations are overstated and innocuous." *Id.* at 543. Because both defendants' actions were "no different . . . than the vast majority of corporate executives," *id.* at 544, the stock sales could not be used as a basis to prove scienter.

The court's opinion in *In re Enron Corp. Securities, Derivatives & ERISA Litigation*, 258 F.

---

[9] The defendants argue that the fact that Utt sold while KBR's stock price was declining shows his lack of culpable knowledge because a rational economic actor would not sell his shares right after the share price fell. *See Shaw*, 537 F.3d at 543–44 (citing *Southland*, 365 F.3d at 369 (an insider's stock sales were not suspicious, in part, because they did not come shortly after an allegedly misleading statement caused a spike in the share price)). This argument loses force when viewed in light of the loss announcements and the magnitude of KBR's subsequent stock price declines.

Supp. 2d 576, 594 (S.D. Tex. 2003), is instructive because it involves sales by an insider retiring from the company. The court held that the plaintiffs' allegations did not support a strong inference of scienter because plausible explanations included "that the insider is leaving the company or retiring in a few months" and made the sale "nonsuspicious." *Id.* at 594; *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company . . . to sell shares."). The court in *Enron* held that this could weigh against finding a stock sale suspicious.

The plaintiffs cite *Central Laborers'* to argue that the Fifth Circuit has rejected similar attempts to use an insider's planned retirement to rebut a strong inference of scienter arising from stock sales. (Docket Entry No. 67, at 25–26). During the class period in that case, a defendant exercised 351,335 options at a profit of nearly $1.5 million keeping only 19,781 options when he resigned from the company. *Central Laborers'*, 497 F.3d at 553. The plaintiffs alleged that the close timing between the defendant's retirement and his stock sale was suspicious. *Id.* at 554. The defendants argued that the timing cut against an inference of scienter. The court rejected both arguments and concluded that the timing of the defendant's stock sales did "not cut deeply in favor of either position." *Id.*

The defendants point out that Utt was the only Individual Defendant who sold KBR stock in this period, despite allegations that they all had access to negative information about the Canadian contracts and the impact that information would have on KBR's financial statements. Their failure to sell as Utt did supports the inference that he did so because of his retirement. In *Enron*, the court stated that an insider "sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." 258 F. Supp. 2d at

594 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434–35 (9th Cir. 2001)) (quotations omitted).[10]

When "[p]laced in context," *Shaw*, 537 F.3d at 543, the allegations about Utt's stock sales fail to support a strong inference of scienter. Utt's impending retirement, which had been publicly announced months earlier, is a plausible and nonsuspicious explanation for why he sold so much of his stock. And "even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period." *Abrams*, 292 Fed.3d at 435. Corporate executives, often compensated in stock, will often "trade those securities in the normal course of events." *Shaw*, 537 F.3d at 543 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)). Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1425). Utt's sales do not support a strong inference of scienter as to Utt or as to other Individual Defendants.[11]

---

[10] The plaintiffs cite *In re APAC Teleservice, Inc. Securities Litigation*, No. 97 Civ. 9145(BSJ), 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999), and *Rubenstein v. Collins*, 20 F.3d 160 (5th Cir. 1994), to rebut the defendants' assertion that nonsales by other Individual Defendants indicate a lack of scienter as to Utt. (Docket Entry No. 67, at 26). In *Rubenstein*, the court held that "trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter." 20 F.3d at 169–70. But that merely suggests that suspicious trades may support an inference of scienter. And although the *APAC* court held that "[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter," 1999 WL 1052004, at *7, that says nothing about whether the sales were suspicious in the first place.

[11] The defendants also argue that "KBR's share repurchase program during the class period negates any inference of scienter," (Docket Entry No. 66, at 23), because "repurchasing stock at a knowingly inflated price would be economically irrational," *UBS AG Sec. Litig.*, 2012 WL 4471265, at *13 (S.D.N.Y. Sept. 28, 2012). But "[t]here are many inferences that a [c]ourt could draw from a stock repurchase." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014). As an example, KBR's "buying could reasonably have augmented market demand, making it easier for [Utt] to find buyers and allowing more sales without depressing prices." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1187 (C.D. Cal. 2008). Or KBR may have viewed its stock price as undervalued. Given these different possible inferences, the court concludes that the repurchasing plan "weighs neither in favor of nor against an inference of scienter." *In re Viropharma*, 21 F. Supp. 3d at 474 n.23.

### 4. Whether the Magnitude of the Accounting Mistakes Revealed in the Restatement Supports a Strong Inference of Scienter

The amended complaint alleges that the sheer "magnitude of the accounting improprieties" KBR eventually disclosed supports a strong inference of scienter. (Docket Entry No. 60 ¶ 118). The plaintiffs claim that in 2013, KBR overstated its net third-quarter income by 329%, its fourth-quarter income by 242%, and its year-end net income by 60%. (*Id.*). The plaintiffs argue that misstatements of this size, particularly in parts of the business that KBR executives had specifically highlighted as strong performers, support a strong inference of scienter. (*Id.*).

Acknowledging or restating inaccurate financial statements does not in itself support a strong inference of scienter. Restatements "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams*, 292 F.3d at 433 (quotations omitted). The issue is how the magnitude of KBR's restatement affects the analysis.

The defendants argue that even large errors may not be the result an intent to deceive or severe recklessness. (Docket Entry No. 70, at 14). The defendants cite *Shaw*'s observation that "bold statements" about the magnitude and egregiousness of premature revenue recognition "cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements." *Shaw*, 537 F.3d at 540. The defendants contend that this court must evaluate the financial misstatements "in context," considering the size of the restatement compared to KBR's total revenue or total costs. (Docket Entry No. 70, at 14). KBR's Canadian business unit comprised roughly 10% of the company's 2013 revenue, and the seven contracts represented only about 2% of KBR's $7.214 billion in total revenues for 2013. (*Id.*). The defendants emphasize that the court should compare the misstated amounts to the company's

36

overall revenue, not to overall net income, and argue that the amounts relating to the seven contracts were insignificant compared to KBR's overall revenue. The defendants cite *Abrams*, in which the court held that corporate executives did not act with scienter despite accounting irregularities in one division. (*Id.*). That division accounted for "20% of the company's revenues," and "the size of the accounting restatement was relatively modest when compared to [the company's] revenues and profits generally.... [indicating that] inferring recklessness by Defendants is more difficult." *Abrams*, 292 F.3d at 438). This suggests that revenues, not net income, should be used to analyze the magnitude of a misstatement. In *Abrams*, the court acknowledged that 20% was "not an insignificant fraction," *id.*, but put more weight on the fact that the defendants were responsible for the company's eight other divisions as well.[12]

The plaintiffs cite *Haack v. Max Internet Communications, Inc.*, Civ. A. 3:00-CV-1162-G, 2002 WL 511514 (N.D. Tex. Apr. 2, 2002), in their response to the defendants' motion to dismiss. (Docket Entry No. 67, at 19). The court in that case held that alleged misstatements about the company's earnings amounting to a "98% decrease of . . . *revenues*" during the relevant period sufficiently pleaded scienter. *Haack*, 2002 WL 511514, at *6–7. Here, by contrast, KBR's misstatements accounted for 2% of the company's revenues. The defendants argue that the plaintiffs used the wrong denominator (net income) and exaggerated the magnitude of the misstatement.

The defendants point to *In re Integrated Electrical Services, Inc. Securities Litigation*, No. Civ. A. 4:04-CV-3342, 2006 WL 54021 (S.D. Tex. Jan. 10, 2006), in which the defendants' restatement reduced the company's net income by $5.7 million over 30 months, during which the company's revenues "consistently exceeded $1 billion." *Id.* at *3. The court held that "[i]n this

---

[12] In *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424–25 (5th Cir. 2001), the Fifth Circuit found that the chief executive's actions supported an inference of scienter because his "was essentially a one product company."

instance, the magnitude of the restatement surely cannot, by itself, support an inference of scienter."
*Id.* The plaintiffs respond that "[m]any courts have held significant overstatements of revenue or income tend to support the conclusion that defendants acted with scienter," and argue that the larger the misstatement, the more likely that it was made with scienter, regardless of the revenue amount. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) (quotations omitted); (*see also* Docket Entry No. 67, at 24). The plaintiffs point to *ArthroCare* and *In re Seitel, Inc. Securities Litigation*, 447 F. Supp. 2d 493 (S.D. Tex. 2006). (Docket Entry No. 74, at 32). The restatement in *ArthroCare* reduced the defendant company's total revenue by 12.4%, 7.3%, 4%, and 1% over four years. 726 F. Supp. 2d at 721. The court looked at both reduced revenue and income in determining whether the magnitude of the restatement supported inferring scienter. *Id.* at 721–22 (courts have held that significant overstatements of revenue *or* income support scienter). *ArthroCare* involves different facts. The misstatements involved relatively simple accounting issues and occurred over four years, three of which had larger revenue adjustments than the 2% amount in this case.

In *Seitel*, the court held that "significant overstatements of *revenue* tend to support the conclusion that the defendants acted with scienter." 447 F. Supp. 2d at 705 (quoting *Newby v. Lay (In re Enron Corp. Secs.)*, 258 F. Supp. 2d 576, 626 n.55 (S.D. Tex. 2003)) (emphasis added). The plaintiffs' allegations concerned Seitel's business group, which generated 80% of the company's total revenue during the class period. *Id.* The plaintiffs alleged that the restatement reduced the company's revenues by 30% for the first nine months of 2001. *Id.* The revenue reductions over the nine-month (30%) and full-year financial periods (15%), *Seitel*, 447 F. Supp. 2d at 705, were many multiples of those KBR reported here.

Comparing KBR's restated net-income reductions against the company's 2013 revenues does not support an inference of scienter. As in *Integrated Electrical*, the accounting errors were not large

enough to "disguise a failing company or turn an ostensible profit into a loss." 2006 WL 54021, at *3. KBR's restatement was more similar in size to that in *Integrated Electrical*, in which the court did not find scienter based the magnitude of the misstatement, as opposed to that in *Haack*, in which the court did find scienter based on this factor. KBR's May 2014 restatement was not large enough compared to the company's total revenue to support a strong inference of scienter on the part of the Individual Defendants.

5.     **Whether the Nature of the GAAP Violations in KBR's Percentage-of-Completion Accounting on the Canadian Contracts Supports a Strong Inference of Scienter**

The plaintiffs allege that the nature of the accounting violations supports a strong inference of scienter, and that KBR's identification of the percentage-of-completion accounting method it used as a critical policy integral to its operations results provides more evidence of severe recklessness. (Docket Entry No. 60 ¶ 121).   The plaintiffs also allege that the Individual Defendants paid "significant attention" to the application of these accounting methods, making the violations indicative of a "high degree of recklessness" on their part. (*Id.*).

The defendants argue that regardless of the accounting method, KBR and its executives had to use judgment to estimate the future costs, including for the seven Canadian construction contracts. The Individual Defendants emphasize that KBR disclosed that "the uncertainties inherent in the estimating process make it possible for actual costs to vary materially from estimates." (*Id.*, Ex. 3, at 19).

The plaintiffs respond that a defendant company's misstatements reflecting or resulting from violations of accounting rules that are central to its business supports inferring scienter. The plaintiffs cite *Kaltman v. Key Energy Services, Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006), to support the argument that publishing inaccurate accounting figures and failing to follow GAAP can show

scienter. But the *Kaltman* opinion says nothing about the centrality of the specific accounting method to the defendant's business, and the court held that inaccurate accounting, "without more, [does] not establish scienter." *Id.*

The plaintiffs argue that the combination of violating accounting principles "with a drastic overstatement of financial results can give rise to a strong inference of scienter." *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CIV-256, 2001 WL 872019, at *10 (E.D. Tex. Mar. 30, 2001) (quoting *Carley Capital Grp. v. Deloitte & Touche*, 27 F. Supp 2d 1324, 1339–40 (N.D. Ga. 1998)) (quotations omitted).[13] The argument appears to be that using "straightforward" percentage-of-completion accounting in conjunction with misstated financials contributes to a strong inference of scienter. This argument fails to account for the Fifth Circuit's rulings that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Shaw*, 537 F.3d at 534. In *Owens*, the court similarly held that plaintiffs must plead "facts leading to a strong inference that each defendant knew the [publicly announced] numbers violated GAAP or was severely reckless in disregarding the concerns." *Owens*, 789 F.3d at 543. The *Owens* court also noted that the plaintiffs must show that using the accounting methods in dispute "was unreasonable even in light of the subjective nature of the GAAP requirements." *Id.* at 544. In *Owens*, despite allegations that two defendants disregarded repeated warnings about "deficiencies in [the company's accounting] models," the court held that the plaintiffs had not shown a strong inference of scienter. *Id.*

The amended complaint in this case does not allege that the Individual Defendants were

---

[13] Additionally, the plaintiffs suggest that because the Individual Defendants were involved in the cost-estimation process and paid significant attention to the accounting methods at issue, this supports an inferring scienter. (Docket Entry No. 60 ¶ 119). The defendants argue that the plaintiffs must allege specific facts suggesting that the Individual Defendants knew or were reckless in not knowing that the cost estimates were inaccurate when they were made public. (Docket Entry No. 66, at 19). This issue addressed in Part III.B.8, *infra*, which analyzes the Individual Defendants' specific involvement with the seven Canadian contracts.

warned about using percentage-of-completion accounting, similar to the warnings described in *Owens*. To the contrary, KBR had relied on this accounting method for years. The plaintiffs' allegations and cited authorities do not plausibly show that the accounting violations alone, taking into account the alleged centrality of the accounting method to the company, supports a strong inference of scienter.

> **6.    Whether KBR and Ferraioli Were Severely Reckless in Failing to Disclose that KBR Was Unable Accurately to Estimate Costs on the Seven Canadian Contracts**

The plaintiffs allege that KBR and Ferraioli were severely reckless in failing to disclose that the company could not reliably estimate KBR's costs for the Canadian contracts. (Docket Entry No. 60 ¶ 120). The amended complaint alleges that it was only at the close of the class period, on July 31, 2014, that Ferraioli admitted the full $82 million in losses for the first two quarters of 2014. More importantly, it was not until then that Ferraioli admitted KBR's inability to make accurate cost estimates until very late in the contract, "because [KBR] did not have design drawings that were essential to its ability to properly account for its ongoing losses." (*Id.*). The defendants argue that this allegation is a "tortured misreading of certain statements from Ferraioli." (Docket Entry No. 66, at 22).

Both the plaintiffs and the defendants base their arguments on statements Ferraioli made to stock market analysts on July 31, 2014. Ferraioli surveyed KBR's second-quarter results and stated that:

> the quarter's results were dominated by Canadian projects, particularly pipe fabrication and modular assembly contracts . . . . These contracts represented significant sales growth, but the modules that we are manufacturing and assembling [are] far larger and more complex than we had historically [] completed. . . . [T]hat's what's driving the financial results. . . . The three projects that remain are tied to unit rates based on weight of the modules and therefore any increased welding or other assembly work that is required when we receive the drawing from our client increases

[our] costs but it doesn't allow us to increase the revenues because the weight in many cases did not change. That's what's driving the [$] 41 million estimate to complete the additional three modules that you see here.

(Docket Entry No. 66, Ex. 8, at 23). When asked a follow-up question about losses on the Canadian contracts going forward, Ferraioli responded:

The difference is that the scope of work is defined by drawings we received from our clients. On the remaining contracts the majority of the drawings have now been received from clients and therefore we're able to do the takeoffs to understand exactly what the scope of work is. So, when the quantity of work increases based upon drawings, that's what's driving the results for this quarter. So, it was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house. So, as we get to the backend of these projects the drawings are in, and now we have defined the scope, and therefore we're much better suited to be able to estimate what those costs are to complete.

(Docket Entry No. 66, Ex. 8 at 10).

The amended complaint alleges that Ferraioli's admission that KBR lacked design drawings for the Canadian contracts means that KBR would not have been able to make the contract-cost estimates essential to percentage-of-completion accounting. (Docket Entry No. 60 ¶ 102). The plaintiffs argue that Ferraioli's comments that estimating costs was "impossible" without the drawings show that KBR "lacked any reasonable basis" for the cost estimates it had made on the Canadian contracts, making the defendants' statements touting those contracts at least severely reckless. (Docket Entry No. 67, at 15).

The defendants dispute that Ferraioli admitted that KBR had been incapable of making GAAP-compliant cost estimates for the Canadian contracts. (Docket Entry No. 66, at 23). They argue that the plaintiffs misconstrued Ferraioli's statement, which referred to backend "issued-for-construction drawings," not to the design drawings that are the basis for initial contract-cost estimates. (Id., at 24). The defendants argue that KBR receives design drawings before bidding on a project

42

while issued-for-construction drawings reflect clients' requested changes to a project and are received at the back end of the contract work. (*Id.*). The defendants argue that Ferraioli was acknowledging that KBR's clients on the Canadian contracts made changes to the scope of the work, affecting the costs. Design drawings issued at the initial cost-estimation stage are not intended to anticipate or reflect these later changes, which are reflected in the back-end drawings. (Docket Entry No. 66, at 23). When a client changes the scope of work on unit-rate fabrication contracts and the changes do not affect the weight of the fabricated items, the construction costs to KBR may increase without recourse. (*Id.*). Ferraioli's comments, the defendants argue, make clear that he was talking only about "'issued for construction drawings' [that] come at the back end of the project, not the front end." (Docket Entry No. 74, at 7). They point out that the confidential witness statement was after Ferraioli's statement and referred not to the back-end issued-for-construction drawings, but instead to design drawings, which come at the front end of the project. The defendants contend that these "are two totally different statements . . . . [and] [t]o the extent there's an ambiguity in the plaintiffs' pleadings, that counts against the plaintiff." (*Id.* at 8); *see also Tellabs*, 551 U.S. at 325 ("[O]missions and ambiguities count against inferring scienter" because plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").

But the amended complaint unambiguously alleges that Ferraioli's statements mean that KBR lacked design drawings when the Individual Defendants, particularly CEO Utt, approved the Canadian contracts and subsequently praised their performance. (Docket Entry No. 60, ¶¶ 10, 14, 25, 61, 62, 65, 102, 110, 120, 122, 124, 156, 170). The issue is not an ambiguity in the plaintiffs' allegations, but rather a dispute about whether KBR had front-end design drawings adequate to make reliable cost estimates. Ferraioli's statements, in light of the complaint allegations and the material properly

43

considered under Rule 12(b)(6), do not resolve that dispute. There appear to be two ways to interpret the alleged statement and each "at least as compelling" as the other, precluding dismissal at this pleading stage. *See In re BP plc*, 922 F. Supp. 2d at 627 (denying motion to dismiss when the plaintiffs' inference of scienter was "*at least* as compelling as any inference that scienter was lacking" (emphasis in original)).[14] At this stage, the court cannot decide that, as a matter of law, Ferraioli's statements referred only to the back-end issued-for-construction drawings and that he did not discuss otherwise undisclosed problems in KBR's ability to make reliable, GAAP-compliant cost estimates at the front end. The allegations about Ferraioli's statements about cost estimates on the Canadian contracts survive the motion to dismiss.

That is not to say that all of plaintiffs' allegations support a strong inference of scienter. The plaintiffs allege that the May 5, 2014 disclosure was misleading primarily because "it purported to identify all losses for work released on the Canadian contracts 'through March 31, 2014.'" (Docket Entry No. 60, ¶ 87). But failing to disclose losses does not support a strong inference of scienter unless the defendants knew, or were severely reckless in not knowing, about those losses. *Abrams*, 292 F.3d at 432. This argument is tangential to the allegation that Ferraioli acknowledged KBR's problems in reliably estimating costs under the percentage-of-completion method at the front end of the Canadian contracts and later, when the Individual Defendants emphasized the profitability of the contracts.

The plaintiffs also argue that Ferraioli was wrong in asserting that the scope of work and the

---

[14] In *Shaw*, the court concluded that a defendant's statement to a confidential source to "do something to fix that" could not "contribute to a strong inference of scienter because it is susceptible to many interpretations, including innocent ones." 537 F.3d at 538 (quotations omitted). But unlike the nebulous directive to "do something to fix that," Ferraioli's specific statements about drawings in this case give rise to only two interpretations, one innocent and the other severely reckless. In addition, Ferraioli's statement about drawings was made in a publicly recorded question and answer session with market analysts, not in private to a "confidential source . . . not identified sufficiently by his title, work location, or dates of employment to reassure the reader that he heard and understood the meaning of the remark." *Shaw*, 537 F.3d at 538.

costs simply cannot be reliably determined at the front end. (Docket Entry No. 67, at 31–32). The plaintiffs point to an industry practice guide and argue that "when unit-price [contracts] are involved, the drawings and specifications must be in a complete and detailed form, before the contractors are brought in for bidding and contract negotiation," and that this is necessary to reliably estimate the costs and to apply percentage-of-completion accounting to comply with GAAP. (*Id.*, at 32) (quoting RICHARD CLOUGH, CONSTRUCTION CONTRACTING, § 4.9, at 67 (5th ed. 1986)).

The defendants respond that this is an "outdated edition of a construction book, which was not cited in or attached to the Complaint."[15] (Docket entry No. 70, at 20). The defendants also note that a recent edition was revised to state that at the front end, contractors need drawings "that are complete enough . . . to assess the overall magnitude of the project and general nature and complexity of the work." (*Id.*) (quoting RICHARD CLOUGH, CONSTRUCTION CONTRACTING, § 6.3 at 136 (7th ed. 2005). The defendants' argument that cost estimates will likely change over contract performance is not inconsistent with the plaintiffs' argument that detailed drawings are needed at the outset to give those estimates a reliable, not a perfect, basis. If KBR did not have design drawings or had inadequate design drawings at the front-end stage, there would be no basis to make even imperfect cost estimates.

The Fifth Circuit has held that motions to dismiss based on industry-specific practices and accounting questions that "necessarily entail fact-intensive inquiries . . . cannot be resolved" at the pleading stage. (Docket Entry No. 67, at 31). *Spitzberg v. Houston American Energy Corp.*, 758 F.3d

---

[15] In *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003), the court denied the plaintiffs' "general curative amendment request [tacked] to the end of their response in opposition to the defendants' motion to dismiss" because the plaintiffs could not show "how they would replead scienter more specifically, . . . did not proffer a proposed second amended complaint to the district court, and did not suggest in their responsive pleading any additional facts not initially pled that could, if necessary, cure the pleading defects raised by the defendants."

676, 689 (5th Cir. 2014), is instructive.  The defendants made a slide presentation stating that the company had recently acquired an interest in a hydrocarbon block in Colombia.  The defendants argued that the fact that they used the term "reserves" would not lead a reasonable investor to believe that "production and formation testing had already been carried out on the . . . Block."  *Id.* at 689–90. The defendants also argued that investors know that "wells aren't drilled in secret," *id.* (quotations omitted), and that if any testing had been done, the information would be available.  The plaintiffs argued that because the defendants' partner previously owned rights in the same block, investors could have reasonably inferred that the defendants did have prior test results.  The court rejected the defendants' arguments and reversed the district court's dismissal of the complaint, holding that "such an industry-specific and inherently fact-bound proposition cannot be verified on the face of the pleadings." *Id.*

*Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 254 (5th Cir. 2005), is similar.  The plaintiffs alleged that the defendant company made false statements about a merger and related earnings and revenue projections.  The defendants responded that the accounting methods they used for revenue recognition were proper under S.E.C. guidance.  *Id.* at 257.  The court assumed that the allegations pleaded with particularity were true, refused to conduct a "battle of the experts" at the motion-to-dismiss stage, found that the accounting questions were disputed, and reversed the district court's dismissal. *Id.* (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001)).

The plaintiffs alleged that in the "absence of design drawings . . . . [t]he risk was increased so significantly that the approval of the Company's CEO, Defendant Utt, was required before KBR could enter into a contract." (Docket Entry No. 60 ¶ 62).  The plaintiffs make no similar allegations about issued-for-construction drawings.  The difference between design and issued-for-construction

46

drawings is relevant to determining whether KBR could or did make GAAP-compliant initial cost estimates on the Canadian contracts. On this record, the court cannot determine which interpretation of Ferraioli's statement is proper. (*See* Docket Entry No. 66, at 22–23). He repeatedly mentions "drawings" with no modifier or context identifying what he meant. He also stated that it was "impossible" to predict the scope of work on the contracts, (*id.* at 22), which could also cast doubt on the reliability of earlier cost estimates and the percentage-of-completion accounting results.

Ferraioli did specifically refer to issued-for-construction drawings in one statement. (Docket Entry No. 66, at 22). The defendants contend that this statement, combined with the references to the "backend" of the projects, shows that he was referring only to issued-for-construction drawings. (*Id.*). Reading the complaint allegations as a whole does not resolve the factual dispute about whether KBR had design drawings necessary to estimate costs. The parties' arguments rely on assumptions about different drawings and how they are used, assumptions that would conflict with the admonition that "industry-specific and inherently fact-bound proposition[s] cannot be verified on the face of the pleadings." *Spitzberg*, 758 F.3d at 690.

The plaintiffs alleged that KBR was unable to "reliably estimate the costs of completing its work because it lacked the design drawings for the projects," (Docket Entry No. 60 ¶ 102), which led Ferraioli to "admit on July 31, 2014, [that] it was '*really impossible*' for the Company to prepare reasonably dependable cost estimates." (*Id.*) (emphasis in original). Like the disputed accounting questions in *Barrie* that precluded dismissal, 397 F.3d at 257, whether Ferraioli admitted that KBR could not make reliable cost estimates in part because it lacked design drawings cannot be resolved at the motion-to-dismiss stage.

       **7.**　　**Whether the Nature of the Material Weaknesses in KBR's Internal Controls Is Compelling Evidence of Scienter**

The amended complaint alleges that the "severe and pervasive nature of KBR's material weaknesses in internal controls is additional compelling evidence of scienter." (Docket Entry No. 60 ¶ 121). The plaintiffs contend that the weaknesses leading to the misstated 2013 financials were "obvious to anyone who cared to look," and that certain Individual Defendants, including CEO Utt and interim CEO Ferraioli, were required to look before signing the SOX certifications. The plaintiffs contend that Utt and Ferraioli were severely reckless because they certified the effectiveness of KBR's internal controls when those controls were woefully inadequate. (Id.).

The defendants support their motion to dismiss by arguing that alleging inaccurate SOX certifications is inadequate to support a strong inference of scienter. (Docket Entry No. 66, at 28). The defendants argue that the complaint did not allege that the Individual Defendants knew that the statements were inaccurate when they signed the certifications, but only that KBR later admitted problems with the controls. (Id.).

Courts have found similar allegations insufficient to support a strong inference of scienter. In *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 346–47 (5th Cir. 2012), the plaintiffs sued Zale and several of its officers, alleging that the defendants knew, or were severely reckless in not knowing, that statements in the company's S.E.C. filings and elsewhere were materially false. The plaintiffs alleged that the officers had signed false SOX certifications, showing scienter. *Id.* at 350. The court held, however, that "Zale's after-the-fact admissions" that it failed to maintain effective internal controls did not "show that Zale or any of its officers acted with scienter in making the inaccurate financial statements." *Id.* The plaintiffs did not allege other facts supporting an inference that the defendants knew or were severely reckless in not knowing about the misstatements in the financials when they signed the SOX certifications. *Id.*

In *Shaw*, the plaintiffs alleged, "[a]lmost as an afterthought," that the SOX certifications the

48

two corporate officers signed contributed to a strong inference of scienter. 537 F.3d at 544. The plaintiffs argued that dismissal was appropriate because the fact that the defendants signed the certifications contributed to showing their knowledge that the company's "internal accounting controls were defective and its financial statements misleading." *Id.* at 545. The court rejected the plaintiffs' claims, citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). In *Garfield*, the Eleventh Circuit held that SOX certifications, standing alone, are "not indicative of scienter." A different rule would turn all auditing mistakes publicly traded companies make indicative of scienter, "eviscerating the pleading requirements for scienter set forth in the PSLRA." *Id.* (quoting *Garfield*, 466 F.3d at 1266). In *Shaw*, the court held that signing SOX certifications is probative of scienter only when the signer had a reason to know or suspect, "due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements." *Id.* (quoting *Garfield*, 466 F.3d at 1266) (quotations omitted). The court found no red flags probative of scienter. *Id.*

The plaintiffs argue that because the Individual Defendants had an affirmative obligation to examine KBR's internal controls before certifying the company's S.E.C. filings, no conspicuous red flag is required. (Docket Entry No. 67, at 28). This argument is inconsistent with Fifth Circuit precedent and with the desire to avoid making accounting mistakes alone sufficient to allege that the officer certifying the resulting financials did so with scienter.

In the alternative, the plaintiffs argue that there were multiple red flags, "including KPMG's first material weakness finding . . . and the widespread nature of the weaknesses in the Canadian Services business, which were so severe that they still have not been corrected." (*Id.*). KPMG's material-weakness finding was about estimating costs in projects involving multiple currencies. This is not a sufficient for a strong inference of scienter in estimating costs for the Canadian construction

49

contracts, which did not involve multiple currencies.   Additionally, the plaintiffs make no particularized allegation that before Utt or Ferraioli signed the SOX certifications, they knew or were severely reckless in not knowing about a "culture" in the Canadian Services business segment likely to lead to material misstatements.   Utt and Ferraioli eventually determined that the "control environment was ineffective in that the culture at the Canadian pipe fabrication and modular assembly business facilitated delayed identification and communication of project concerns." (Docket Entry No. 66, Ex. 2, at 129).  But after-the-fact admissions are not enough to show that individual officers who signed SOX certifications acted with scienter. *See Zale*, 499 F. App'x at 350; *see also Owens*, 2015 WL 3649823, at *8 ("The 'red flags' add little inference of scienter" when the information "become[s] knowable" only after the alleged misrepresentations.").  Without more, the allegation that Utt and Ferraioli signed the SOX certifications does not support scienter.

### 8.   Whether the Defendants' Personal Involvement in Cost Estimation Supports a Strong Inference of Scienter

The amended complaint alleges that the Individual Defendants' involvement in estimating the costs for the Canadian projects supports a strong inference of scienter. (Docket Entry No. 60 ¶ 122). The defendants received reports with detailed cost estimates for the projects before each monthly Executive Leadership Team meeting.  These "KBR Monthly Business Unit ELT Reviews" included estimates of the costs needed to complete projects, updates on projects, and issues relating to projects. (*Id.*).  ELT members were allegedly told in advance when KBR was considering a construction contract but did not have design drawings.  The amended complaint also alleges that the Individual Defendants met each month with Karl Roberts, Senior Vice-President of Canada Operations, to discuss the status of the Canadian contracts.  (*Id.*).  The plaintiffs contend that the Individual Defendants' involvement in the contracts' cost-estimation work means that they knew or were

50

severely reckless in not knowing that the KBR filings and their own public statements about the contracts were incorrect.

The plaintiffs' allegations are largely derived from confidential witnesses. CW1, for example, a former General Manager of KBR Industrial Services in Canada described "senior management's role in estimating costs at the outset of projects." (Docket Entry No. 60 ¶ 59). CW1 was responsible, the plaintiffs allege, to prepare "white paper briefs" with detailed evaluations of potential projects. Though CW1 was not involved in creating a white-paper brief for the seven Canadian contracts, he asserts that the papers would have been prepared and distributed to senior management. (Docket Entry No. 60 ¶ 60). The amended complaint alleges that the white papers contained detailed cost estimates, gave the bases for them, and provided risk evaluations, all giving the Individual Defendants information about the contract problems. The amended complaint specifically alleged that ELT members Baldwin, Carter, Ferraioli, and Utt would have "reviewed and analyzed the cost estimates for the Canadian projects." (*Id.* ¶ 63). CW1 claims that Utt and others in senior-management positions would have to approve contracts in the absence of design drawings. (*Id.* ¶ 61, 62). The amended complaint alleges that KBR lacked design drawings for the seven Canadian contracts necessary to produce reliable cost estimates under percentage-of-completion accounting, and the Individual Defendants inaccurately described their profitability.

The amended complaint also alleges details from CW2 about the monthly ELT meetings in Houston. In advance of the meetings, the ELT members allegedly "received detailed monthly reports concerning the Company's important projects, including the Canadian projects at issue here." (Docket Entry No. 60 ¶ 64). CW2 worked in Canada as a KBR financial analyst, then a Senior Contract Specialist. He prepared the KBR Monthly Business Unit Reviews for ELT members. CW2 is the source for the amended complaint allegations that ELT members, including these defendants,

51

met monthly with Karl Roberts to discuss the Canadian contracts. (*Id.*). CW2 stated that these monthly meetings gave the defendants "critical information about the status of the Canadian projects," including "(i) the percentage-of-completion for individual Canadian projects; (ii) the estimated costs to complete individual Canadian projects; (iii) revenue and job income for individual Canadian projects; and (iv) a list of updates and issues encountered on the individual Canadian projects." (*Id.* ¶¶ 64, 65).

The defendants argue that the plaintiffs' "vague" allegations about the defendants' involvement in making cost estimates do not support a strong inference of scienter. (Docket Entry No. 66, at 27). First, as the defendants argue, even though the complaint allegations about the information CW1 and CW2 provided are pleaded with particularity, the fact that they are from confidential sources "detract[s] from their weight in the scienter analysis." (*Id.*) (quoting *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011)) (quotations omitted). Second, the defendants contend that the amended complaint did not allege facts suggesting that the Individual Defendants knew that the estimated costs for the Canadian contracts were wrong. There "is no allegation that there were any 'reports' contradicting what was publicly disclosed, or that the Individual Defendants ever received such 'reports.'" (Docket Entry No. 66, at 27) (citation omitted).[16] The defendants argue that a strong inference of scienter cannot arise without allegations that the Individual Defendants had information about the problems with the seven Canadian contracts. (Docket Entry No. 66, at 27). In *In re Dell Inc., Securities Litigation*, 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008), the plaintiffs alleged that the defendant's senior executives had unfettered access to Dell's

---

[16] The defendants also argue that the plaintiffs impermissibly used group pleading in alleging that "senior management" received the reports. (Docket Entry No. 66, at 27–28). But the amended complaint specifically alleged that the Individual Defendants were ELT members who received monthly reports and attended the meetings with Karl Roberts in Houston.

financial information, oversaw the accounting functions, and were responsible for high-level financial decisions. According to the plaintiffs, these defendants must have known or been reckless in not knowing that the financial documents they approved "contained erroneous information." *Id.* The court held that "[w]ithout specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the pleadings are simply too vague to support a strong inference of scienter." *Id.* Even though the defendants allegedly proclaimed their intimate knowledge of the company's operations, there were no allegations that they approved statements they knew were fraudulent or were severely reckless in not having this knowledge. *Id.*

In *Shaw*, the plaintiffs alleged that the defendants "must have known of the irregularities" because of their positions in the company and their hands-on management style. 537 F.3d at 535. The court held that "a CEO's boasting 'there is nothing in this company I don't know' was insufficient" to support a strong inference of scienter. *Id.* Scienter pleadings "may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company," *id.* (quoting *Abrams*, 292 F.3d at 432), and the fact that it "derive[s] from confidential sources further detracts from their weight in the scienter analysis." *Id.*

The amended complaint does not rest on "must have known" allegations. The complaint "alleges that the ELT Reviews told the Individual Defendants that KBR lacked drawings necessary to define the 'scope of work' (and, thus, reliably estimate costs)." (Docket Entry No. 67, at 27); (Docket Entry No. 60, ¶¶ 25, 62–65). Paragraph 65, for example, alleges that the defendants received materials providing that information. (Docket Entry No. 60 ¶ 65). Paragraph 110 reiterates the allegations about Ferraioli's statement. (*Id.* ¶ 110). The amended complaint sufficiently alleges that KBR lacked design drawings needed to make GAAP-compliant initial cost estimates on the Canadian contracts and that the Individual Defendants knew this when they made statements touting the

contracts. These allegations preclude granting the motion to dismiss on this issue.

>    **9.    Whether the Defendants' Decades of Accounting Experience Support a Strong Inference of Scienter**

The amended complaint alleges that the Individual Defendants' "decades of accounting experience further support a strong inference of severe recklessness." (Docket Entry No. 60 ¶ 123). Utt was CEO of KBR for eight years and had more than twenty years of financial experience in the engineering and construction industries; Carter was CFO of KBR for four years and had nearly thirty years of accounting experience in similar industries. (*Id.*). Baldwin was CAO of KBR for four years and had twenty-six years of accounting experience in these industries; and Ferraioli served as interim CEO during the class period and had thirty-four years of accounting experience in similar industries before joining KBR. (*Id.*). The amended complaint alleges that their experience "further demonstrates [their] severe recklessness in misstating KBR's financial results to such an extraordinary degree." (*Id.*).

These allegations fail to show a strong inference of scienter. Scienter cannot rest "on the inference that defendants must have been aware of the misstatement based on their position with the company." *Abrams*, 292 F.3d at 432. The defendants' years of accounting experience is a variation that adds some, but not enough, detail to the allegation that a high-level position within the company and the commensurate access to information shows scienter. Because the defendants had the skills or knowledge to identify an accounting violation does not mean that they had information about the violation alleged here.

54

### 10.    The Scienter Allegations in the Aggregate

Even if the lack of design drawings alone do not give rise to a strong inference of scienter, they do when viewed in context with the other allegations about the Individual Defendants' repeated statements praising the Canadian construction contracts, about the magnitude of the revenue overstatements, and about the failure to discover these issues in light of a different, but related, material weakness finding.    Considered in the aggregate, the amended complaint allegations sufficiently support scienter if KBR lacked design drawings, not just issued-for-construction drawings and the Individual Defendants knew, or were severely reckless in not knowing, of their absence. "When the allegations are accepted as true and taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Tellabs I*, 551 U.S. at 325.

## IV.    Control-Person Liability Under Section 20(a) of the Exchange Act

The plaintiffs alleged that Baldwin, Carter, Ferraioli, and Utt are liable as control persons under § 20(a) of the Exchange Act. (Docket Entry No. 60 ¶ 200–04).  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Securities Corp.*, 365 F.3d at 383.  Because the defendants' motion to dismiss has been denied, the plaintiffs' § 20(a) claims survive.

## V.    Conclusion

The defendants' motion to dismiss, (Docket Entry No. 66), is denied.  A status and scheduling conference is set for September 28, 2015, at 5:00 p.m., to consider and set a scheduling order for discovery, subsequent motions, and trial.

SIGNED on September 3, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge